## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, and | ) ) ) | |
| NETCHOICE, LLC, | ) ) | |
| *Plaintiffs*, | ) ) ) | Civil Action No. 1:24-cv-849 |
| v. | ) ) | |
| KEN PAXTON, in his official capacity as Attorney General of Texas, | ) ) ) | |
| *Defendant*. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Texas House Bill 18, 2023 Tex. Sess. Law Serv. Ch. 795 ("HB18"), attached as Ex. 1, is Texas's latest attempt to regulate online speech and information—and control access to it. Just like its last attempt, Texas has enacted a law targeting disfavored online publishers and their dissemination of protected, valuable expression online. And just like last time, "Texas's" new "law does not pass" First Amendment scrutiny. *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2407 (2024). In addition to its burden on disfavored speakers, HB18 would require these websites to affirmatively block some content on minors' accounts.[1] A State's "legitimate power to protect children from harm . . . does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794-95 (2011). And it certainly does not allow governments to regulate minors' access to speech in ways that also limit *adults'*

---

[1] This Complaint collectively refers to websites, applications, and other digital services as "websites" and it refers to websites within the scope of the Act's regulation—including members' websites identified in ¶ 13—as "covered websites."

access to protected speech. These principles apply with equal force online: governments cannot "regulate ['social media'] free of the First Amendment's restraints." *Moody*, 144 S. Ct. at 2399. That is why district courts across the country have enjoined other States' attempts to impede access to online speech. *E.g.*, *NetChoice, LLC v. Fitch*, 2024 WL 3276409 (S.D. Miss. July 1, 2024) (enjoining age-verification, parental-consent, and monitoring-and-censorship law); *NetChoice, LLC v. Yost*, 2024 WL 555904 (S.D. Ohio Feb. 12, 2024) (enjoining parental-consent law); *NetChoice, LLC v. Bonta*, 692 F. Supp. 3d 924 (N.D. Cal. 2023) (enjoining law requiring age-estimation and "design" changes to social media websites ); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) (enjoining age-verification and parental-consent law).

2.      Plaintiffs' members' websites regulated by the Act—including Facebook, Instagram, Nextdoor, Pinterest, Snapchat, X and YouTube—allow "adults and minors" "to engage in a wide array of protected First Amendment activity on topics as diverse as human thought." *Griffin*, 2023 WL 5660155, at *5 (cleaned up). These websites allow users to "read the news, connect with friends, explore new interests, and follow their favorite sports teams and their dream colleges, as well as showcase their creative talents to others, raise awareness about social causes, and participate in public discussion on the hottest topics of the day." *Id.* at *6 (cleaned up).

3.      Yet HB18 would make it much more difficult for Plaintiffs' members to allow minors to continue accessing their services. This lawsuit challenges only the parts of HB18 that regulate Plaintiffs' member companies with "social media" websites. *See* Tex. Bus. & Com. Code §§ 509.001-590.002, 509.051-509.056, 509.058-509.059, 509.101-509.104, 509.151. Thus, this Complaint's references to "HB18" refer only to these provisions, rather than all of HB18.

4.      HB18 regulates a content-based, speaker-based, and vague collection of social media websites. It uniquely burdens those websites' abilities to continue offering their services to

minors. The law excludes, among others, websites that "provide a user with access to news, sports, [and] commerce" and websites that do not allow interaction at all. *Id.* § 509.002(b)(10)(A). As one consequence of the Act's haphazard collection of regulated social media websites, minors are free to encounter speech the Act expressly prohibits on websites left unregulated by the Act. Relying on the Act's unconstitutional definition, HB18 mandates that covered websites adopt many costly requirements. Thus, every operative provision of HB18 that burdens speech dissemination and restricts speech access relying on this flawed definition is unconstitutional as well. *See id.* §§ 509.001-590.002, 509.051-509.056, 509.101-509.104.

5. One of HB18's operative provisions is also individually unconstitutional and preempted because it purports to regulate the speech that minors can see on those websites.

6. HB18 requires websites to monitor and censor—including by "block[ing]"—content-based and viewpoint-based categories of speech available on minors' accounts. *Id.* §§ 509.053, 509.056(1). These are broad, subjective, and vague categories of speech that HB18 calls to be censored. They reach everything from classic literature such as *The Bell Jar*, to modern media like *13 Reasons Why*, to political discussions—and much more. The $10,000 penalty per violation of the statute will chill the publication of yet more protected speech. The First Amendment abhors such prior restraints on speech. Furthermore, Congress in 47 U.S.C. § 230 ("Section 230") expressly preempted state attempts to require websites to monitor speech or impose liability for imperfect content moderation. 47 U.S.C. § 230(c)(1), (e)(3). On top of these requirements' illegality, they are *unnecessary*. Websites already engage in "content moderation," which is how websites identify and address (including restricting access to) content they consider to be objectionable and harmful. Troublingly, HB18 would require websites to change these effective voluntary processes as well because HB18 also directs the technical means by which the websites must

monitor and censor HB18-prohibited content. In other words, HB18 imposes a one-size-fits-all content-moderation scheme to further HB18's monitoring-and-censorship requirement. Adopting HB18's mandated means of content moderation will require Plaintiffs' members to eschew the content-moderation enforcement capabilities they have developed and replace them with state-mandated techniques that will not be tailored to address the unique content-moderation hurdles that each member faces.

7.     For these reasons and more, this Court should facially enjoin Defendant from enforcing the provisions of HB18 challenged in this lawsuit and declare them facially unlawful.

8.     Alternatively, this Court should enjoin Defendant from enforcing the provisions of HB18 challenged in this lawsuit as applied to Plaintiffs' members, and declare them unlawful as applied to Plaintiffs' members.

## PARTIES AND STANDING

9.     **Plaintiffs.** Plaintiff Computer & Communications Industry Association ("CCIA") is a non-profit entity organized under Section 501(c)(6) of the Internal Revenue Code incorporated in the Commonwealth of Virginia.[2] For more than 50 years, CCIA has promoted open markets, open systems, and open networks.

10.     Plaintiff NetChoice, LLC is a District of Columbia nonprofit trade association for Internet companies.[3] NetChoice's mission is to promote online commerce and speech and to

---

[2] CCIA's members are listed at CCIA, Members, https://perma.cc/P48B-QWY3.
[3] NetChoice's members are listed at NetChoice, About Us, https://perma.cc/MJ4R-SWH2.

increase consumer access and options through the Internet, while minimizing the burdens that would prevent businesses from making the Internet more accessible and useful.

11.     Plaintiffs have standing to bring their challenges on multiple grounds.

12.     Plaintiffs have associational standing because: (1) some of their members have standing, as those members are "the object" of HB18's regulation and face substantial liability, *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019); (2) challenging HB18 is germane to Plaintiffs' missions; and (3) members' individual participation is unnecessary in this purely legal challenge.

13.     Based on HB18's definitions, *see infra* ¶¶ 36-42, HB18 regulates services of members of Plaintiffs' organizations, including: (1) Google, which owns and operates YouTube; (2) Meta, which owns and operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; (5) Snap Inc., which owns and operates Snapchat; and (6) X. This Complaint refers to members with HB18-regulated services as simply "members." These members are "digital service provider[s]," that own and/or operate "digital services" that are not otherwise subject to any exceptions from the Act's coverage. Tex. Bus. & Com. Code §§ 509.001(1)-(2), 509.002.

14.     Plaintiffs and their members also have standing to assert the First Amendment rights of their users—current and prospective. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988); *Fitch*, 2024 WL 3276409, at *7; *Yost*, 2024 WL 555904, at *5; *Bonta*, 692 F. Supp. 3d at 939; *Griffin*, 2023 WL 5660155, at *11-12.

15.     **Defendant.** Defendant Ken Paxton is Attorney General of Texas. He is a resident of Texas and is sued in his official capacity. HB18 grants the Texas "attorney general's office" enforcement authority. Tex. Bus. & Com. Code § 509.151.

## JURISDICTION AND VENUE

16.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

17.    This Court has personal jurisdiction over Defendant, because he resides in and/or conducts a substantial proportion of his official business in Austin, Texas. Venue is proper in this District under 28 U.S.C. § 1391(b) because the only Defendant resides in, and the events giving rise to this civil action occurred in, Austin, Texas.

## BACKGROUND

18.    **Plaintiffs' members' websites disseminate and facilitate speech protected by the First Amendment.** Social media websites such as Plaintiffs' members' covered services "engage[] in expression" through their "display" and "compiling and curating" of protected "third-party speech." *Moody*, 144 S. Ct. at 2393, 2401. They "allow[] users"—both minors and adults—"to gain access to information[,] communicate with one another," and "engage in a wide array of protected First Amendment activity." *Packingham v. North Carolina*, 582 U.S. 98, 105, 107 (2017).

19.    Minors—like adults—use covered websites to engage in speech that is entitled to First Amendment protection from governmental interference. On these websites, minors can "take positions on and engage with others in pursuit of the type of 'political, social, economic, educational, religious, and cultural' activities" protected by the First Amendment. *Fitch*, 2024 WL 3276409, at *10; *see Yost*, 2024 WL 555904, at *7; *Griffin*, 2023 WL 5660155, at *5-6. "On Facebook, . . . users can debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 582 U.S. at 104. Instagram allows people to post and view photos and videos, comment on them, learn about and advocate for the causes they care about, showcase their art

or athletic talent, and hear from their local government officials. On Nextdoor, users can connect with neighbors, share local news, and borrow tools. Pinterest allows users to explore recipes, home decor, and more. Snapchat is designed to allow users to have digital conversations with friends and family in ways that replicate real-life interactions. On X (formerly Twitter), "users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. And YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions.

20.     **Existing options for parental control and oversight.** Parents have many existing options to regulate whether and how their minor children use the Internet.

21.     Parents can decide whether and when to let their minor children use computers, tablets, smartphones, and other devices to access the Internet.

22.     Cellular and broadband Internet providers offer families tools to block certain online services on devices using a particular cellular, Wi-Fi, or broadband network (such as that used in the minor's home). *See, e.g.*, Verizon, Verizon Smart Family, https://perma.cc/RE78-EPNM; AT&T, AT&T Secure Family, https://perma.cc/TH9L-FQFP; T-Mobile, Family Controls and Privacy, https://perma.cc/7KEM-MJUW; Comcast Xfinity, Set Up Parental Controls for the Internet, https://perma.cc/5TTJ-MBDP.

23.     Internet browsers also allow parents to control what online services their children may access. *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://perma.cc/P6UM-CUWA. For example, some browsers offer a "kids mode" or enable parents to see what online services their children are accessing the most. *See* Google, Safety Center, https://perma.cc/U6A7-8TRJ; Microsoft, Learn More About Kids Mode in Microsoft Edge, https://perma.cc/8B98-QZK9. Parents can also use widely available third-party software and

browser extensions to reinforce these tools. *See, e.g.*, Kim Key, *The Best Parental Control Software for 2024*, PCMag (Dec. 15, 2023), https://perma.cc/HD2W-VAEK.

24. Wireless routers often have settings allowing parents to block particular websites, filter content, monitor Internet usage, and control time spent on the Internet. *See, e.g.*, Netgear, Netgear Smart Parental Controls, https://perma.cc/KVS3-9N6T; tp-link, How to Configure Parental Controls on the Wi-Fi Routers (case 1) (June 27, 2022), https://perma.cc/U8MC-7MPD.

25. Device manufacturers allow parents to limit the time spent on the device, curtail the applications that can be used, filter online content, and control privacy settings. *See* Apple, Use Parental Controls on Your Child's iPhone and iPad, https://perma.cc/3K6X-KE7M; Google Family Link, Help Keep Your Family Safer Online, https://perma.cc/P3CE-2H37; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/T283-99QY; Samsung, Parental Controls Available on Your Galaxy Phone or Tablet, https://perma.cc/YH4P-LF67.

26. Many third-party applications also allow parents to control and monitor their children's online activities. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps in 2024, Tested by Our Editors*, CNN Underscored (Mar. 11, 2024), https://perma.cc/W929-XH5C.

27. In addition, Plaintiffs' members provide parents with tools and options to help parents manage their children's online activities. For example, Facebook and Instagram offer supervision tools and resources that empower parents and teens to work together to set time limits and schedule breaks; allow parents to see whom their teen follows and who follows their teen; allow parents to see which accounts their teen is currently blocking; enable parents to view their teen's account settings for sensitive content, privacy, and messaging; and empower teens to notify their parents when they block or report someone. Similarly, Snapchat's "Family Center" allows parents

to see which friends the teen has been recently communicating with on Snapchat, view their list of friends, restrict sensitive content, and report abuse.

28.     All Plaintiffs' members prohibit minors under 13 from accessing their main services, although some offer separate experiences for users under 13 geared for that age group. For example, YouTube offers two services (YouTube Kids and a "Supervised Experience" on YouTube) for minors younger than 13 with parental consent. These services allow parents to select content settings, set screen time limits, and otherwise oversee their children's use of the services.

29.     **Plaintiffs' members engage in effective content moderation.** Plaintiffs' members expend vast resources to improve their services and curate the content that users post to best ensure that it is appropriate for users, especially with respect to minors.

30.     Covered websites publish diverse content for diverse audiences, but they face the common problem of how to address objectionable and harmful content. For members' communities to flourish, users must feel comfortable expressing themselves. Accordingly, Plaintiffs' members take special care to try to prevent minor users from encountering objectionable and harmful speech. And Plaintiffs have challenged other state laws—including a separate Texas law—to preserve their members' abilities to do so. *E.g.*, *Moody*, 144 S. Ct. at 2394-97.

31.     Plaintiffs' members have undertaken extensive efforts to develop robust policies and processes for prohibiting, detecting, and removing (or restricting access to) objectionable and harmful speech covered by HB18. *See* Tex. Bus. & Com. Code § 509.053(a).

32.     This objectionable content can take many forms. Some of that content is illegal, like child sexual abuse material ("CSAM"). *See* NetChoice, By the Numbers: What Content Social Media Removes and Why 1, https://perma.cc/YSB8-R3Y4 [hereinafter, "By the Numbers"]. Some of that content is lawful yet considered objectionable by many. *See id.* at 9-13. And some of that

speech simply violates websites' particular rules for what speech they want to disseminate within their own online communities. *E.g.*, Nextdoor, Teens on Nextdoor, https://perma.cc/H793-4FH9 ("Nextdoor is intended primarily for neighbors to share community-related information.").

33.    Plaintiffs' members' voluntary content-moderation efforts are effective. A NetChoice report concluded that the "rate of violative content removed from platforms and the level at which it is removed prior to being seen by users makes clear companies are successfully prioritizing the safety of their users." By the Numbers at 13.

34.    Plaintiffs' members have also been at the forefront of developing new technologies to identify objectionable and harmful content. *E.g.*, Google, Fighting Child Sexual Abuse Online, https://perma.cc/D4EJ-XYX6.

## TEXAS HOUSE BILL 18

35.    HB18 imposes overly broad and extremely costly regulations that redefine websites' obligations for all minors—including Plaintiffs' regulated members and services identified in ¶ 13. Tex. Bus. & Com. Code § 509.001(5) (defining "minor" to include all those under 18). In addition to enforcement by Defendant, HB18 creates a separate private right of action that threatens websites with countless individual lawsuits. *Id.* § 509.152. HB18 takes effect September 1, 2024.

36.    **Coverage definition of regulated websites that is content-based, speaker-based, and vague (Tex. Bus. & Com. Code §§ 509.001(1)-(2), 509.002)).** The "actors" HB18 regulates are social media websites that disseminate and facilitate user-generated speech. *Moody*, 144 S. Ct. at 2398. These "actors" include the members and services identified in ¶ 13.

37.     HB18 regulates "digital service provider[s]," defined to include any owner or operator of any "website," "application," "program, or software that collects or processes personal identifying information" and:

(1)     "determines" both the "means" and the "purpose of collecting and processing the personal identifying information of users," Tex. Bus. & Com. Code § 509.001(1)-(2);
(2)     "connects users in a manner that allows users to socially interact with other users on the digital service," *id.* § 509.002(a)(1);
(3)     "allows a user to create a public or semi-public profile for purposes of signing into and using the digital service," *id.* § 509.002(a)(2);
(4)     "allows a user to create or post content that can be viewed by other users of the digital service, including sharing content on: (A) a message board; (B) a chat room; or (C) a landing page, video channel, or main feed that presents to a user content created and posted by other users," *id.* § 509.002(a)(3).

38.     This coverage definition is limited to social media websites through its requirement that users must be able to "socially interact with other users." The word "socially" requires a form of communication that can be seen publicly by more than one other individual (including other registered users). *Id.* § 509.002(a)(1).

39.     So this coverage definition does not include individual-to-individual communication. It also does not include services like ride-sharing services or e-commerce websites (which also have their own express exception, detailed below),

40.     That is confirmed by the coverage definition's examples of covering "a message board," "a chat room," and "a landing page, video channel, or main feed." All these present speech for multiple other people to see in some non-private fashion. *Id.* § 509.002(a)(3).

41.     *Moody* applied full First Amendment protection to websites that work in exactly this way—to "allow users to upload content . . . to share with others" and allow those "viewing the content . . . to react to it, comment on it, or share it themselves." 144 S. Ct. at 2394-95.

42.     This definition is subject to a litany of content-based, speaker-based, and vague exceptions, including for "news, sports, [and] commerce" websites:

(1) a state agency or a political subdivision of this state;

(2) a financial institution or data subject to Title V, Gramm-Leach-Bliley Act (15 U.S.C. Section 6801 et seq.);

(3) a covered entity or business associate governed by the privacy, security, and breach notification rules issued by the United States Department of Health and Human Services, 45 C.F.R. Parts 160 and 164, established under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. Section 1320d et seq.), and the Health Information Technology for Economic and Clinical Health Act (Division A, Title XIII, and Division B, Title IV, Pub. L. No. 111-5);

(4) a small business as defined by the United States Small Business Administration on September 1, 2024;

(5) an institution of higher education;

(6) a digital service provider who processes or maintains user data in connection with the employment, promotion, reassignment, or retention of the user as an employee or independent contractor, to the extent that the user's data is processed or maintained for that purpose;

(7) an operator or provider regulated by Subchapter D, Chapter 32, Education Code, that primarily provides education services to students or educational institutions;

(8) a person subject to the Family Educational Rights and Privacy Act of 1974 (20 U.S.C. Section 1232g) that:

    (A) operates a digital service; and

    (B) primarily provides education services to students or educational institutions;

(9) a digital service provider's provision of a digital service that facilitates e-mail or direct messaging services, if the digital service facilitates only those services; or

(10) a digital service provider's provision of a digital service that:

    (A) primarily functions to provide a user with access to news, sports, commerce, or content primarily generated or selected by the digital service provider; and

    (B) allows chat, comment, or other interactive functionality that is incidental to the digital service.

Tex. Bus. & Com. Code § 509.002(b).

43.     From this central definition, HB18 regulates a defined set of "activities." *Moody*, 144 S. Ct. at 2398.

44.     **Monitoring and censorship of online speech based on content and viewpoint. (Tex. Bus. & Com. Code §§ 509.053, 509.056(1)).** HB18 requires covered websites—including the members and services identified in ¶ 13—to monitor and censor content-based and viewpoint-

based categories of speech using specific (and perhaps exclusive) technological means: "develop and implement a strategy to prevent [a] known minor's exposure to" defined categories of prohibited speech. Tex. Bus. & Com. Code § 509.053(a).

45.     *Categories of prohibited content.* HB18 requires websites to monitor and censor speech, much of which is speech protected by the First Amendment. Because of HB18's broad, vague, and subjective categories of prohibited speech, websites will be forced to moderate all content that even arguably implicates these prohibited categories of speech. They will do so out of an abundance of caution to avoid enforcement and the risk of steep monetary penalties.

46.     First, HB18 identifies content "that promotes, glorifies, or facilitates" (1) "suicide, self-harm, or eating disorders"; (2) "substance abuse"; (3) "stalking, bullying, or harassment"; or (4) "grooming, trafficking, child pornography, or other sexual exploitation or abuse." *Id.* HB18 does not define any of these terms, nor does it limit them to speech unprotected by the First Amendment. Many of these categories are viewpoint-based and subjective.

47.     Second, HB18 identifies "harmful material," which HB18 defines to incorporate another preexisting prohibition under Texas criminal law for obscenity for minors. *Id.* § 509.001(3) (incorporating Tex. Pen. Code § 43.24).

48.     Under HB18's plain terms, prohibited speech can include political speech, critically lauded works of fiction, and everyday interpersonal communications. For instance, many protected works at least arguably "promote[], glorif[y], or facilitate[]"—

- "Substance abuse": Everyday communication about the use of illegal drugs or alcohol often "glorifies" what is arguably substance abuse. And pop culture is full of such expression, such as Toby Keith's *Weed with Willie* (2003), The Weeknd's Kids'-Choice-Award-nominated *Can't Feel My Face* (2016), and multiple Emmy-Award-winning series such as *Euphoria* (2019-present).

- "Suicide, self-harm, or eating disorders": Discussions about assisted suicide for terminal illnesses are politically and culturally relevant. *E.g.*, Peter Singer, *Practical Ethics*

(1993). And such topics run throughout literature and pop culture, such as William Shakespeare's *Romeo and Juliet* (1597), Kate Chopin's *The Awakening* (1899), Sylvia Plath's *The Bell Jar* (1963), and television shows like *13 Reasons Why* (2017-2020).

- "Stalking, bullying, or harassment": These topics are often depicted, and even romanticized, in works such as *The Phantom of the Opera* (1910), the musical *Chicago* (1975), The Police's *Every Breath You Take* (1983), the television series *Kitchen Nightmares* (2007-2014), numerous horror movies (*Halloween*, *Scream*, *I Know What You Did Last Summer*), and entire categories at large bookstores, *e.g.*, Stalking – Fiction, Barnes & Noble, https://perma.cc/VX92-257V.

- "Grooming, trafficking, child pornography, or other sexual exploitation or abuse": As the Supreme Court has recognized, even "teenage sexual activity and the sexual abuse of children" has "inspired countless literary works" protected by the First Amendment, such as "Romeo and Juliet" and the Oscar-winning movie "American Beauty." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 247-48 (2002).

49.     Additional examples of what qualifies for censorship under HB18 will often be open to debate. Speech's meaning often depends on subjective considerations like context (immediate and societal), the nuances of human language, and the intent and understanding of users.

50.     HB18's governmental restrictions cannot be justified on the basis that there is some overlap between content prohibited by HB18 and the content addressed under Plaintiffs' members' voluntary content-moderation policies. First, HB18 is a *governmental* demand to monitor and remove speech, which violates both the websites and their users' rights. Second, HB18 sweeps in more protected speech than members' current policies, and the threat of liability will chill the dissemination of a broad range of speech.

51.     *Required means of monitoring and censorship.* HB18 prescribes in detail the technical means by which covered websites must monitor and censor speech.

52.     Specifically, websites' "strateg[ies]" to prevent minors' exposure to prohibited content "*must* include":

(A)     creating and maintaining a comprehensive list of harmful material or other content described [above] to block from display to a known minor;

(B)     using filtering technology and other protocols to enforce the blocking of material or content on the list [above];

(C)     using hash-sharing technology and other protocols to identify recurring harmful material or other content described [above];

(D)     creating and maintaining a database of keywords used for filter evasion, such as identifiable misspellings, hash-tags, or identifiable homoglyphs;

(E)     performing standard human-performed monitoring reviews to ensure efficacy of filtering technology;

(F)     making available to users a comprehensive description of the categories of harmful material or other content described [above] that will be filtered; and

(G)     except as provided by Section 509.058, making available the digital service provider's algorithm code to independent security researchers.

Tex. Bus. & Com. Code § 509.053(b)(1) (emphasis added).

53.     HB18's required strategies are ineffectual at finding certain kinds of content or are blunt instruments that will sweep in great amounts of protected speech.

54.     For example, hash-matching technology is a useful tool for identifying content like *copies* of CSAM and terrorist content "that ha[ve] been *previously identified*." Susan Jasper, *How We Detect, Remove and Report Child Sexual Abuse Material*, Google: The Keyword (Oct. 28, 2022), https://perma.cc/XBS9-L44S (emphasis added). Because hash-matching relies on "previously identified" *visual* content that is then reproduced, it is not an effective tool for (1) *non-image-based* content, like text posts; or (2) *new* content. Consequently, hash-matching is not an effective tool for the kinds of content that are generated at an enormous scale every second of every day.

55.     Filtering can be a better tool for new and text-based content, but it is a blunt instrument. It relies on identifying certain terms, but the meaning of those terms is often defined by context. Thus, filtering is unlikely to be a reliable way to distinguish between, *e.g.*, glamorizing, denigrating, or merely discussing substance abuse. Requiring use of filtering is likely to result in overinclusive moderation. *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 201 (2003).

HB18's requirements for "creating and maintaining a *comprehensive list* of" prohibited content and "creating and maintaining a database of keywords used for filter evasion" do not solve these problems. Tex. Bus. & Com. Code § 509.053(b). An almost unquantifiable amount of new content is generated every day, so a "comprehensive list" would be impossible to compile. And even if websites already have something akin to HB18-required "databases" of prohibited terms, the problem with "filter evasion" is that "evasion" techniques constantly evolve. *Id.*

56.     Finally, it is unclear whether HB18 permits websites to use technologies that are *not* listed, because the statute identifies both mandatory ("must include") and permissible means ("may include"). *Id.* § 509.053(b)(2). If HB18 limits the technologies that websites can use, HB18 will make websites *less effective* at content moderation. For instance, some members use machine-learning technologies that do not operate precisely the same way as hashing or filtering.

57.     Plaintiffs' members have determined that it would be ineffectual or uneconomical to employ all the technological tools HB18 demands for all kinds of prohibited content. For instance, websites largely do not use hash-matching technology for content related to substance abuse. And websites use more than just hashing and filtering to moderate content, yet HB18 may not allow use of those alternative methods. These requirements may therefore result in websites removing *less* objectionable and harmful speech and removing *more* permissible speech that complies with websites' policies. That would make all users worse off.

58.     HB18 also provides that "[n]othing . . . may be construed to require a [website] to disclose a trade secret." *Id.* § 509.058. But members' "algorithm code[s]" are trade secrets. *Id.* § 509.053(b)(1)(G). Thus it is unclear which provision should prevail.

59.     In addition to those mandatory requirements, websites' "strateg[ies] *may* include":

(A)     engaging a third party to rigorously review the digital service provider's content filtering technology;

(B)     participating in industry-specific partnerships to share best practices in pre-
venting access to harmful material or other content described [above]; or

(C)     conducting periodic independent audits to ensure:

(i)     continued compliance with the digital service provider's strategy;
and

(ii)     efficacy of filtering technology and protocols used by the digital ser-
vice provider.

*Id.* § 509.053(b)(2) (emphasis added).

60.     Websites that "use[] algorithms to automate the suggestion, promotion, or ranking
of information" must "make a commercially reasonable effort to ensure that the algorithm does
not interfere with the digital service provider's duties." *Id.* § 509.056(1).

61.     **Age-challenge, parental-verification, parental-tool, and disclosure require-
ments (Tex. Bus. & Com. Code §§ 509.051-509.052, 509.054-509.056, 509.101-509.103).** HB18
imposes a series of requirements for covered websites—including members' services identified in
¶ 13—to "register" the ages of their users before those users can create an account, provide a pro-
cess for parents to dispute the ages of their minor children, and provide a process to "verify" the
relationship between a parent and a minor user. These requirements are designed to identify
"known minors" and "verified parents"—which triggers HB18's operative provisions restricting
speech. *Id.* § 509.051(d), (e).

62.     These requirements are burdensome and could operate as infringements on minors'
access to speech on the websites. And compliance difficulties may make websites stop offering
their services to minors—or to cease operation altogether—limiting the public's access to speech.

63.     *Age registration.* HB18 provides that websites "may not enter into an agreement
with a person to create an account with a digital service unless the person has registered the per-
son's age with the" website. *Id.* § 509.051(a).

64.     HB18 limits users' ability to "to alter the person's registered age, unless the altera-tion process involves a commercially reasonable review process." *Id.* § 509.051(c). So if an adult mistypes his birth year and registers as a minor, he cannot change his registered age—and access the full range of speech on the website—unless that website has adopted a "commercially reason-able review process" requiring yet more personal information. *Id.*

65.     HB18 requires both burdensome age registration and also age *verification* of both the parent and child whenever someone tells a covered website that a user is purportedly the par-ent's minor child.

66.     *Age challenge.* HB18 allows *parents* to dispute the ages of their purportedly minor children: "[P]arent[s] or guardian[s], including a verified parent," may also inform the websites that a user is a minor, including by (1) "notif[ying]" a website "that the minor is younger than 18 years of age"; (2) "successfully disput[ing] the registered age of the minor"; (3) "perform[ing] another function of a parent or guardian under this chapter." *Id.* § 509.051(d)(2). Once identified as a minor by her parent, a user must be treated as a "known" minor. *Id.* § 509.051(e).

67.     Any user on the website could be subject to a dispute about his age that would require the user to provide proof of his age and identity—in an effort to defend against a dispute. And thus every time a user signs up for an account, he runs the risk of having to provide yet more personal information to the website.

68.     *Parental verification.* HB18 provides websites "shall verify, using a commercially reasonable method and for each person seeking to perform an action on a digital service as a mi-nor's parent or guardian: (1) the person's identity; and (2) the relationship of the person to the known minor." *Id.* § 509.101(a).

69. HB18 does not define how a website can verify the identity of a parent. Yet verifying the relationship between a minor user and a parent is difficult: "the biggest challenge you have . . . is actually establishing the relationship, the parental relationship. . . . [A]ctually establishing that that is a parent or a legal guardian, that's the challenge with those processes." *Griffin*, 2023 WL 5660155, at *4. These difficulties are compounded when, *e.g.*, families are nontraditional, family members have differences in last name or address, parents disagree with each other about consent, minors are unsafe at home, or parental rights have been terminated.

70. *Parental tools.* Once verified as a parent, websites must allow the parent to exercise a variety of onerous-to-develop parental tools. *See* Tex. Bus. & Com. Code §§ 509.052, 509.054, 509.102-509.103.

71. *Disclosures.* HB18 requires covered websites that "use[] algorithms to automate the suggestion, promotion, or ranking of information to known minors" to "disclose . . . in a clear and accessible manner, an overview of": (1) "the manner in which the digital service uses algorithms to provide information or content"; (2) "the manner in which algorithms promote, rank, or filter information or content"; and (3) "the personal identifying information used as inputs to provide information or content." *Id.* § 509.056(2).

\*     \*     \*

72. In total, the Act will impose large, speech-chilling burdens on covered websites—including Facebook, Instagram, Nextdoor, Pinterest, Snapchat, X, and YouTube. These websites will be required to monitor for and censor content- and viewpoint-based categories of speech—including protected speech. *Id.* §§ 509.053, 509.056(1). In addition to the First Amendment harms inherent to such governmental regulations of speech, the Act imposes the precise technical means by which websites must comply with this requirement—which will obligate websites to alter their

current content-moderation systems. They must also adopt costly and burdensome age-challenge, parental-verification, and parental-tool systems. *Id.* §§ 509.051-509.052, 509.054-509.056, 509.101-509.103. Adopting these systems will burden the dissemination of speech on a content-based and speaker-based collection of websites, while other websites excluded from the Act's scope may disseminate speech free of these requirements. Finally, covered websites—and covered websites alone—will need to make disclosures about their use of algorithms. *Id.* § 509.056(2). In all, these requirements will be costly and complicated for websites to implement—and many websites will not be able to implement them at all. Rather than undertaking all the costly obligations that HB18 imposes, many websites will have no choice but to forbid minors from accessing their websites. Because even websites limited to adults will need to comply with the age-challenge process, some websites may cease operation altogether.

## CLAIMS

73.     Plaintiffs raise both (1) a *facial* challenge to Tex. Bus. & Com. Code §§ 509.001-590.002, 509.051-509.056, 509.101-509.104; and (2) a challenge to the same provisions *as applied* to the members and services identified in ¶ 13.

74.     For all First Amendment claims, the facial challenge standard asks whether "a substantial number of [HB18's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 144 S. Ct. at 2397 (citation omitted). At a minimum, HB18 is invalid to the extent it regulates "social media" websites, including as applied to Plaintiffs' members' regulated services identified in ¶ 13. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by Plaintiff).

75.     Each First Amendment challenge raises the rights of both Plaintiffs' members and those individuals who use or could prospectively use members' websites.

**Requirements for "Digital Service Providers"**
**(Tex. Bus. & Com. Code §§ 509.001-590.002,**
**509.051-509.056, 509.058-509.059, 509.101-509.104, 509.151)**

**COUNT I**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE**
**STATES THROUGH THE FOURTEENTH AMENDMENT**
**(Tex. Bus. & Com. Code §§ 509.001-590.002,**
**509.051-509.056, 509.058-509.059, 509.101-509.104, 509.151)**

76.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

77.     The entire Act and its burdens and restrictions on speech violate the First Amend-
ment because the Act's central coverage definition is content- and speaker-based, triggering and
failing strict scrutiny. The Act singles out a content- and speaker-based collection of websites and
it imposes unique burdens and restrictions on those covered websites—but not other websites left
unregulated by the Act. *See* Tex. Bus. & Com. Code §§ 509.001-590.002, 509.051-509.056,
509.058-509.059, 509.101-509.104, 509.151.

78.     The First Amendment to the U.S. Constitution provides that government "shall
make no Law . . . abridging the Freedom of Speech, or of the Press." U.S. Const. amend. I. The
First Amendment protects "publish[ing]," *Reno v. ACLU*, 521 U.S. 844, 852-53 (1997); "dissem-
inat[ing]," *303 Creative v. Elenis*, 600 U.S. 570, 594 (2023); and "creating, distributing, [and]
consuming" speech, *Brown*, 564 U.S. at 792 n.1. The First Amendment protects "social-media
platforms." *Moody*, 144 S. Ct. at 2394.

79.     "When the Government restricts speech, the Government bears the burden of prov-
ing the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

80.     The First Amendment's "most basic" principle is that "government has no power
to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*,
564 U.S. at 790-91. The First Amendment also limits government power to enforce "restrictions

21

distinguishing among different speakers, allowing speech by some but not others." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). For one thing, "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Id.* Likewise, "[s]peaker-based laws run the risk that the State has left unburdened those speakers whose messages are in accord with its own views." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 778 (2018) (cleaned up). The Supreme Court's First Amendment precedent is "deeply skeptical of laws that 'distinguish among different speakers, allowing speech by some but not others.'" *Id.* at 777-78 (alterations adopted) (internal quotation marks and citation omitted). Therefore, "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015).

81.     A law is "facially invalid" when it cannot "withstand strict scrutiny." *Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 441 (5th Cir. 2014).

82.     HB18 triggers strict scrutiny because its central definition of "digital service provider" is a content-based and speaker-based definition that pervades the entire law, including §§ 509.001-590.002, 509.051-509.056, 509.058-509.059, 509.101-509.104, and 509.151.

83.     A law "is facially content based . . . if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed*, 576 U.S. at 163).

84.     When the government differentiates based on "content"—such as by treating speech about "news, sports, [or] commerce," Tex. Bus. & Com. Code § 509.002(b)(10), more favorably than speech about political, social, or religious matters—the law is "particularly repugnant to First Amendment principles." *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229 (1987) (emphasis omitted). HB18 regulates only a subset of websites, while the Internet is full of other

websites with objectionable and harmful content. Minors can easily encounter prohibited content in the comments sections on content-based (unregulated) websites that "primarily function[] to provide a user with access to news, sports, commerce." Tex. Bus. & Com. Code § 509.002(b)(10). In fact, minors can find objectionable and harmful content on potentially every website, including websites that would otherwise be covered by HB18's general coverage definition but are expressly excluded from regulation. *Id.* § 509.002(b) (listing expressly excluded websites). Content glorifying substance abuse can just as easily show up in the comments section on a news website as on social media websites. Objectionable and harmful content is also available via analog and physical media, but HB18 leaves such media unregulated.

85.     HB18 is also speaker-based. Laws that "discriminate among media, or among different speakers within a single medium," present very real "dangers of suppression and manipulation" of the medium and risk "distort[ing] the market [of] ideas." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659-60, 661 (1994). Minors can find HB18-prohibited content on websites that lack user-generated content entirely. Tex. Bus. & Com. Code § 509.002(b)(10) (excluding websites with "content primarily generated or selected by the digital service provider"). By distinguishing between websites that "select[]" their own content and websites that disseminate user-generated content, *id.*, HB18 singles out some speakers for favorable treatment while burdening others.

86.     "The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000). Yet HB18 does not satisfy strict scrutiny, which requires a law to be "narrowly tailored" to advance a "compelling" governmental interest. *Reed*, 576 U.S. at 171. HB18 "is either underinclusive or overinclusive, or both, for all the purported government interests at stake." *Yost*, 2024 WL 555904, at *13. Nor can HB18 satisfy any other level of heightened scrutiny.

87.     The State has not "specifically identif[ied]" how HB18's "curtailment of free speech must be actually necessary to the solution." *Brown*, 564 U.S. at 799 (citation omitted). Defendant must demonstrate that there is a problem in need of a *governmental* solution, as compared to private solutions. Defendant also must show that any such governmental solution is the governmental solution that has the least restrictive effect on speech possible. Defendant cannot carry either burden. Parents have a wealth of resources to help oversee their minor children online, and those resources provide families more flexibility than the State's one-size-fits-all mandate. The Supreme Court has repeatedly endorsed similar parental controls over governmental intervention. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 666-67 (2004); *Playboy*, 529 U.S. at 826. Government's desire to "[f]ill[] the [] modest gap" between the "voluntary . . . system[s]" that private entities have voluntarily adopted and what the State has demanded, "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803. Plus, HB18 contains no legislative findings, and certainly nothing to justify the law's infringement on First Amendment rights.

88.     The Act is overinclusive because it sweeps in all kinds of social media websites, without tailoring sufficient to match whatever governmental interests Defendant may assert.

89.     The Act is also overinclusive because it regulates all manner of protected speech, including political and religious speech that lies at the very heart of the First Amendment's protections.

90.     The Act's one-size-fits-all approach is overbroad because it treats all minors alike, from websites' youngest users to seventeen-year-olds, regardless of differences in those minors' developmental stage. *See Reno*, 521 U.S. at 865-66; *Am. Booksellers Ass'n*, 484 U.S. at 396.

91.     HB18's central definitions give the law an arbitrary and overinclusive scope because it chills adult speech by targeting social media websites that allow user-generated content.

92.     The Act's laundry list of exclusions also renders it underinclusive.

93.     The Act's central coverage definition is integral to the entire Act. Without this central definition, no other provision in the Act could operate, and thus the entire Act requires invalidation. Tex. Bus. & Com. Code §§ 509.001-590.002, 509.051-509.056, 509.058-509.059, 509.101-509.104, and 509.151 all rely on the content- and speaker-based definition of "digital service provider."

94.     Unless declared invalid and enjoined, Tex. Bus. & Com. Code §§ 509.001-590.002, 509.051-509.056, 509.058-509.059, 509.101-509.104, and 509.151 will unlawfully deprive Plaintiffs' members of their fundamental First Amendment rights and irreparably harm Plaintiffs, their members, and Internet users.

## COUNT II
### 42 U.S.C. § 1983
### VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS
#### (Tex. Bus. & Com. Code §§ 509.001-590.002,
#### 509.051-509.056, 509.058-509.059, 509.101-509.104, 509.151)

95.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

96.     The entire Act and its burdens and restrictions on speech violate the First Amendment because the Act's central coverage definition is unconstitutionally vague.

97.     A "fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). "[R]igorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech," *id.* at 253-54, or invite "arbitrary and discriminatory enforcement," *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

98.     HB18's central coverage definitions fail these requirements for three reasons.

99.     First, HB18 does define what it means to "connect[] users in a manner that allows users to *socially* interact," Tex. Bus. & Com. Code § 509.002(a)(1) (emphasis added), as compared

to other forms of interaction. *See Fitch*, 2024 WL 3276409, at *15 (concluding similar requirement is vague).

100.    Second, HB18 does not explain what it means "allow[] a user to create a public or semi-public profile *for purposes of* signing into and using the digital service." Tex. Bus. & Com. Code § 509.002(a)(2) (emphasis added). "But the statute neither defines '[] purpose'—a term critical to determining which entities fall within [the law's] scope—nor provides any guidelines about how to determine . . . 'purpose[.]'" *Griffin*, 2023 WL 5660155, at *13.

101.    Third, HB18 excludes any website that "allows chat, comment, or other interactive functionality that is *incidental to* the digital service." Tex. Bus. & Com. Code § 509.002(b)(10)(B) (emphasis added). This "incidental to" language is similarly undefined and vague. *See Fitch*, 2024 WL 3276409, at *15 (concluding similar exception is vague).

102.    HB18's central coverage definition is integral to the entire Act. Without this central definition, no other provision in the Act could operate, and thus the entire Act requires invalidation.

103.    Unless declared invalid and enjoined, HB18 will unlawfully deprive Plaintiffs' members and Internet users of their First Amendment and Due Process rights and will irreparably harm Plaintiffs, their members, and Internet users.

**Monitoring-and-Censorship Requirements**
**(Tex. Bus. & Com. Code §§ 509.053, 509.056(1))**

**COUNT III**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES THROUGH THE FOURTEENTH AMENDMENT**
**(Tex. Bus. & Com. Code §§ 509.053, 509.056(1))**

104.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

105.    The First Amendment prohibits HB18's demand that websites monitor and censor content. Tex. Bus. & Com. Code §§ 509.053, 509.056(1).

106.    These requirements are prior restraints, as well as viewpoint-based and content-based restrictions on speech. These HB18 provisions therefore trigger and fail strict scrutiny. *Reed*, 576 U.S. at 171. And they are "substantially overbroad, and therefore invalid under the First Amendment." *United States v. Stevens*, 559 U.S. 460, 481-82 (2010). Regardless, they fail whatever form of heightened First Amendment scrutiny could possibly apply.

107.    HB18's message is clear: ban and remove speech the State deems harmful or face adverse actions by the Attorney General through investigation, subpoena, fines, and other adverse legal changes. The government cannot censor this speech "directly," so it cannot "coerce" websites to suppress "speech on [its] behalf." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024).

108.    Indeed, the First Amendment protects social media websites' "choices about what third-party speech to display" and "which messages are appropriate." *Moody*, 144 S. Ct. at 2393, 2405. In other words, the "government may not . . . alter a private speaker's own editorial choices about the mix of speech it wants to convey." *Id.* at 2403.

109.    That is why the Southern District of Mississippi recently enjoined a remarkably similar set of requirements. *Fitch*, 2024 WL 3276409, at *17.

110.    HB18 is an unconstitutional prior restraint. "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). They are subject to "the most exacting scrutiny." *Smith v. Daily Mail Publ'g. Co.*, 443 U.S. 97, 102 (1979). HB18 operates as a prior restraint on the ability of websites *and* their users to publish, engage in, and disseminate speech.

111.    HB18's requirement to monitor and censor content is a twenty-first century version of the censorship boards that the Supreme Court has long held violate the Constitution. *Freedman v. Maryland*, 380 U.S. 51 (1965); *Bantam Books v. Sullivan*, 372 U.S. 58 (1963). Likewise, the

Supreme Court has warned about the chilling effects that arise from requiring private entities to constantly screen and monitor the speech they disseminate—even when those screening requirements include *unprotected* speech. *Smith v. California*, 361 U.S. 147, 152-53 (1959).

112.   "[A]ny system of prior restraints of expression" like HB18 here "bear[s] a heavy presumption against its constitutional validity." *Bantam Books*, 372 U.S. at 70. The State cannot overcome that presumption.

113.   HB18's monitoring-and-censorship requirements also trigger strict scrutiny because they rely on HB18's central coverage definition.

114.   These monitoring-and-censorship requirements independently trigger strict scrutiny because they discriminate based on overbroad content- and viewpoint-based categories.

115.   HB18 identifies content-based categories of prohibited speech "based on its communicative content": "the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163 (collecting cases). HB18 regulates content "that promotes, glorifies, or facilitates" (1) "suicide, self-harm, or eating disorders"; (2) "substance abuse"; (3) "stalking, bullying, or harassment"; or (4) "grooming, trafficking, child pornography, or other sexual exploitation or abuse." Tex. Bus. & Com. Code § 509.053(a). These are content-based categories. *Reed*, 576 U.S. at 163.

116.   HB18 further discriminates among "viewpoint[s]," based on the State's "judgment that the content of protected speech is offensive or inappropriate." *Robinson v. Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir. 2019) (citing *Matal v. Tam*, 582 U.S. 218, 243-44 (2017)). As one example, HB18 regulates speech that "promotes" or "glorifies" substance abuse—content that expresses the (objectionable) viewpoint that substance abuse is good or romantic.

117.   It "is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011).

118.     Furthermore, HB18's prohibitions extend beyond unprotected speech, and thus the law will chill the dissemination of a broad amount of protected speech. The "government [cannot] proscribe unprotected content through a regulation that simultaneously encompasses a substantial amount of protected content[.]" *Seals v. McBee*, 898 F.3d 587, 596 (5th Cir. 2018).

119.     As addressed above at ¶¶ 48-49, HB18 sweeps in a great amount of protected and valuable speech.

120.     Even speech that glorifies or promotes social ills—including criminal activities— is protected speech. *E.g.*, *Hess v. Indiana*, 414 U.S. 105, 108 (1973).

121.     HB18's prohibition of obscenity for minors is also unconstitutionally overbroad because it does not distinguish between what speech is obscene as to 17-year-olds versus what speech is obscene as to younger minors. The Supreme Court has made clear that any obscenity-for-minors analysis must examine whether such speech is obscene to 17-year-olds versus younger minors. *E.g.*, *Am. Booksellers*, 484 U.S. at 396.

122.     Websites seeking to comply with the law may monitor and censor content that comes anywhere near mentioning topics regulated by HB18. This may result in websites defaulting to publishing to minors content fit only for the youngest and most sensitive users. *See Bonta*, 692 F. Supp. 3d at 955. That would harm adults too, not just minors. Many websites do not have the ability to "age-gate" content, which means that, to implement such requirements, they would have to limit speech for all users—adults included. Faced with the prospect of either limiting the speech available to adults or restricting access to minors, many websites will choose to restrict minors altogether, which would further injure those minors. *Id.*

123.    Accordingly, HB18's monitoring-and-censorship requirements reach "a substantial amount of constitutionally protected speech rendering [them] substantially overbroad" and "facially invalid." *City of Houston v. Hill*, 482 U.S. 451, 458 (1987).

124.    HB18's command to monitor and censor speech fails strict scrutiny because it is not (1) "justified by a compelling government interest"; and (2) "narrowly drawn to serve that interest." *Brown*, 564 U.S. at 799 (citation omitted). The State must show a "direct causal link" between the restriction on speech and alleged harm it seeks to address. *Id.* (cleaned up). HB18 would fail any form of First Amendment heightened scrutiny, such as intermediate scrutiny.

125.    The State lacks any legally cognizable interest in "protect[ing] the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. Jacksonville*, 422 U.S. 205, 213-14 (1975) "[D]isgust is not a valid basis for restricting expression." *Brown*, 564 U.S. at 798.

126.    HB18 is also not properly tailored, as it is both over- and underinclusive in critical ways. *Id.* at 805. Though the State carries the burden to prove narrow tailoring, *id.* at 799, Plaintiffs provide below a few non-exhaustive examples of the State's failure to tailor HB18 properly.

127.    *First*, the State has ample alternative means to combat the social ills it seeks to regulate indirectly through HB18's unlawful regulation of speech. *Bartnicki v. Vopper*, 532 U.S. 514, 529-30 (2001). For example, Texas already penalizes, or otherwise regulates, the harmful conduct related to the speech it seeks to censor in HB18:

- "A person commits an offense if, with intent to promote or assist the commission of suicide by another, he aids or attempts to aid the other to commit or attempt to commit suicide." Tex. Pen. Code § 22.08; *see also* Tex. Hum. Res. Code § 42.0433 (requiring suicide-prevention in residential child-care facilities).

- "A person commits an offense if the person knowingly delivers a controlled substance . . . [or] marihuana . . . to a person . . . who is a child." Tex. Health & Safety

Code § 481.122; *see also id.* §§ 461A.001-469.008 (establishing substance abuse pro-grams).

- "A person commits an offense [by] . . . send[ing] repeated electronic communications in a manner reasonably likely to harass . . . ." Tex. Pen. Code § 42.07(a); *see also id.* §§ 42.07(c) (raising offense level if "the offense was . . . against a child"); 42.072 (es-tablishing stalking as an offense); Tex. Civ. Prac. & Rem. Code § 129A (establishing remedies for a victim "of cyberbullying behavior who is younger than 18 years of age").

- Texas law also has criminal provisions prohibiting child grooming, Tex. Pen. Code § 15.032; child trafficking, *id.* § 20A.02; child sexual abuse, *id.* § 21.02; sexual assault, *id.* § 22.011; "child pornography," *id.* § 43.26; and obscenity for minors, *id.* § 43.24.

128.     Furthermore, Texas law already provides for criminal liability for aiding or abetting crimes, including actions made with the "intent *to promote* or assist the commission of the of-fense." *Id.* § 7.02(2) (emphasis added).

129.     Regulating speech as a means to address underlying criminal conduct is a "prophy-laxis-upon-prophylaxis approach" that the Supreme Court's First Amendment precedents have re-jected. *FEC v. Cruz*, 596 U.S. at 306 (citation omitted).

130.     *Second*, HB18 is hopelessly underinclusive. Minors can encounter harmful speech on many websites and other forms of media left unregulated by HB18 like books and television. There are other unregulated websites that may carry content that could be considered "pro-mot[ing]" eating disorders, among other topics regulated by HB18. *See* Sarah Rainey, *Secretly Starving*, The Telegraph, https://perma.cc/56F2-GRBM (blogs).

131.     *Third*, the technical means that HB18 demands covered websites "must use" are not narrowly tailored to achieve the State's identified aims. Covered websites, in order to avoid liability, will therefore have to broadly block even more protected speech than HB18 identifies. At the same time, many of the technical means required by HB18 will fail to detect certain objection-able and harmful speech. *See supra* ¶¶ 53-57. For example, the Supreme Court recognized years

ago that various filtering technologies are imperfect, prone to be overinclusive and underinclusive. *Am. Library Ass'n*, 539 U.S. at 201. That remains true today.

132.    Furthermore, HB18 may make websites *less* effective at identifying harmful speech if HB18 does not allow websites to use content-moderation methods like machine-learning.

133.    *Fourth*, the means of monitoring and censoring that the law requires are unduly burdensome—and potentially impossible. If compliance with HB18 is too costly for some websites, those websites may cease publishing speech. For example, the law requires websites to "creat[e] and maintain[] a comprehensive list" of prohibited content. Tex. Bus. & Com. Code § 509.053(b)(1). Similarly, HB18 requires "making available to users a comprehensive description of the categories of" prohibited speech. *Id.* § 509.053(b)(1)(F). There are near-infinite ways that users could engage in prohibited speech, however.

134.    Unless declared invalid and enjoined, Tex. Bus. & Com. Code §§ 509.053, 509.056(1) will unlawfully deprive Plaintiffs' members of their fundamental First Amendment rights and irreparably harm Plaintiffs, their members, and Internet users.

## COUNT IV
## VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS
### (Tex. Bus. & Com. Code §§ 509.053, 509.056(1))

135.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

136.    Both the categories of speech that Tex. Bus. & Com. Code § 509.053 demands to be monitored and censored *and* the means of monitoring and censorship are unconstitutionally vague. This vagueness will chill the publication of protected speech.

137.    *First*, HB18 does not define key terms in the content- and viewpoint-based categories of speech that HB18 demands to be monitored and censored. *Id.* § 509.053(a). Specifically, HB18 does not define "glorif[y]," "promote[]," or "facilitate[]." *Id.* The Supreme Court has held that a speech law hinging on the word "promote" was invalid "because of vagueness." *Baggett v.*

*Bullitt*, 377 U.S. 360, 371 (1964). The "range of activities which are or might be deemed" to "promote" an idea provides no "ascertainable standard of conduct." *Id.* at 371-72. As the Supreme Court separately recognized, "'promotes' . . . [is] susceptible of multiple and wide-ranging meanings." *United States v. Williams*, 553 U.S. 285, 294 (2008). Nor does HB18 define the terms outlining prohibited topics, including but not limited to, "eating disorders," "substance abuse," "bullying," "harassment," and "grooming." Tex. Bus. & Com. Code § 509.053(a) Accordingly, HB18 fails to provide websites with notice of what speech to block. HB18's penalties will cause websites to err on the side of overinclusive censorship, unconstitutionally chilling the publication of protected speech.

138. *Second*, and relatedly, the categories of prohibited speech are too subjective to provide websites with any notice of what speech they must monitor and censor. For instance, what "glorifies" substance abuse is a highly subjective question on which people will differ. This will grant Defendant too much discretion, inviting arbitrary and discriminatory enforcement. *Grayned*, 408 U.S. at 108. Moreover, websites will err on the side of overinclusive censorship, unconstitutionally chilling the publication of speech.

139. *Third*, HB18 does not make clear whether the means of content moderation websites "must" and "may" use are the exclusive means websites must use. Tex. Bus. & Com. Code § 509.053(b). By identifying both the mandatory and voluntary methods of content moderation, HB18 suggests that its enumerated means are the only means that websites may use.

140. *Fourth*, HB18's requirement that websites "mak[e] available the digital service provider's algorithm code to independent security researchers," *id.* § 509.053(b)(1)(F), is unconstitutionally vague. Any disclosure of "algorithm" code would necessarily require websites to turn over highly sensitive and proprietary trade secrets for members. Yet, HB18 separately provides that

nothing in HB18 "may be construed to require a digital service provider to disclose a trade secret." *Id.* § 509.058. HB18's conflicting requirements deprive Plaintiffs' members of notice of what the law requires.

141.    Unless declared invalid and enjoined, Tex. Bus. & Com. Code § 509.053 will unlawfully deprive Plaintiffs' members and Internet users of their First Amendment and Due Process rights and will irreparably harm Plaintiffs, their members, and Internet users.

**COUNT V**
**FEDERAL STATUTORY PREEMPTION UNDER 47 U.S.C. § 230,**
**42 U.S.C. § 1983, AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION**
**(Tex. Bus. & Com. Code §§ 509.053, 509.056(1))**

142.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

143.    Plaintiffs may assert federal preemption under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908).

144.    47 U.S.C. § 230 preempts HB18's monitoring-and-censorship requirements. Tex. Bus. & Com. Code §§ 509.053, 509.056(1).

145.    Covered websites are "interactive computer services" that disseminate "information provided by another information content provider." 47 U.S.C. § 230(c)(1), (f)(2).

146.    Congress enacted Section 230 to provide all websites with protections from liability for the third-party speech on their services: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1). It also protects websites from any limits on their ability to remove user-submitted content. *Id.* § 230(c)(2). To remove any doubt, Section 230 expressly preempts state law to the contrary. *Id.* § 230(e)(3).

147.    As the Texas Attorney General has recognized, "Section 230 . . . immunizes website operators from state-law obligations that . . . require the *monitoring or deletion* of third-party

content." Brief for Appellant 30-31, *Free Speech Coal., Inc. v. Paxton* (No. 23-50627), 2023 WL 6465441 (5th Cir. filed Sept. 25, 2023) (emphasis added).

148.     Accordingly, Section 230 protects websites' "decisions *relating to the monitoring, screening, and deletion of content* from its network." *Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008) (emphasis added) (quoting *Green v. Am. Online*, 318 F.3d 465, 471 (3d Cir. 2003)); *see Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 284-85 (5th Cir. 2024) (Section 230 protects websites "from liability stemming from attempts to 'restrict' unwanted material"), *cert. granted*, 2024 WL 3259690 (U.S. July 2, 2024); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 993-94 (S.D. Tex. 2017) (similar). So Section 230 protects websites from liability for content that they do not remove. "[T]hat is the point of Section 230: to immunize web service providers for harm caused by unremoved speech on their website." *Free Speech Coal.*, 95 F.4th at 285. Therefore, Section 230 protects websites from "all claims stemming from their *publication of information created by third parties*." *Id.* at 286 (cleaned up).

149.     HB18's monitoring-and-censorship requirements are "inconsistent" with Section 230(c)(1) because they would permit lawsuits and impose liability on covered websites for failing to monitor, screen, filter, or otherwise censor third-party content. 47 U.S.C. § 230(e)(3). Moreover, if Defendant pursues enforcement based on websites publishing speech prohibited by the Act that is generated by third parties, that enforcement would unlawfully "treat[]" websites "as the publisher or speaker of [] information provided by another information content provider." *Id.* § 230(c)(1).

150.     Unless declared preempted, Tex. Bus. & Com. Code §§ 509.053, 509.056(1) will cause Plaintiffs, their members, and Internet users irreparable harm.

### Generally Applicable Counts

### COUNT VI
### EQUITABLE RELIEF

151.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

152.    HB18 and the challenged provisions violate federal law, both facially and as-applied, and deprive Plaintiffs and their members of enforceable rights secured by federal law. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326-27 (2015).

153.    This Court can and should exercise its equitable power to enter an injunction precluding Defendant from enforcing HB18 against Plaintiffs' members.

### COUNT VII
### 42 U.S.C. § 1983 AND 28 U.S.C. § 2201
### DECLARATORY RELIEF

154.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

155.    For the reasons discussed above, Tex. Bus. & Com. Code §§ 509.053, 509.056(1) are preempted by federal law, both facially and as-applied.

156.    Tex. Bus. & Com. Code §§ 509.001-590.002, 509.051-509.056, 509.058-509.059, 509.101-509.104, and 509.151 violate the First Amendment to the Constitution and the Due Process Clause and thereby deprive Plaintiffs and their members of enforceable rights, both facially and as-applied.

157.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

158.     This Court can and should exercise its equitable power to enter a declaration that the challenged provisions of HB18 are unconstitutional and otherwise unlawful, both facially and as-applied.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.  Declare that the provisions of HB18 challenged in this lawsuit are unlawful, both facially and as-applied;

B.  Declare that Tex. Bus. & Com. Code §§ 509.053 and 509.056(1) are preempted by federal law, both facially and as-applied;

C.  Declare that Tex. Bus. & Com. Code §§ 509.001-590.002, 509.051-509.056, 509.101-509.104, and 509.151 violate the First Amendment to the Constitution, both facially and as-applied;

D.  Declare that Tex. Bus. & Com. Code §§ 509.001-590.002, 509.051-509.056, 509.058-509.059, 509.101-509.104, and 509.151 are void for vagueness, both facially and as-applied;

E.  Enjoin Defendant and his agents, employees, and all persons acting under his direction or control from taking any action to enforce the challenged portions of HB18 against Plaintiffs' members;

F.  Enter judgment in favor of Plaintiffs;

G.  Award Plaintiffs their attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

H.  Award Plaintiffs all other such relief as the Court deems proper and just.

Dated: July 30, 2024

Steven P. Lehotsky*
steve@lkcfirm.com
Jeremy Evan Maltz (Texas Bar # 24102129)
jeremy@lkcfirm.com
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001

Jared B. Magnuson*
jared@lkcfirm.com
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

*motion for admission *pro hac vice* forthcoming

Respectfully submitted.

*Scott A. Keller*

Scott A. Keller (Texas Bar # 24062822)
scott@lkcfirm.com
Joshua P. Morrow (Texas Bar # 24106345)
josh@lkcfirm.com
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
T: (512) 693-8350
F: (512) 727-4755

*Attorneys for Plaintiffs*