**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, and | ) ) ) | |
| NETCHOICE, LLC, | ) ) | |
| *Plaintiffs*, | ) ) ) | Civil Action No. 1:24-cv-849 |
| v. | ) ) | |
| KEN PAXTON, in his official capacity as Attorney General of Texas, | ) ) ) | |
| *Defendant*. | ) | |

**<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND,
IN THE ALTERNATIVE, TEMPORARY RESTRAINING ORDER</u>**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................. ii

Introduction ........................................................................................................................... 1

Background ............................................................................................................................ 2

    A.  Factual Background ............................................................................................ 2

    B.  Texas House Bill 18's Scope ............................................................................. 3

Argument ............................................................................................................................... 6

I.  Plaintiffs are likely to succeed in this challenge, because all the challenged provisions of HB18 are unconstitutional regulations of, and burdens on, speech that rely on a content-based, speaker-based, and vague scope-defining definition of "digital service provider" that fails strict scrutiny. ............................................................................................. 7

II.  Plaintiffs are likely to succeed in this challenge, because HB18's monitoring-and-censorship requirements unlawfully restrict websites' speech dissemination to both minors and adults. .......................................................................................................... 11

    A.  HB18's monitoring-and censorship requirements are unconstitutional............................ 11

        1.  HB18's monitoring-and-censorship requirements are content-based and viewpoint-based prior restraints. ..................................................................... 11

        2.  HB18's monitoring-and-censorship requirements are unconstitutionally vague........ 17

    B.  HB18's monitoring-and-censorship requirements are preempted by 47 U.S.C. § 230. ... 18

III. The remaining factors favor a preliminary injunction. .......................................... 20

Conclusion ........................................................................................................................... 20

Certificate of Service .......................................................................................................... 22

Certificate of Conference ..................................................................................................... 22

## Table of Authorities

Page(s)

**Cases**

*Ams. for Prosperity Found. v. Bonta,*
   594 U.S. 595 (2021)................................................................6

*Ashcroft v. ACLU,*
   542 U.S. 656 (2004)..............................................................9, 15

*Ashcroft v. Free Speech Coal.,*
   535 U.S. 234 (2002)..............................................................14

*Baggett v. Bullitt,*
   377 U.S. 360 (1964)..............................................................17

*Bantam Books, Inc. v. Sullivan,*
   372 U.S. 58 (1963)............................................................11, 12, 16

*Barr v. Am. Ass'n of Pol. Consultants,*
   591 U.S. 610 (2020)..............................................................7

*Bartnicki v. Vopper,*
   532 U.S. 514 (2001)..............................................................16

*Bates Energy Oil & Gas, LLC v. Complete Oil Field Servs., LLC,*
   2017 WL 4051569 (W.D. Tex. Sept. 13, 2017)......................................6

*Book People, Inc. v. Wong,*
   91 F.4th 318 (5th Cir. 2024)....................................................20

*Brown v. Ent. Merchs. Ass'n,*
   564 U.S. 786 (2011)............................................................ *passim*

*City of Houston v. Hill,*
   482 U.S. 451 (1987)............................................................13, 18

*Dep't of Tex., Veterans of Foreign Wars of the U.S. v. Tex. Lottery Comm'n,*
   760 F.3d 427 (5th Cir. 2014)....................................................9

*Doe v. MySpace, Inc.,*
   528 F.3d 413 (5th Cir. 2008)....................................................18, 19

*Erznoznik v. Jacksonville,*
   422 U.S. 205 (1975)..............................................................11

*FCC v. Fox TV Stations, Inc.*,
  567 U.S. 239 (2012).........................................................................................10, 18

*FEC v. Cruz*,
  596 U.S. 289 (2022).........................................................................................11, 16

*Free Speech Coal., Inc. v. Paxton*,
  95 F.4th 263 (5th Cir. 2024) ...........................................................................18, 19

*Freedman v. Maryland*,
  380 U.S. 51 (1965)..................................................................................................12

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972).........................................................................................10, 18

*Hess v. Indiana*,
  414 U.S. 105 (1973)..................................................................................................8

*John Doe No. 1 v. Reed*,
  561 U.S. 186 (2010)..................................................................................................6

*Kolender v. Lawson*,
  461 U.S. 352 (1983)................................................................................................18

*La'Tiejira v. Facebook, Inc.*,
  272 F. Supp. 3d 981 (S.D. Tex. 2017) ...........................................................18, 19

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2024)...................................................................................*passim*

*Nat'l Inst. of Family & Life Advocs. v. Becerra*,
  585 U.S. 755 (2018)...........................................................................................8, 15

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024).........................................................................................11, 12

*Neb. Press Ass'n v. Stuart*,
  427 U.S. 539 (1976)................................................................................................11

*NetChoice, LLC v. Bonta*,
  692 F. Supp. 3d 924 (N.D. Cal. 2023) ....................................................1, 5, 7, 14

*NetChoice, LLC v. Fitch*,
  2024 WL 3276409 (S.D. Miss. July 1, 2024) ...............................................*passim*

*NetChoice, LLC v. Griffin*,
  2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)............................................*passim*

*NetChoice, LLC v. Yost*,
   2024 WL 555904 (S.D. Ohio Feb. 12, 2024)..............................................................1, 7, 15

*Netflix, Inc. v. Babin*,
   88 F.4th 1080 (5th Cir. 2023) ...................................................................................20

*Nken v. Holder*,
   556 U.S. 418 (2009) ...................................................................................................20

*Ohio v. EPA*,
   144 S. Ct. 2040 (2024)...............................................................................................20

*Packingham v. North Carolina*,
   582 U.S. 98 (2017).................................................................................................2, 4, 8

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015)...............................................................................................7, 13

*Reno v. ACLU*,
   521 U.S. 844 (1997)...............................................................................................2, 16

*Robinson v. Hunt Cnty.*,
   921 F.3d 440 (5th Cir. 2019) ....................................................................................13

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
   592 U.S. 14 (2020).......................................................................................................20

*Seals v. McBee*,
   898 F.3d 587 (5th Cir. 2018) ....................................................................................13

*SEIU, Local 5 v. City of Houston*,
   595 F.3d 588 (5th Cir. 2010) ....................................................................................10

*Smith v. California*,
   361 U.S. 147 (1959)...............................................................................................12, 13

*Smith v. Daily Mail Pub. Co.*,
   443 U.S. 97 (1979)................................................................................................11, 12

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011)..................................................................................................8, 13

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
   732 F.3d 535 (5th Cir. 2013) .....................................................................................6

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994).....................................................................................................7

*United States v. Am. Library Ass'n, Inc.*,
    539 U.S. 194 (2003)...........................................................................17

*United States v. Hansen*,
    599 U.S. 762 (2023)...........................................................................16

*United States v. Playboy Ent. Grp.*,
    529 U.S. 803 (2000).......................................................................9, 15

*United States v. Stevens*,
    559 U.S. 460 (2010)...........................................................................13

*United States v. Williams*,
    553 U.S. 285 (2008)...........................................................................17

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988)...................................................................6, 14, 16

**Statutes**

47 U.S.C. § 230....................................................................2, 9, 18, 19

Tex. Bus. & Com. Code § 17.47....................................................................6

Tex. Bus. & Com. Code § 509.001..............................................................1, 4, 5

Tex. Bus. & Com. Code § 509.002......................................................1, 4, 7, 9, 10

Tex. Bus. & Com. Code § 509.051..............................................................1, 5

Tex. Bus. & Com. Code § 509.052..............................................................1, 5

Tex. Bus. & Com. Code § 509.053........................................................ *passim*

Tex. Bus. & Com. Code § 509.054..............................................................1, 5

Tex. Bus. & Com. Code § 509.055................................................................1

Tex. Bus. & Com. Code § 509.056..........................................................1, 2, 5

Tex. Bus. & Com. Code § 509.058................................................................1

Tex. Bus. & Com. Code § 509.059................................................................1

Tex. Bus. & Com. Code § 509.101..............................................................1, 5

Tex. Bus. & Com. Code § 509.102..............................................................1, 5

Tex. Bus. & Com. Code § 509.103..............................................................1, 5

Tex. Bus. & Com. Code § 509.104.................................................................1

Tex. Bus. & Com. Code § 509.151.............................................................1, 6

Tex. Bus. & Com. Code § 509.152.................................................................6

Tex. Pen. Code § 43.24.................................................................................5

**Other Authorities**

*13 Reasons Why* (Netflix 2017-20).............................................................13

Br. for Appellant, *Free Speech Coal., Inc. v. Paxton*, 2023 WL 6465441 (5th Cir. Sept. 25, 2023).............................................................................................18

Peter Singer, *Practical Ethics* (3d ed. 2011)..............................................13

The Police, *Every Breath You Take* (1983).................................................14

The Weeknd, *Can't Feel My Face* (Republic 2015)....................................14

Stalking – Fiction, Barnes & Noble, https://perma.cc/VX92-257V ..............14

Sylvia Plath, *The Bell Jar* (1963)...............................................................13

**Introduction**

Texas House Bill 18 (HB18 or Act) is the State's latest unconstitutional attempt to regulate online speech and information.[1] After attempting to *prevent* social media websites from moderating content on their services, Texas now *requires* those same websites (and more) to censor broadly and vaguely defined categories of speech on minors' accounts. On top of that, HB18 imposes onerous burdens on the dissemination of speech from a content-based and speaker-based collection of vaguely defined social media websites. Like Texas's previous attempt to regulate online speech, "Texas's" new "law does not pass" First Amendment scrutiny because government cannot "control the expression of ideas." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2407, 2409 (2024). "Minors are entitled to a significant measure of First Amendment protection" and governments lack "a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (cleaned up). Courts nationwide have enjoined similar laws—including a strikingly similar Mississippi law. *E.g.*, *NetChoice, LLC v. Fitch*, 2024 WL 3276409 (S.D. Miss. July 1, 2024); *NetChoice, LLC v. Yost*, 2024 WL 555904 (S.D. Ohio Feb. 12, 2024); *NetChoice, LLC v. Bonta*, 692 F. Supp. 3d 924 (N.D. Cal. 2023); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023).

Plaintiffs request this Court enjoin Defendant from enforcing the Act against their covered members before the Act's September 1, 2024, effective date. If a ruling by that date is not feasible, and if Defendant does not disclaim enforcement against Plaintiffs' covered members while this motion is pending, then Plaintiffs request the Court enter a temporary restraining order.[2]

---

[1] This Motion cites HB18's provisions by identifying only section numbers in the Texas Business and Commerce Code. This Motion uses "HB18" to refer to challenged provisions of the Act: §§ 509.001-590.002, 509.051-509.056, 509.058-509.059, 509.101-509.104, 509.151.

[2] Plaintiffs' counsel contacted counsel for Defendant and provided Defendant's counsel a copy of this Motion (including exhibits) and the Complaint before filing.

HB18's scope-defining "digital service provider" definition regulates a content-based and speaker-based collection of social media websites—and burdens their ability to disseminate speech. For this reason alone, HB18 violates the First Amendment. Furthermore, HB18 requires covered websites to "develop and implement a strategy to prevent" minors' "exposure to"—*e.g.*, "block[]"—broad, vague, and subjective categories of speech. §§ 509.053, 509.056(1). Although Plaintiffs' members engage in their own extensive and effective "content moderation" to address potentially harmful content, the Act's vague governmental demand to do so is likely to chill the dissemination of speech—impeding websites' right to "make choices about what third-party content to display." *Moody*, 144 S. Ct. at 2393. And its enumerated means of moderating such content may render websites' content moderation less effective. By directing websites' content moderation, HB18's monitoring-and-censorship requirements are also preempted by 47 U.S.C. § 230.

Though the State has an interest in protecting minors, HB18's overly broad and burdensome approach will "burn[] the house to roast the pig." *Reno v. ACLU*, 521 U.S. 844, 882 (1997) (cleaned up). Plaintiffs therefore request that this Court enjoin Defendant's enforcement of HB18.

## Background

### A.   Factual Background

Plaintiffs CCIA and NetChoice are trade associations. HB18's regulatory scope includes websites offered by "members" of Plaintiffs' organizations, including: (1) Facebook (Meta); (2) Instagram (Meta); (3) Nextdoor; (4) Pinterest; (5) Snapchat (Snap Inc.); (6) X; and (7) YouTube (Google). Schruers Decl. ¶ 4; Szabo Decl. ¶ 23; Veitch Decl. ¶ 5. HB18 also regulates similar, non-member websites. *E.g.*, Szabo Decl. ¶ 24; Riley Decl. ¶ 6.

These websites "engage[] in expression" by "display[ing]" protected "third-party speech." *Moody*, 144 S. Ct. at 2393. They allow users to "engage in a wide array of protected First Amendment activity on topics as diverse as human thought." *Packingham v. North Carolina*, 582 U.S.

98, 105 (2017) (cleaned up); Schruers Decl. ¶¶ 6-7. Teens (like adults) use these websites for protected expression, education, civic engagement, and plain entertainment. Szabo Decl. ¶¶ 6-7; Pai Decl. ¶¶ 2, 21; Veitch Decl. ¶ 3.

Parents can and do control their children's online experiences. Schruers Decl. ¶ 22; Szabo Decl. ¶ 8. Parents control what *devices* minors can access—and when. Szabo Decl. ¶ 8. Internet-enabled devices have many parental-control options, including the ability to lock or limit specific apps and features, restrict the device settings to limit content, limit access to only approved websites, and set overall or time-of-day usage limits. *Id.* ¶ 8.b. Parents also control the *networks* that minors use to connect to the Internet. *Id.* ¶ 8.a. Wireless routers allow parents to manage which Internet websites minors can use (and at what times). *Id.* Cellular and broadband Internet providers offer similar controls. *Id.* Parents also have control over *software*. *Id.* ¶ 8.c-d. Web browsers offer parental controls, and third-party parental-control software is available for many devices. *Id.* ¶ 8.c. Many members have developed parental controls and protections for minors on their services. *E.g.*, *id.* ¶¶ 8.d, 9; Veitch Decl. ¶¶ 11-14, 16-17.

To make their websites welcoming and commercially viable, Plaintiffs' members have policies defining acceptable speech, and they moderate content to avoid disseminating content violating these policies. Schruers Decl. ¶¶ 8-10; Pai Decl. ¶¶ 10-17; Veitch Decl. ¶ 10; *see also* Riley Decl. ¶¶ 4-5. These policies address nudity and sexual content, self-harm, substance abuse, harassment, and child exploitation—among other things. Szabo Decl. ¶¶ 11-17; Veitch Decl. ¶¶ 15, 18-21. These websites' content moderation has been successful, especially considering the hurdles they face. Schruers Decl. ¶¶ 11-17; Szabo Decl. ¶¶ 10, 18-21; Veitch Decl. ¶¶ 22-28. Websites dedicate substantial resources to innovating new content-moderation tools. *E.g.*, Veitch Decl. ¶ 28.

## B.   Texas House Bill 18's Scope

**Content- and speaker-based coverage definition.** HB18 regulates "digital service

provider[s]" that "allow[] users to socially interact with other users." §§ 509.001(2), 509.002(a)(2). In other words, HB18 regulates social media websites and similar web forums. The Supreme Court has said these websites "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind," *Packingham*, 582 U.S. at 107; and are afforded full First Amendment protection, *Moody*, 144 S. Ct. at 2394.

HB18 targets "own[ers]" or "operat[ors]" of any online service that (1) "determines" the "means" and "purpose of collecting and processing [users'] personal identifying information"; (2) "connects users in a manner that allows users to *socially* interact with other users"; (3) "allows a user to create a public or semi-public profile for purposes of signing into and using the" website; and (4) "allows a user to create or *post* content that can be viewed by other users . . . including *sharing* content on: (A) a *message board*; (B) a *chat room*; or (C) a *landing page*, video *channel*, or main *feed* that presents to a user content created and *posted* by other *users*." §§ 509.001(1)-(2), 509.002(a) (emphases added). By its plain language (exemplified by the emphasized terms), HB18's scope is limited to services that publicly disseminate speech to multiple users. It does not govern "direct messaging" and "email" services. *See Moody*, 144 S. Ct. at 2398.

This definition also has multiple content-based exceptions. For example, websites are excluded if they "primarily" feature "news, sports, commerce, or content primarily generated or selected by the [website]." § 509.002(b)(10). It thus excludes "ride-sharing," "payment," "online marketplace," and other similar services. *Moody*, 144 S. Ct. at 2398. HB18 also excludes search engines, "small business[es]," and "institution[s] of higher learning," among others. § 509.002(b).

**Onerous requirements.** HB18 imposes two sets of onerous requirements that will limit websites' abilities to disseminate protected speech to their users.

*Age-challenge, parental-verification, parental tools, and disclosure.* HB18 requires

websites to adopt costly processes to verify the identity and age of minor users and parents.

For all users, websites must first "register[] the person's age" before users can create an account. § 509.051(a). A user becomes a "known minor" to the website—and thus subject to restrictions on the speech he can access—if he registers an age below 18. § 509.051(d)(1). Even if a user registers an adult age, HB18 also deems the user as a "known minor" if the "minor's parent or guardian" either "notifies [the website] that the minor is younger than 18" or "successfully disputes the registered age of the minor." § 509.051(d)(2).

HB18 also requires covered websites to "verify, using a commercially reasonable method" both the "identity" of a person claiming to be a minor's parent and "the relationship of the person to the known minor." § 509.101(a). Processes like these are "costly," *Griffin*, 2023 WL 5660155, at *13, and require the disclosure of personal information that increases concerns about minors' data privacy, *Bonta*, 692 F. Supp. 3d at 951; *see* Rumenap Decl. ¶¶ 6-7. HB18 then requires covered websites to provide a suite of burdensome-to-develop-and-maintain "tools" accessible by these "verified parent[s]." §§ 509.052, 509.054, 509.102-509.103. And the websites must make various disclosures about their "algorithms." *Id.* § 509.056(2).

*Monitoring-and-censorship requirements.* Covered websites must "develop and implement a strategy to prevent [a] known minor's exposure to" subjective categories of speech:

- Content that (a) "promotes," (b) "glorifies," or (c) "facilitates," the following content-based categories: (1) suicide; (2) self-harm; (3) eating disorders; (4) substance abuse; (5) stalking; (6) bullying; (7) harassment; (8) grooming; (9) trafficking; (10) "child pornography;" or (11) other sexual exploitation or abuse. § 509.053(a).
- Content that is (12) "harmful material," *id.*—defined as obscenity for minors, § 509.001(3) (incorporating Tex. Pen. Code § 43.24).

Websites' strategies "*must* include" mechanisms that would, among other things, "block" prohibited content: "(A) creating and maintaining a comprehensive list of [content] to *block* . . . ; (B) using filtering technology and other protocols to *enforce the blocking* . . . ; (C) using hash-

sharing technology and other protocols to identify recurring [prohibited content]; (D) creating and maintaining a database of keywords used for filter evasion . . . ; (E) performing standard human-performed monitoring reviews to ensure efficacy of filtering . . . ; (F) making available to users a comprehensive description of the categories of [prohibited content] that will be filtered; and (G) . . . making available . . . algorithm code to independent security researchers." § 509.053(b) (emphases added). And a website's strategy "*may* include": "(A) engaging a third party to rigor-ously review . . . filtering technology; (B) participating in industry-specific partnerships to share best practices . . . ; or (C) conducting periodic independent audits." *Id.* (emphasis added).

**Enforcement.** Any "violation" of HB18 is "a deceptive act or practice" under Texas law enforceable by "the attorney general's office." § 509.151. Defendant may seek civil penalties of "$10,000 per violation." § 17.47(c)(1). HB18 also creates a "private right of action." § 509.152.

## Argument

Plaintiffs are entitled to a preliminary injunction, as they can demonstrate: (1) a "substan-tial likelihood of success on the merits"; (2) a "substantial threat of irreparable injury"; (3) that the equities favor an injunction; and (4) that the injunction "serve[s] the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536-37 (5th Cir. 2013) (citation omitted). Plain-tiffs are entitled to a temporary restraining order for the same reasons. *Bates Energy Oil & Gas, LLC v. Complete Oil Field Servs., LLC*, 2017 WL 4051569, at *3 (W.D. Tex. Sept. 13, 2017).

For all claims, "a substantial number of [HB18's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 144 S. Ct. at 2397 (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). At a minimum, HB18 is invalid as applied to Plaintiffs' members' regulated services. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing challenge "to the extent of [the] reach" defined by Plaintiff). Plaintiffs have standing to assert the First Amendment harms of their members and websites' users. *Virginia v. Am.*

*Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988); *Fitch*, 2024 WL 3276409, at \*7; *Yost*, 2024 WL 555904, at \*5; *Bonta*, 692 F. Supp. 3d at 939; *Griffin*, 2023 WL 5660155, at \*11-12.

I.     **Plaintiffs are likely to succeed in this challenge, because all the challenged provisions of HB18 are unconstitutional regulations of, and burdens on, speech that rely on a content-based, speaker-based, and vague scope-defining definition of "digital service provider" that fails strict scrutiny.**

HB18's central coverage definition of "digital service provider" is unconstitutionally content-based, speaker-based, and vague. HB18 used this central definition to regulate and burden the dissemination of speech, so HB18's provisions violate the First Amendment.

**A.** HB18 regulates speech on only a subset of social media websites, distinguishing based on content and speaker. At the outset, HB18's central definition of a covered "digital service provider" targets websites based on whether they allow users to interact "socially." § 509.002(a)(1). It therefore excludes other forms of interaction. That "singles out specific subject matter for differential treatment," by using the "function or purpose" of speech as a stand-in for its content. *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64, 169 (2015). HB18 also codifies overtly content-based and speaker-based exceptions, including for websites that disseminate "content primarily generated or selected by the" website, or "primarily" feature "news, sports, [or] commerce." § 509.002(b)(10)(A); *see Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 620-21 (2020) (controlling plurality op.) (content-based exceptions render entire statute content-based).

These distinctions trigger strict scrutiny. "Content-based laws . . . are presumptively unconstitutional." *Reed*, 576 U.S. at 163. Plus, speaker-based "laws that single out the press, or certain elements thereof, . . . are always subject to at least some degree of heightened First Amendment scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640-41 (1994) (cleaned up).

**B.** Using this central content-based and speaker-based definition, HB18 burdens covered websites' abilities to disseminate protected speech, especially to minors. These content-based and

speaker-based "burdens . . . must satisfy the same rigorous scrutiny as . . . content-based" and speaker-based "bans." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 555-56 (2011) (citation omitted). Centrally, the Act requires websites to monitor and block State-identified categories of speech— using technical means imposed by the State. *E.g.*, Riley Decl. ¶ 8; Schruers Decl. ¶ 19; Veitch Decl. ¶¶ 30-39. Other provisions further burden the dissemination of speech. For instance, verifying the age of a minor in response to a parental dispute will require websites to adopt costly new processes and to devote substantial human resources. Pai Decl. ¶¶ 22-23; Riley Decl. ¶ 9; Schruers Decl. ¶ 18; Szabo Decl. ¶ 22; Veitch Decl. ¶ 41. So too for verifying the identity of parents and their relationship to minor children on the websites. *Id.* The parental tools are similarly burdensome. Schruers Decl. ¶ 18.b. These burdens will discourage websites from permitting minors to create accounts, barring minors from valuable speech. Pai Decl. ¶ 37. Even refusing to serve minors will not alleviate the burdens: Covered websites will still need the age-challenge processes, which are so onerous that they could cause some websites to shut down entirely. Riley Decl. ¶ 10.

**C.** Strict scrutiny therefore applies to all of HB18's provisions because they regulate and burden speech based on content and speaker. Defendant must "prove[]" that HB18 is "the least restrictive means of achieving a compelling state interest." *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*") (citation omitted). At a minimum, governmental restrictions on accessing these websites trigger heightened scrutiny. *Packingham*, 582 U.S. at 108.

The State does not have "a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (citations omitted). Thus, the State lacks an interest in "suppress[ing]" or burdening speech "solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (citation omitted). Indeed, the First Amendment protects even speech that promotes illegal activities. *Hess v. Indiana*, 414 U.S. 105, 108-09 (1973).

Regardless of the State's interest, Defendant cannot demonstrate that HB18's patchwork of regulated websites is the least restrictive means of furthering any sufficient governmental interest. Parents have a wealth of options available to oversee and control their minor children online. *See supra* p.3; 47 U.S.C. § 230(d) (notification requirements for parental controls). The State could have supported "preexisting protections to help parents" and "provid[ed] parents additional information or mechanisms needed to engage in active supervision over children's internet access." *Fitch*, 2024 WL 3276409, at *12. The Supreme Court has repeatedly endorsed those private tools over governmental intervention. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 666-67 (2004); *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 826 (2000). Whatever "modest gap in concerned parents' control" those tools leave open (if any), filling it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803. Moreover, covered websites themselves undertake great efforts to address potentially harmful content. *See supra* p.3. The Supreme Court has endorsed similar "voluntary," industry-led efforts over governmental mandates restricting speech. *Brown*, 564 U.S. at 803.

The Act's coverage provisions are also both "seriously underinclusive" and "seriously overinclusive" as to any asserted interest. *Id.* at 805. HB18 does not purport to regulate websites that are particularly harmful to minors, nor even websites particularly likely to be used by minors. It imposes onerous burdens on these websites all the same. And the Act leaves unregulated many other websites that are allowed to disseminate speech to minors free of HB18's burdensome regulations. § 509.002(b)(10),

All of HB18's provisions therefore fail "strict scrutiny," so this law is "facially invalid under the First Amendment." *Dep't of Tex., Veterans of Foreign Wars of the U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 441 (5th Cir. 2014).

**D.** Furthermore, HB18's central coverage definition is unconstitutionally vague.

9

First, HB18 does not define its central coverage requirement: whether a website "connects users in a manner that allows users to *socially interact* with other users." § 509.002(a)(1) (emphasis added). HB18 "does not explicate what constitutes 'social' interaction . . . , as opposed to other interactions between users on websites. Websites are thus left to guess as to whether the Act applies at all to them." *Fitch*, 2024 WL 3276409, at *15 (citation omitted).

Second, HB18's major exception relies on amorphous primary- and incidental-function tests. Specifically, HB18's major exception excludes websites that (A) "*primarily* function[] to provide a user with access to news, sports, commerce, or content primarily generated or selected by the digital service provider" and (B) "allow[] chat, comment, or other interactive functionality that is *incidental* to the digital service." § 509.002(b)(10) (emphases added). But "it is unclear what test one uses to determine how a digital service 'primarily' functions. Nor does the Act provide any guidance as to when a website permits chat, comment, or other interactive functionality that is merely 'incidental' to its purpose, as opposed to being a primary or integral function." *Fitch*, 2024 WL 3276409, at *15; *Griffin*, 2023 WL 5660155, at *13 (similar).

Consequently, many websites that disseminate user-generated content cannot tell whether they are covered under the law, which "has a capacity to chill constitutionally protected" speech activity. *SEIU, Local 5 v. City of Houston*, 595 F.3d 588, 597 (5th Cir. 2010) (cleaned up). The First Amendment and Due Process Clause demand "that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). And a "heightened vagueness standard appli[es] to restrictions upon speech." *Brown*, 564 U.S. at 793. "[R]igorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech," *Fox*, 567 U.S. at 253-54, or invite arbitrary and discriminatory enforcement, *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

II.   **Plaintiffs are likely to succeed in this challenge, because HB18's monitoring-and-censorship requirements unlawfully restrict websites' speech dissemination to both minors and adults.**

HB18's monitoring-and-censorship requirements are independently unlawful.

**A.  HB18's monitoring-and censorship requirements are unconstitutional.**

HB18's monitoring-and-censorship requirements violate the First Amendment by imposing a prior restraint on publishing and disseminating protected speech to minors. Even if they were not prior restraints, these provisions violate websites' right to "control the content that will appear to users." *Moody*, 144 S. Ct. at 2404-05. These provisions seek to replace private websites' voluntary content-moderation policies with the State's own—enforced using tools prescribed by the State. But the Supreme Court has made clear that those decisions belong to private websites. *See id.* "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted). The "Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Erznoznik v. Jacksonville*, 422 U.S. 205, 210 (1975). Government cannot censor this protected speech "directly," so it cannot "coerce" websites to suppress "speech on [its] behalf." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) (citation omitted). Mississippi's similar requirements were recently enjoined. *See Fitch*, 2024 WL 3276409, at *2, *17.

**1.  HB18's monitoring-and-censorship requirements are content-based and viewpoint-based prior restraints.**

**a.** Prior restraints are the "least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558-59 (1976) (citation omitted). Even prior restraints of *unprotected* speech must meet "the most exacting scrutiny." *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 102 (1979) (collecting cases); *e.g.*, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).

And requiring websites to constantly pre-screen and monitor all content they disseminate to the State's standards will chill speech. *Smith v. California*, 361 U.S. 147, 153-54 (1959).

HB18 requires websites to "*implement*" "strateg[ies]" to "*prevent* [a] known minor's *exposure to*" multiple categories of content—including by "*blocking*" content. § 509.053(a), (b)(1)(B) (emphases added). In other words, Texas now mandates that social media websites *must remove* speech after previously attempting to *prevent* websites from doing so. *See Moody*, 144 S. Ct. at 2408 ("Texas does not like the way those platforms are selecting and moderating content."). Whichever way Texas attempts to regulate the way websites make "choices about the views they will, and will not convey," the First Amendment prohibits it all the same. *Id.* at 2393.

HB18 goes even further than prior restraints that the Supreme Court has held unlawful. HB18's express requirements to censor are more than mere "informal" governmental "coercion, persuasion, and intimidation." *Bantam Books*, 372 U.S. at 67; *see Vullo*, 602 U.S. at 188. Websites must actively "prevent . . . exposure" to (*e.g.*, "block") speech or else risk liability. § 509.053(a). Worse, the effects of this law cannot be limited to minors: Websites lacking the ability to impose "age-gates"—where adults and minors are presented with different content—can comply only by preventing prohibited content from reaching *anyone*. Schruers Decl. ¶ 15.

Nor does HB18 even attempt to comply with the "procedural safeguards" that the Supreme Court has required of prior restraints. *Freedman v. Maryland*, 380 U.S. 51, 58-59 (1965). HB18 is unlawful on that basis alone. HB18 also fails strict scrutiny as discussed below, so these prior restraints necessarily fail "the most exacting scrutiny." *Daily Mail*, 443 U.S. at 102.

**b.** HB18's monitoring-and-censorship requirements trigger and fail strict scrutiny. These requirements are content-based: they facially target 12 specific content categories encompassing wide swaths of protected speech. § 509.053(a). The law thus "singles out specific subject matter

for differential treatment." *Reed*, 576 U.S. at 169. HB18 also discriminates on the basis of "viewpoint": the State's "judgment that the content of protected speech is offensive or inappropriate." *Robinson v. Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir. 2019) (citation omitted). HB18 identifies speech that "promotes," "glorifies," or "facilitates" prohibited topics. § 509.053(a). The Supreme Court has held that a law is directly "aimed at a particular viewpoint" if it forbids "promot[ing]." *Sorrell*, 564 U.S. at 565. So too for "glorifying" and "facilitating."

These requirements reach "a substantial amount of constitutionally protected speech[,]" rendering them substantially overbroad and "facially invalid." *City of Houston v. Hill*, 482 U.S. 451, 458-59 (1987); *see Seals v. McBee*, 898 F.3d 587, 596 (5th Cir. 2018) ("government [cannot] proscribe unprotected content through a regulation that simultaneously encompasses a substantial amount of protected content"). The First Amendment does not permit the State to enact "statute[s] patently capable of many unconstitutional applications, threatening those who validly exercise their rights of free expression." *Smith*, 361 U.S. at 151. So HB18's "presumptively impermissible applications" to protected speech "far outnumber any permissible ones" to unprotected speech. *United States v. Stevens*, 559 U.S. 460, 481-82 (2010). Below and in Plaintiffs' Complaint (at ¶ 48) are examples of protected speech that the Act's censorship categories could reach.

"*Suicide, self-harm, or eating disorders.*" Many protected works of art, literature, and philosophy "promote[], glorif[y], or facilitate[] . . . suicide, self-harm, [or] eating disorders," § 509.053(a)(1). Examples include Sylvia Plath's *The Bell Jar* (1963) and television series like *13 Reasons Why* (2017-2020). HB18 also captures discussions about assisted suicide for those with terminal illnesses in online support groups. *Cf.* Peter Singer, *Practical Ethics* (3d ed. 2011).

"*Substance abuse.*" Literature and popular culture are replete with examples of protected speech that "promotes, glorifies, or facilitates . . . substance abuse." § 509.053(a)(2). Examples

include The Weeknd's Kids'-Choice-Award-nominated song *Can't Feel My Face* (2016). HB18 also arguably reaches support-group discussions about using drugs to address illnesses.

"*Stalking, bullying, or harassment.*" Many protected works of art and literature "promote[], glorif[y], or facilitate[] . . . stalking, bullying, or harassment," § 509.053(a)(3). Examples include The Police's *Every Breath You Take* (1983) and entire categories at large bookstores (*e.g.*, Stalking – Fiction, Barnes & Noble, https://perma.cc/VX92-257V).

"*Grooming, trafficking, child pornography, or other sexual exploitation or abuse.*" Perhaps more than any other category that HB18 identifies, websites work diligently to avoid disseminating any speech that "promotes, glorifies, or facilitates . . . grooming, trafficking, child pornography, or other sexual exploitation or abuse." § 509.053(a)(4); *see supra* p.3; Szabo Decl. ¶¶ 10, 15; Veitch Decl. ¶¶ 17.b, 19.e, 23. Although child pornography and sexual abuse are obviously illegal, the Supreme Court has acknowledged that "teenage sexual activity and the sexual abuse of children" have "inspired countless literary works" protected by the First Amendment, such as "Romeo and Juliet" and "American Beauty." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 247-48 (2002).

"*Harmful material.*" HB18's definition of "harmful material" (§ 509.053(a)) does not distinguish between content that is obscene to children versus teenagers. Instead, HB18 applies equally to "an infant, a five-year old, or a person just shy of age seventeen." *Bonta*, 692 F. Supp. 3d at 955 (cleaned up). Laws regulating even unprotected obscenity for minors must account for the differences between these ages. *See Am. Booksellers*, 484 U.S. at 391.

**c.** HB18's monitoring-and-censorship requirements run afoul of the "most basic" First Amendment principle: "[G]overnment has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91. Such laws are "presumptively unconstitutional and may be justified only if" the State demonstrates they are "the least

restrictive means of achieving a compelling state interest." *NIFLA*, 585 U.S. at 766 (citation omitted). Defendant must demonstrate "the curtailment of free speech [is] actually necessary to the solution," *Brown*, 564 U.S. at 799—including "hard evidence of how widespread or how serious the problem" is, *Playboy*, 529 U.S. at 819 (cleaned up). It must "show a direct causal link," *Brown*, 564 U.S. at 799, between that "problem" and the "speech ban" it imposes, *Playboy*, 529 U.S. at 823. Defendant cannot meet these burdens for the reasons discussed above (at pp.8-10) and below.

To begin, the State lacks a legitimate interest in preventing minors from accessing protected speech. *Supra* p.8. The Supreme Court has rejected the "mistaken" view that States may "create a wholly new category of content-based regulation that is permissible only for speech directed at children." *Brown*, 564 U.S. at 794. Regardless, HB18 is not the least restrictive means and is both "seriously underinclusive" and "seriously overinclusive." *Id.* at 805.

*Not least restrictive means.* Members' websites employ policies and enforcement tools to address potentially harmful content. *Supra* p.3. These "voluntary" self-regulatory efforts are preferable to government intervention. *Brown*, 564 U.S. at 803. Because websites' existing content-moderation policies are a preexisting "system [that] does much to ensure that minors cannot" access harmful and objectionable content, "the government does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Id.* at 803 & n.9. Parents and guardians, too, have myriad available means to help prevent minors from accessing harmful and objectionable content. *E.g.*, *Ashcroft*, 542 U.S. at 667 (private alternatives demonstrate tailoring problems); *Playboy*, 529 U.S. at 824 (similar); *Fitch*, 2024 WL 3276409, at *12. The State could "encourage the use of [content] filters . . . by parents to protect minors." *Griffin*, 2023 WL 5660155, at *21 (cleaned up); *see Yost*, 2024 WL 555904, at *13.

*Vastly underinclusive.* HB18 leaves untouched many media sources where minors can

encounter the harmful and objectionable speech HB18 seeks to regulate. *See Fitch*, 2024 WL 3276409, at *12-13. Minors can encounter speech identified by the Act in books, television, movies, and *other websites* excluded from the Act's scope—such as streaming services like Hulu and myriad blogs and other websites without interactivity. The State's "wise decision" not to regulate other protected media sources ("wise" because it would be similarly unconstitutional) nevertheless renders the Act "wildly underinclusive." *See Brown*, 564 U.S. at 801.

*Overinclusive: ignores other preexisting laws.* HB18's prior restraints are "superimposed upon the State's criminal regulation[s]"—making HB18 itself "largely unnecessary." *Bantam Books*, 372 U.S. at 69. Texas law already addresses unlawful conduct (and speech) related to HB18's censorship categories. *See* Compl. ¶ 127.[3] "The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it." *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001). And the government cannot "suppress[ ]" the speech of a "law-abiding" minor or website "to deter conduct by a non-law-abiding third party." *Id.* at 529-30. HB18's speech restrictions are thus an unconstitutional "prophylaxis-upon-prophylaxis approach." *FEC v. Cruz*, 596 U.S. at 306.

*Overinclusive: ignores differing ages.* HB18 does not distinguish between speech appropriate for websites' youngest users versus 17-year-olds. *Am. Booksellers*, 484 U.S. at 395. Laws that ignore the developmental differences among minors "raise . . . First Amendment questions." *Id.*; *Reno*, 521 U.S. at 865-66; *Fitch*, 2024 WL 3276409, at *12. Because HB18 "burdens adults' First Amendment rights, [ ] that alone makes it overinclusive." *Fitch*, 2024 WL 3276409, at *12.

*Counterproductive.* HB18 will hurt websites' efforts to address potentially harmful content

---

[3] The State cannot defend HB18 by resorting to the criminal context where "promote" and "facilitate" have "longstanding and pervasive" judicial constructions that speech laws lack. *United States v. Hansen*, 599 U.S. 762, 773 (2023). Plus, "glorify" has no such analog.

by dictating the technical means by which websites must moderate that content. Each website has developed its own content-moderation system that it continuously calibrates to address the content on its service and the specific mix of hurdles it faces. *E.g.*, Veitch Decl. ¶¶ 35-39. HB18 will replace those bespoke systems with an already-outmoded, static checklist. *E.g.*, Pai Decl. ¶ 15; Schruers Decl. ¶ 21, Veitch Decl. ¶ 37. For example, filtering and hashing content is not well-suited to monitor for like *behavioral* violations, such as harassment and grooming. Schruers Decl. ¶ 19.a-b; Szabo Decl.¶ 22; Veitch Decl. ¶ 36. Filtering is ill-suited to address context, making it both over- and underinclusive. Veitch Decl. ¶ 36; *see* Schruers Decl. ¶ 19.a; *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 201 (2003). Hashing capabilities do not exist in meaningful forms for almost all of the categories identified by the Act—and even then is limited to identifying *copies* of previously identified content. Veitch Decl. ¶ 36. Regardless, even if such capabilities existed, hashing is not a viable approach to identifying *new* content or text-based content. *See* Szabo Decl. ¶ 22; Compl. ¶ 57. Finally, sharing websites' proprietary algorithms with third parties could enable malicious actors to evade moderation. Schruers Decl. ¶ 19.f; Veitch Decl. ¶ 38.

### 2. HB18's monitoring-and-censorship requirements are unconstitutionally vague.

HB18's monitoring-and-censorship requirements are also unconstitutionally vague. Websites cannot be sure that their voluntary content-moderation efforts comply with HB18's governmental demand—chilling their dissemination of speech. *E.g.*, Veitch Decl. ¶¶ 31-34.

The Supreme Court has held a speech law void "because of vagueness" if compliance hinges on the word "promote." *Baggett v. Bullitt*, 377 U.S. 360, 371-72 (1964). The "range of activities which are or might be deemed inconsistent with" promoting an idea "is very wide indeed" and fails to "provide[] an ascertainable standard of conduct." *Id.* "'[P]romotes' . . . [is] susceptible of multiple and wide-ranging meanings." *United States v. Williams*, 553 U.S. 285, 294

(2008). HB18's other verbs—"glorify" and "facilitate"—are similarly vague.

HB18 does not define these liability-assigning terms with the "sufficient definiteness" required to ensure "that ordinary people can understand" their obligations. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Thus, they risk "arbitrary or discriminatory" enforcement. *Fox*, 567 U.S. at 253. This vagueness is exacerbated by content moderation's nature: Context and intent (across language and culture) all help determine whether content "promotes, glorifies, or facilitates" something else. Schruers Decl. ¶ 14; Veitch Decl. ¶¶ 36-37. The same phrase ("drugs are glorious!") could be sarcastic, earnest, or quoting another person. What that phrase means depends on the vagaries of human communication, and thus risks being "completely subjective." *Grayned*, 408 U.S. at 113. HB18 "effectively grants [the State] the discretion to [assign liability] selectively on the basis of the content of the speech." *Hill*, 482 U.S. at 465 n.15.

## B. HB18's monitoring-and-censorship requirements are preempted by 47 U.S.C. § 230.

Congress provided all websites "broad immunity" for "all claims stemming from their *publication of information created by third parties*." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 286 (5th Cir. 2024) (cleaned up), *cert. granted* (U.S. July 2, 2024). That includes purported "failure[s] to implement basic safety measures to protect minors." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418-19 (5th Cir. 2008). It likewise "immunizes website operators from state-law obligations . . . requir[ing] the *monitoring or deletion* of third-party content." Br. for Appellant 30-31, *Free Speech Coal., Inc. v. Paxton*, 2023 WL 6465441 (5th Cir. Sept. 25, 2023) (emphasis added).

Relevant here, "[n]o interactive computer service shall be treated as the publisher or speaker of any information provided by" someone else. 47 U.S.C. § 230(c)(1).[4] Protected

---

[4] Members' websites are "interactive computer service[s]" under 47 U.S.C. § 230(f)(2). *E.g.*, *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 993 (S.D. Tex. 2017).

"publisher" activities include decisions about whether and how to "filter, screen, allow, [] disallow," "pick, choose," and "display," "content." *Id.* § 230(f)(4). By preempting "inconsistent" laws, *id.* § 230(e)(3), Congress barred regulation of Internet websites' "decisions relating to the monitoring, screening, and deletion of content," *MySpace*, 528 F.3d at 420 (citation omitted).

Section 230 thus preempts HB18's monitoring-and-censorship requirements. HB18 requires websites to "*implement* a strategy to *prevent* [a] known minor's *exposure to*" certain third-party content. § 509.053(a) (emphases added). That impermissibly requires covered websites to "address certain harmful content" on their services. *MySpace*, 528 F.3d at 420 (citation omitted).

Compliance with this requirement raises additional § 230 problems. For example, it would require covered websites to monitor for content, but § 230 "specifically proscribes liability" for "decisions relating to the monitoring . . . of content." *Id.* (citation omitted); *see La'Tiejira*, 272 F. Supp. 3d at 993 (similar). Similarly, HB18 would require covered websites to block minors' access to user-generated content through its command to "prevent . . . exposure to" prohibited third-party content. § 509.053(a). That means websites must avoid "display[ing]" such content, through "block[ing]," "screen[ing]," or "disallow[ing]" that content. 47 U.S.C. § 230(c), (f)(4). Yet, § 230 protects websites from liability for third-party content that they (purportedly) do not remove. "[T]hat is the point of Section 230: to immunize [websites] for harm caused by unremoved speech." *Free Speech Coal.*, 95 F.4th at 284-85; *see MySpace*, 528 F.3d at 420 ("deletion of content") (citation omitted); *La'Tiejira*, 272 F. Supp. 3d at 993-94 ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." (citation omitted)).

At bottom, "publishers . . . filter content," and § 230 preempts liability for "actions quintessentially related to a publisher's role." *Free Speech Coal.*, 95 F.4th at 286 (citation omitted).

Section 230 therefore preempts HB18's monitoring-and-censorship provisions in all applications.

## III.   The remaining factors favor a preliminary injunction.

Plaintiffs have shown "arguably the most important factor: likelihood of success on the merits." *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1099 (5th Cir. 2023). They meet the other factors.

The Act will cause Plaintiffs' members and users irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted).

HB18 will also cause irreparable harm for Plaintiffs' members by imposing steep and "non-recoverable" compliance costs. *Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024) (citation omitted). Websites have provided declarations that these costs are large, as they will require websites to either revamp existing systems or develop them anew. Pai Decl. ¶ 22; Schruers Decl. ¶¶ 18-19; Szabo Decl. ¶ 22; Veitch Decl. ¶¶ 30, 39-42. As just one example, adopting the infrastructure to "hash" content will require substantial investment. Schruers Decl. ¶ 19.b. For some websites, HB18's costs may be insurmountable. Riley Decl. ¶¶ 7-10; Schruers Decl. ¶ 20; Szabo Dec. ¶ 25.

The final factors—"harm to the opposing party and the public interest"—"merge" in lawsuits against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[I]njunctions protecting First Amendment freedoms are always in the public interest" and "the State and the public won't be injured by an injunction of a statute that likely violates the First Amendment." *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024) (citation omitted). And whatever interest the State has in preventing the dissemination of certain limited content categories, they are amply served by Plaintiffs' members' existing content moderation. *See supra* p.3.

## Conclusion

Plaintiffs respectfully request that this Court enjoin Defendant from enforcing HB18.

Dated: July 30, 2024

Steven P. Lehotsky*
steve@lkcfirm.com
Jeremy Evan Maltz (Texas Bar # 24102129)
jeremy@lkcfirm.com
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave., NW, Suite 700
Washington, DC 20001

Jared B. Magnuson*
jared@lkcfirm.com
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

*Motion for admission *pro hac vice*
forthcoming

Respectfully submitted,

*/s/ Scott A. Keller*
Scott A. Keller (Texas Bar # 24062822)
scott@lkcfirm.com
Joshua P. Morrow (Texas Bar # 24106345)
josh@lkcfirm.com
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
T: (512) 693-8350
F: (512) 727-4755

21

**Certificate of Service**

I certify that on July 30, 2024, the foregoing was filed electronically via the Court's CM/ECF system. Plaintiffs will also cause the foregoing to be served by process server and electronic mail to:

> Aaron.Nielson@oag.texas.gov
> Lanora.Pettit@oag.texas.gov
> James.Lloyd@oag.texas.gov
> Todd.Dickerson@oag.texas.gov
> Kimberly.Gdula@oag.texas.gov

> */s/ Jeremy Evan Maltz*
> Jeremy Evan Maltz

**Certificate of Conference**

I certify that on July 30, 2024, before filing in this Court, counsel for Plaintiffs conferred with counsel for Defendant and provided counsel copies of the foregoing, its accompanying exhibits, and the Complaint. Defendant opposes the relief requested in this motion.

> */s/ Jeremy Evan Maltz*
> Jeremy Evan Maltz