# Exhibit 3 –
# Declaration of
# Carl Szabo (NetChoice)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, and <br><br> NETCHOICE, LLC, <br><br> *Plaintiffs,* <br><br> v. <br><br> KEN PAXTON, in his official capacity as Attorney General of Texas, <br><br> *Defendant.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 1:24-cv-849 |

**DECLARATION OF CARL SZABO IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Carl Szabo, declare as follows:

1. I am the Vice President and General Counsel of Plaintiff NetChoice, LLC ("NetChoice"). In addition to providing legal counsel to NetChoice, I coordinate NetChoice's advocacy before legislative bodies, courts, and government agencies to promote NetChoice's mission of advancing free enterprise and free expression on the Internet. My role at NetChoice has made me broadly familiar with member companies' business practices, the benefits they provide the public, and their efforts to keep minors safe online. My role has also made me familiar with other websites, applications, and digital services more broadly.[1]

2. I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order. I am over the age of 18 and am competent to make the

---

[1] This Declaration will refer to all digital services covered by Texas House Bill 18 as "covered websites," unless necessary to distinguish among different kinds of digital services. Similarly, this Declaration will use "members" to refer to NetChoice members with services regulated by the Act, unless otherwise noted.

statements herein. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

I.     **About NetChoice.**

3.     NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. As our website explains, NetChoice "works to make the Internet safe for free enterprise and free expression" and engages at the local, state, national, and international levels to ensure a bright digital future.[2] In particular, we are dedicated to preserving the Internet as a vibrant marketplace for communication, commerce, and the exchange of ideas.

4.     For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the Internet, while minimizing burdens on businesses to help make the Internet more accessible and useful for both businesses and consumers. Our members include a broad array of popular online services, including: Airbnb, Alibaba.com, Amazon.com, AOL, Dreamwidth, eBay, Etsy, Expedia, Fluid Truck, Google, HomeAway, Hotels.com, Lime, Lyft, Meta, Netflix, Nextdoor, Oath, OfferUp, Orbitz, PayPal, Pindrop, Pinterest, PrizePicks, Snap Inc., StubHub, Swimply, Travel Tech, Travelocity, Trivago, Turo, VRBO, VSBLTY, Waymo, Wing, X (formerly known as Twitter), and Yahoo!.[3] Many of these members operate websites that are among the Internet's most popular destinations, disseminating billions of user-generated posts. Other members' websites serve comparatively smaller communities.

5.     NetChoice has over two decades of experience advocating for online businesses and for the principles of free speech and free enterprise on the Internet. That experience, combined

---

[2] NetChoice, Home, https://perma.cc/R7YU-JBN4.
[3] NetChoice, About Us, https://perma.cc/5KHE-CZ3R.

with the practical applications of the law and declarations submitted by our members, leads us to conclude that Texas House Bill House Bill 18 ("HB18" or "Act"), 2023 Tex. Sess. Law Serv. Ch. 795, were it to take effect, would irreparably harm our members and those who interact with members' websites.

**II.     NetChoice members' websites are full of valuable expression and communities that provide people—minors and adults alike—with profound benefits.**

6.      NetChoice members' websites are full of a wide range of valuable expression and communities. Whether it is to practice their religious beliefs, engage in political discourse, seek cross-cultural dialogue, supplement their education, or learn new skills, people across the nation and world (minors and adults alike) use these websites every day to explore protected speech. They do so in a wide variety of ways—socially (to connect with friends from school and church, form groups, or find communities of those with likeminded interests), demonstratively (to showcase their creative, artistic, or athletic talents), informatively (to keep up with the news or current events), politically (to participate in public discussion or raise awareness about social causes), educationally (to get help with math problems, learn about financial literacy, or listen to college course lectures), and myriad other ways.

7.      The specific communities that websites offer and foster differ, providing users with different benefits. On Facebook, users can create communities with other like-minded users for many purposes, including by taking part in religious services. On Instagram, users can share vacation pictures and short informative videos. On Nextdoor, users can connect with their neighbors, including by sharing local news and requesting to borrow tools. On Pinterest, users can discover ideas for recipes, style, home decor, motivation, and more. On Snapchat, users can share moments with friends and family. On YouTube, users can watch documentaries. And on X, users can engage with their elected representatives and the political, cultural, and social topics of the day.

3

**III.    Parents have many tools to oversee and control their minor children online, and NetChoice members go to great lengths to protect minors.**

8.    Parents and guardians have many overlapping and complementary choices to oversee and control their minor children's use of the Internet, including controlling whether their minor children have access to Internet-connected devices in the first place.

a.    **Network-Level Restrictions.** Many, if not most, cell service and broadband Internet providers have designed and advertised tools for parents to block Internet access altogether; to block certain apps, sites, and contacts from their children's phones; and to restrict screen time on their children's devices. *See, e.g.*, Verizon, Verizon Smart Family, https://perma.cc/5H9F-ZEYQ; AT&T, AT&T Secure Family, https://perma.cc/G4JH-JMP6; T-Mobile, Family Controls and Privacy, https://perma.cc/Y476-NMGH; Comcast Xfinity, Set Up Parental Controls for the Internet, https://perma.cc/5NUD-GYGJ. Similarly, there is much publicly accessible information about the many wireless routers that offer parental control settings that parents can use to block specific online services, allow only the specific online services that a parent specifies, limit the time that their children spend on the Internet, set individualized content filters, and monitor the online services that their children visit. *See, e.g.*, Molly Price & Ry Crist, *How to Set Up and Use Your Wi-Fi Router's Parental Controls*, CNET (Feb. 11, 2021), https://perma.cc/GR8X-XCY6; Netgear, Circle Smart Parental Controls, https://perma.cc/768H-NVXH; tp-link, How to Configure Parental Controls on the Wi-Fi Routers (Case 1), https://perma.cc/2NN9-HBPH.

b.    **Device-Level Restrictions.** Many devices themselves contain ways parents can restrict their use. Many of the most popular mobile phone, tablet, video game console, and personal computer manufacturers like Apple, Google, Microsoft, and Samsung publicize the ways they allow parents to limit screen time across their devices and provide parents with tools to control what applications their children can use, set age-related restrictions on those applications, filter content,

4

and control privacy settings. *See, e.g.*, Apple, Use Parental Controls on Your Child's iPhone and iPad, https://perma.cc/UEK6-G8GZ; Google, Family Link, Help Keep Your Family Safer Online, https://perma.cc/D22U-SMQ9; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/9J48-B39J; Samsung, Parental Controls Available on Your Galaxy Phone or Tablet, https://perma.cc/95KC-P39K; Xbox, Xbox Family Settings App, https://perma.cc/CWR3-99LV. There are also many third-party applications parents can install on their children's devices to monitor their activity, set limits on screen time, and filter content—as publicized in mainstream publications. *See, e.g.,* Alyson Behr, *The Best Parental Control Apps in 2024, Tested By Our Editors*, CNN underscored (Mar. 11, 2024), https://perma.cc/QX9H-G88B.

    c.    **Browser-Level Restrictions.** There are also parental controls on Internet browsers that allow parents to control what online services their children may access. *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://perma.cc/U86T-VFJ2. Some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, Safety Center, Helping You Set Digital Ground Rules with Family Link, https://perma.cc/FTG3-3JHW; Microsoft, Learn More About Kids Mode in Microsoft Edge, https://perma.cc/C93B-SJT5. Third-party software and browser extensions are also widely available to reinforce these tools. *See, e.g.*, Kim Key, *The Best Parental Control Software for 2024*, PCMag (Dec. 15, 2023), https://perma.cc/NF7X-4KJP. Browsers also provide all users with "some control over the information websites collect." FTC, How Websites and Apps Collect and Use Your Information, https://perma.cc/34QL-TX2T.

    d.    **App-Level Restrictions.** NetChoice members have developed their own tools that allow parents to set further restrictions on their minor children's use of the websites. For example, Meta has developed its "Family Center," which provides for parental supervision on Instagram.

5

Meta, Family Center, https://perma.cc/4XG9-AF9D. Using these tools, parents can, among other things, (1) see their minor children's followers and who their minor children are following; (2) see how long the minor spends on Instagram; and (3) set time limits and scheduled breaks. Similarly, Pinterest provides parents of minors under 18 the ability to "set[] up a 4-digit passcode" that "lock[s] certain settings related to account management, privacy and data, and social permissions on [a] teen's Pinterest account." Pinterest, Resources for Parents and Caregivers of Teens, https://perma.cc/8KHF-6A6S ("Pinterest Parent Resources"). And for teenage users, Snapchat provides parents and guardians the "Family Center," where parents and guardian can:

- See which Snapchat friends . . . their teens have sent [messages, photos, or videos] to in the last seven days, in a way that still protects their privacy by not revealing the actual contents of their conversations (Snaps and messages);

- See a complete list of their teens' existing friends and easily view new friends their teens have added, making it easy to start conversations about who their new contacts are;

- Limit their teen's ability to view certain content in the Stories and Spotlight tabs; and

- Easily and confidentially report any accounts parents may be concerned about directly to our 24/7 Trust and Safety team.

Snapchat Support, What is Family Center?, https://perma.cc/5V8M-3WKD.

9. NetChoice members take the safety of all users seriously and place a special emphasis on minors' safety, including through the following means:

a. **Limiting access by age.** All NetChoice members prohibit minors younger than 13 from accessing their main services. Some members, however, offer separate experiences for users under 13 geared for that specific age group.

b. **Minor-Specific Policies.** Some NetChoice members have policies or practices specifically for minors' accounts on their websites. Instagram, for instance, states that it imposes default restrictions that make it more difficult for people under 16 years old to come across potentially

6

sensitive content. *See* Instagram, Updates to the Sensitive Content Control (June 6, 2022), https://perma.cc/YPY9-XE4A. Facebook, likewise, has default settings for minors. Meta, Protecting Teens and Their Privacy on Facebook and Instagram, https://perma.cc/YM6F-BZ8L. Similarly, YouTube publicizes that it "place[s] an age-restriction on" certain content that "may be . . . not appropriate for viewers under 18." YouTube Help, Age-Restricted Content, https://perma.cc/H2DH-7EMA. Pinterest sets accounts for users younger than 16 to private. Pinterest, Resources for Parents and Caregivers of Teens, https://perma.cc/SE6W-36VZ.

10. Any minor-specific policies and parental tools exist alongside the websites' generally applicable "content-moderation" policies. NetChoice members have chosen to balance disseminating large amounts of user-authored expression while also limiting publication of speech that NetChoice members consider harmful, objectionable, or simply not conducive to their communities. NetChoice members publish and enforce varied content-moderation policies that address the publication of such prohibited content. Based on NetChoice's research, the "rate of violative content removed from platforms and the level at which it is removed prior to being seen by users makes clear companies are successfully prioritizing the safety of their users." NetChoice, By the Numbers: What Content Social Media Removes and Why 13 (2021), https://perma.cc/7E63-ECRT ("By the Numbers"). That is especially true for some of the most potentially harmful content. *Id.* at 5-6 (on Facebook "[t]he proactive rate for severe violations such as child sexual exploitation, terrorist organizations, and violent or graphic content were all 99-100%").

11. To that end, NetChoice's members already have policies in place to block or limit the publication of content that the Act regulates.[4]

---

[4] This Declaration cites portions of NetChoice members' policies. Those policies are lengthy and nuanced, so this Declaration does not purport to fully summarize the policies. To aid readability, quotes from some policies have capitalization adjusted.

7

12. Expression that "promotes, glorifies, or facilitates . . . suicide, self-harm, or eating disorders." Tex. Bus. & Com. Code § 509.053(a)(1). NetChoice's members already have policies about this prohibited speech, sometimes in nearly identical terms:

**a. Google (YouTube):** YouTube **does not allow** "content on YouTube that promotes suicide, self-harm, or eating disorders, that is intended to shock or disgust, or that poses a considerable risk to viewers." YouTube Help, Suicide, Self-Harm, and Eating Disorders Policy, https://perma.cc/66VN-YSZT.

**b. Meta (Facebook and Instagram):** Meta **prohibits** speech that "intentionally or unintentionally celebrate[s] or promote[s] suicide, self-injury or eating disorders." Meta Transparency Center, Suicide, Self-Injury, and Eating Disorders, https://perma.cc/2LB8-ALGG. But Meta does "allow people to discuss these topics because [Meta] want[s] [its] services to be a space where people can share their experiences, raise awareness about these issues, and seek support from one another." *Id.* Thus, Meta **prohibits** "content that promotes, encourages, coordinates, or provides instructions for suicide, self-injury, or eating disorders." *Id.* But Meta may allow "content that depicts older instances of self-harm such as healed cuts or other non-graphic self-injury imagery in a self-injury, suicide or recovery context" (although sometimes this content appears behind "sensitivity screen[s]"). *Id.*

**c. Nextdoor:** Nextdoor has resources available for suicide and self-harm prevention. Nextdoor Help Center, Suicide & Self-Harm Prevention, https://perma.cc/XCX9-MFTR.

**d. Pinterest:** Pinterest **prohibits** "content that displays, rationalizes or encourages suicide, self-injury, [or] eating disorders." Pinterest, Community Guidelines, https://perma.cc/5Q5T-ZJL6. Accordingly, Pinterest expressly **prohibits**: "self-harm instructions," "suicidal thinking and quotes," "graphic or otherwise triggering imagery or descriptions of self-harm," "promotion of self-harm," "images of accessories used to self-harm," "negative self-talk and insensitive humor about self-harming behavior," and "suicide pacts, challenges and hoaxes," among other things. *Id.*

**e. Snap:** Snap **prohibits** "the glorification of self-harm, including the promotion of self-injury, suicide, or eating disorders." Snap Privacy, Safety, and Policy Hub, Community Guidelines, https://perma.cc/M8NM-4ABR ("Snap Community Guidelines"); *see* Snap Privacy, Safety, and Policy Hub, Threats, Violence, & Harm, https://perma.cc/8JDW-3LQA (noting that Snap **prohibits** "content that encourages or glorifies self-harm, such as suicide, self-mutilation, or eating disorders").

**f. X:** X prohibits "promot[ing] or encourag[ing] suicide or self-harm," including "eating disorders" and "sharing information, strategies, methods or instructions that would assist people to engage in self-harm and suicide." X Help Center, Suicide and Self-Harm Policy, https://perma.cc/P5GL-CMK6.

13.     Expression that "promotes, glorifies, or facilitates . . . substance abuse." Tex. Bus. & Com. Code § 509.053(a)(2). NetChoice's members already have policies concerning substance use and abuse.

**a. Google (YouTube):** YouTube **prohibits** various kinds of speech related to substance abuse. YouTube **prohibits** (1) "displays of hard drug use," including "non-educational" displays of "the injection of intravenous drugs"; (2) "making hard drugs"; (3) "minors using alcohol or drugs"; (4) "selling hard drugs"; and (5) "selling soft drugs." YouTube Help, Illegal or Regulated Goods or Services Policies, https://perma.cc/HVH3-5DCR. Likewise, YouTube **prohibits** "content instructing how to purchase drugs on the dark web" and "content that promotes a product that contains drugs, nicotine, or a controlled substance." *Id.* Additionally, YouTube **prohibits** expression that "aims to directly sell, link to, or facilitate access to" "alcohol," "controlled narcotics and other drugs," "nicotine, including vaping products," and "pharmaceuticals without a prescription." *Id.*

**b. Meta (Facebook and Instagram):** Meta **prohibits** various kinds of content related to substance use, including content that "coordinates or promotes (by which we mean speaks positively about, encourages the use of, or provides instructions to use or make) non-medical drugs." Meta Transparency Center, Restricted Goods and Services, https://perma.cc/EML4-5LLJ. Meta also **prohibits** content that "admits to personal use without acknowledgment of or reference to recovery, treatment, or other assistance to combat usage," but even with such an acknowledgement or reference, this content "may not speak positively about, encourage use of, coordinate or provide instructions to make or use non-medical drugs." *Id.*

**d. Nextdoor:** Nextdoor **prohibits** the "purchase, trade, sale or distribution" of "alcohol, including homebrews," "drug paraphernalia," "marijuana and CBD," "prescription drugs and prescription medical devices," "tobacco," and "other controlled substances." Nextdoor Help Center, List of Prohibited Goods and Services, https://perma.cc/7TCD-DRT9. Nextdoor also **prohibits** "selling, soliciting, or offering any illegal goods or services." Nextdoor Help Center, Do Not Engage in Harmful Activity, https://perma.cc/CD34-PSZC.

**e. Pinterest:** Pinterest **prohibits** "content that displays, rationalizes or encourages . . . substance abuse." Pinterest, Community Guidelines, https://perma.cc/5Q5T-ZJL6. Pinterest also **prohibits** "trading or selling . . . products or substances that can cause harm when used, altered or manufactured irresponsibly," including "alcohol, tobacco, drugs . . . including chemical precursors and pill presses, punches and dies." *Id.*

**f. Snap:** Snap **prohibits** "promoting, facilitating, or participating in criminal activity, such as buying, selling, exchanging, or facilitating sales of illegal or regulated drugs." Snap Community Guidelines.

**g. X:** X **prohibits** "selling, buying, or facilitating transactions in illegal goods or services," including "drugs and controlled substances." X Help Center, Illegal or Certain Regulated Goods or Services, https://perma.cc/DZX7-46TJ. And for advertisers specifically, "X

prohibits the promotion of drugs and drug paraphernalia." X Business, Drugs and Drug Paraphernalia, https://perma.cc/5QTE-PPBY.

14. Expression that "promotes, glorifies, or facilitates . . . stalking, bullying, or harassment." Tex. Bus. & Com. Code § 509.053(a)(3). NetChoice's members already have policies about stalking, bullying, and harassment.

    **a. Google (YouTube):** YouTube **prohibits** expression that "threaten[s] someone's physical safety" or "targets someone with prolonged insults or slurs based on their physical traits or protected group status." YouTube Help, Harassment & Cyberbullying Policies, https://perma.cc/T35Q-2G9H. In particular, YouTube **prohibits** expression "uploaded with the intent to shame, deceive or insult a minor." *Id.* YouTube also prohibits "content that promotes violence or hatred against individuals or groups based on" certain attributes. YouTube Help, Hate Speech Policy, https://perma.cc/SA76-ALJV.

    **b. Meta (Facebook and Instagram):** Meta **prohibits** "bullying and harassment," using a sophisticated, multi-tier policy that covers everything from "making threats and releasing personally identifiable information," to "sending threatening messages and making unwanted malicious contact," to "content that's meant to degrade or shame." Meta Transparency Center, Bullying and Harassment, https://perma.cc/NFN9-LRVT. These "policies provide heightened protection for anyone under the age 18, regardless of user status." *Id.*

    **c. Nextdoor:** Nextdoor **prohibits** "[a]ttacking, berating, bullying, belittling, insulting, harassing, threatening, trolling, or swearing at others or their views," as well as "[p]ublic shaming." Nextdoor Help Center, Be Respectful to Your Neighbors, https://perma.cc/7HBD-9SMA?type=image. Nextdoor also **prohibits** "[t]hreatening someone and/or their pet's safety," "[p]osting comments that encourage violence against others," and "[t]hreatening someone's privacy or security." Nextdoor Help Center, Do Not Engage in Harmful Activity, https://perma.cc/VU45-G82U?type=image.

    **d. Pinterest:** Pinterest **prohibits** content that "insult[s], hurt[s] or antagonize[s] individuals or groups of people," including "[c]riticisms involving name-calling, profanity and other insulting language or imagery." Pinterest, Community Guidelines, https://perma.cc/P6UY-Y46M. Pinterest also **prohibits** "[h]arassing content or behavior" in messages. *Id.*

    **e. Snap:** Snap **prohibits** all "bullying or harassment," including "all forms of sexual harassment," such as "sending unwanted sexually explicit, suggestive, or nude images to other users." Snap Community Guidelines.

    **f. X:** X **prohibits** "target[ing] others with abuse or harassment, or encourag[ing] other people to do so." X Help Center, Abuse and Harassment, https://perma.cc/8XVX-VD5M.

10

15. Expression that "promotes, glorifies, or facilitates . . . grooming, trafficking, child pornography, or other sexual exploitation or abuse." Tex. Bus. & Com. Code § 509.053(a)(4). NetChoice's members already have policies about this content.

   **a. Google (YouTube):** YouTube **prohibits** all "sexually explicit content featuring minors and content that sexually exploits minors." YouTube Help, Child Safety Policy, https://perma.cc/C5VC-5EM8. YouTube "report[s] content containing child sexual abuse imagery to the National Center for Missing and Exploited Children, who work with global law enforcement agencies." *Id.*

   **b. Meta (Facebook and Instagram):** Meta **prohibits** a vast range of "content or activity that sexually exploits or endangers children," including: "[c]hild sexual exploitation," "[s]olicitation," "[i]nappropriate interactions with children," "[e]xploitative intimate imagery and sextortion," "[s]exualization of children," "[c]hild nudity," and "[n]on-sexual child abuse." Meta Transparency Center, Child Sexual Exploitation, Abuse, and Nudity, https://perma.cc/42H5-EF6N. Meta also prohibits "[c]ontent that praises, supports, promotes, advocates for, provides instructions for or encourages participation in non-sexual child abuse." *Id.*

   **c. Nextdoor:** Nextdoor's policies against off-topic and sexual content **prohibit** the kind of content covered by this requirement. *See, e.g.*, Nextdoor Help Center, Do Not Engage in Harmful Activity, https://perma.cc/AY8T-LCPK ("No graphic, violent, sexually explicit, or adult content."). Notably, Nextdoor has relatively few instances of CSAM. In 2023, for instance, Nextdoor made only six reports to the National Center for Missing & Exploited Children. *See* Nextdoor, Transparency Report 2023 at 9, https://perma.cc/3UA6-7PCP.

   **d. Pinterest:** Pinterest **prohibits** "child sexual exploitation of any kind" and "enforce[s] a strict, zero-tolerance policy for any content—including imagery, video, or text— or accounts that might exploit or endanger minors." Pinterest, Community Guidelines, https://perma.cc/K5PD-UG87. "Pinterest prohibits not just illegal child sexual abuse material (CSAM), but goes a step further to prohibit any content that contributes to the sexualization of minors, including in imagery and text. [It] also work[s] closely with the National Center for Missing and Exploited Children (NCMEC) to combat this type of activity, and report content violations as required under the law." *Id.* Accordingly, Pinterest "remove[s]": (1) "Illegal child sexual abuse material"; (2) "Sexualization or sexual exploitation of minors, like grooming, sexual remarks or inappropriate imagery–including in the form of cartoons and anime"; (3) "Nude and sexual imagery involving minors"; (4) "Content that facilitates unsolicited contact with minors, such as email addresses, phone numbers and physical addresses, to prevent contact intending to start an exploitative relationship"; (5) "Comments on imagery of minors that are inappropriate or sexualized"; and (6) "The intentional misuse of content depicting minors that is otherwise non-violating. For example, [Pinterest] will deactivate users who save otherwise non-violating content into collections or in other contexts that suggest the intent is sexualization of minors." *Id.*

11

**e. Snap:** Snap **prohibits** "any activity that involves sexual exploitation or abuse of a minor, including sharing child sexual exploitation or abuse imagery, grooming, or sexual extortion (sextortion), or the sexualization of children." Snap Community Guidelines. Snap "report[s] all identified instances of child sexual exploitation to authorities, including attempts to engage in such conduct." *Id.*; *see also* Snap Privacy, Safety, and Policy Hub, Illegal or Regulated Activities, https://perma.cc/VC6T-LM4K. (noting that Snap **prohibits** "promoting or facilitating any form of exploitation, including human trafficking or sex trafficking").

**f. X:** X has "**zero tolerance** towards any material that features or promotes child sexual exploitation." X Help Center, Child Safety, https://perma.cc/24AF-7DDQ (emphasis added).

16. "Harmful Material." Tex. Bus. & Com. Code § 509.001(3). Even if not classified as "obscenity for minors" or "harmful material," NetChoice's members already have policies in place to prohibit publishing obscenity to minors or all users.

**a. Google (YouTube):** YouTube **prohibits** "explicit content meant to be sexually gratifying," including the "depiction of clothed or unclothed genitals, breasts, or buttocks that are meant for sexual gratification." YouTube Help, Nudity and Sexual Content Policy, https://perma.cc/U3U5-E9VN. YouTube also prohibits "pornography, the depiction of sexual acts, or fetishes that are meant for sexual gratification." *Id.*

**b. Meta (Facebook and Instagram):** Meta **prohibits** "[i]magery of adult nudity" and "[i]magery of sexual activity," including even "implicit sexual activity and stimulation." Meta Transparency Center, Adult Nudity and Sexual Activity, https://perma.cc/W6LY-ZJFT. For other content, such as "[r]eal-world art, where . . . [i]magery depicts . . . sexual activity," Meta **restricts** content by "limit[ing] the ability to view the content to adults, ages 18 and older." *Id.*

**c. Nextdoor:** Nextdoor **prohibits** "sexually explicit or suggestive content," "adult content," "photos that contain nudity," and "any content that facilitates, encourages, or coordinates commercial sexual services." Nextdoor Help Center, Do Not Engage in Harmful Activity, https://perma.cc/VAA9-QFWR. Nextdoor also **prohibits** "[s]exual content," including "[a]dult toys or products," "[p]ornography," and "[p]rostitution or escort services." Nextdoor Help Center, List of Prohibited Goods and Services, https://perma.cc/MTN3-3GGM.

**d. Pinterest:** Pinterest **prohibits** "adult content, including pornography and most nudity." Pinterest, Community Guidelines, https://perma.cc/K5PD-UG87. Consequently, Pinterest "remove[s] or limit[s] the distribution of mature and explicit content," including "nudity"; "[s]exualized content, even if the people are clothed or partially clothed"; "[g]raphic depictions of sexual activity in imagery or text"; and "[f]etish imagery." *Id.* Pinterest does not prohibit all nudity, however. *See id.* "For instance, nudity in paintings and sculptures and in science and historical contexts is okay. Content about breastfeeding and mastectomies is also allowed." *Id.*

**e. Snap:** Snap **prohibits** "promoting, distributing, or sharing pornographic content, as well as commercial activities that relate to pornography or sexual interactions (whether online

12

or offline)." Snap Community Guidelines. But "breastfeeding and other depictions of nudity in non-sexual contexts are generally permitted." *Id.*

**f. X:** X **restricts** users' ability to "share . . . adult nudity or sexual behavior," requiring that such material be "properly labeled and not prominently displayed" in "highly visible places such as profile photos or banners." X Help Center, Adult Content, https://perma.cc/EAE3-NHD8. Though X permits adult users to view nudity and even pornographic content, it restricts minors' access to such material. *Id.*; *see also* X Help Center, Notices on X and What They Mean, https://perma.cc/T5NY-4SK4. Moreover, X **prohibits** all "[n]on-consensual nudity," "[p]romoting or soliciting sexual services," "[c]hild sexual exploitation," "[v]iolent sexual conduct," "[u]nwanted sexual content & graphic objectification," and "[b]estiality and necrophilia." X Help Center, Adult Content, https://perma.cc/EAE3-NHD8.

17. NetChoice's members also have policies against other forms of harmful, objectionable, or just off-topic speech:

**a. Google (YouTube):** Among other things, YouTube has policies that **prohibit** and otherwise address (1) "vulgar language," YouTube Help, Vulgar Language Policy, https://perma.cc/7PQF-BU9P; (2) "hate speech," YouTube Help, Hate Speech Policy, https://perma.cc/SA76-ALJV; and (3) "[v]iolent or gory content intended to shock or disgust viewers," YouTube Help, Violent or Graphic Content Policies, https://perma.cc/QDR3-R57D.

**b. Meta (Facebook and Instagram):** Among other things, Meta **prohibits** hate speech. Meta Transparency Center, Hate Speech, https://perma.cc/E9YU-Y9PD. As part of this broad prohibition, Meta prohibits the use of slurs—though Meta "recognize[s]" there are situations in which slurs may be permissible because "people sometimes share content that includes slurs or someone else's hate speech in order to condemn the speech or report on it" and slurs can be "used self-referentially or in an empowering way." *Id.*

**c. Nextdoor:** Among other things, Nextdoor **prohibits** "racist behavior, discrimination, and hate speech of any kind." Nextdoor Help Center, Policies to Prevent Racism & Discrimination, https://perma.cc/U68L-Q7YS. More generally, "Nextdoor is intended primarily for neighbors to share community-related information," which means that "[d]iscussions about personal interests in the main newsfeed should be limited unless they are directly related to the neighborhood." Nextdoor Help Center, Teens on Nextdoor, https://perma.cc/93L8-UBSR.

**d. Pinterest:** Among other things, Pinterest **prohibits** "hateful content [and] the people and groups that promote hateful activities," "[c]ontent that shows the use of violence," "[i]rresponsible and harmful animal tourism or otherwise exploitative practices like organized animal fighting," and "[h]armful pranks or challenges that risk imminent physical harm or extreme emotional distress, especially if showing or encouraging the participation of minors." Pinterest, Community Guidelines, https://perma.cc/K5PD-UG87.

**e. Snap:** Among other things, Snap **prohibits** "fraud and other deceptive practices" and "spreading false information that causes harm or is malicious, such as denying the existence of tragic events, unsubstantiated medical claims, undermining the integrity of civic

processes, or manipulating content for false or misleading purposes." Snap Community Guidelines; *see* Snap Privacy, Safety, and Policy Hub, Harmful False or Deceptive Information, https://perma.cc/DM68-KUPR (similar).

   **f. X:** Among other things, X **prohibits** (1) various kinds of "hateful conduct," X Help Center, Hateful Conduct, https://perma.cc/2WK4-UCJM; (2) "hoping for others to die, suffer illnesses, tragic incidents, or experience other physically harmful consequences," X Help Center, Violent Content, https://perma.cc/KT5M-8EVD; and (3) "Posts that include manifestos or other similar material produced by perpetrators [of violent acts] . . . , even if the context is not abusive," X Help Center, Perpetrators of Violent Attacks, https://perma.cc/VV7Q-W86G.

   18.   There are literally countless pieces of content on the Internet, and not all content is suitable for all audiences on all websites in all contexts. Thus, content moderation requires the removal of large amounts of objectionable content from members' websites. NetChoice has produced a report detailing members' successes in moderating the vast scope of objectionable and harmful content that specific member companies have blocked or removed from their websites. *See* By the Numbers.

   19.   For instance, in just a six-month span from July to December 2020, Facebook (≈5.7 billion), Instagram (≈65.3 million), Pinterest (≈2.1 million), Snap (≈5.5 million), YouTube (≈17.2 million), and X (≈4.5 million) removed approximately 5.9 *billion* posts. *See id.* at 2. Nearly half of those removals (approximately 2.9 billion removals) were for spam. *See id.* at 4.

   20.   Members work to remove violative content quickly before many (if any) users see the content. *See id.* at 13. "Platforms enable users to report posts and accounts, but social media companies acknowledge that taking down content is not sufficient if the content in question reaches a wide audience prior to removal. Because of this, companies report not only the number of posts removed but also the degree to which they were seen prior to removal. While platforms enable users to report posts and accounts, the aim of limiting exposure requires that a combination of artificial intelligence and human reviewers take down violating content as quickly as possible after it was posted. . . . This proactive approach to removal mitigates the threat of spam, violent,

14

or otherwise offensive content being spread beyond the account responsible for the original post." *Id.* at 5. NetChoice's members have been largely successful, especially for the most harmful content. *See id.* at 5-6. For example, on Facebook, "[t]he proactive rate for severe violations such as child sexual exploitation, terrorist organizations, and violent or graphic content were all 99-100%." That means this content was "found or flagged by Facebook prior to being reported by users." *Id.*

21. Regardless of the scale of the websites, content moderation is difficult for multiple reasons. For example, websites disseminate different forms of content that raise their own content-moderation difficulties. These different forms of content include text, audio, and video. Furthermore, content moderation often requires contextual determinations. Whether a given piece of content violates a website's policies can turn on a complicated interaction between the intent of the user, the content itself, the social and cultural context, the context on the service, and the effect on the reader. Further complicating this task is that many members operate worldwide, and thus must take into account different languages and cultures. Consequently, overreliance on automated systems of content moderation may result in overinclusive removal of content that may not violate websites' policies. Alternatively, removing—or restricting access to—too little violative content may make the websites less hospitable to users and advertisers. Finally, malicious actors always attempt to find ways to avoid moderation to upload violative content; so websites must constantly innovate.

**IV.   HB18's effect on NetChoice members and the Internet.**

22. If the challenged HB18 requirements go into effect on September 1, 2024, NetChoice's members would incur multiple distinct irreparable injuries. First, NetChoice's members will need to expend unrecoverable resources to develop and maintain the costly requirements imposed by HB18, including age- and identity-verification processes, parental tools, and monitoring and censorship requirements. Tex. Bus. & Com. Code §§ 509.053, 509.056(1), 509.052-

15

509.056, 509.101-509.103. Many websites may not be able to comply with these requirements. They impose large costs to implement and maintain (including though large investments in human resources), and may result in websites refusing to allow minors to access their websites to avoid the compliance costs and liability risks. Second, NetChoice's members' continued dissemination of speech to minors would exist under a constant threat of liability arising from situations in which the Defendant Attorney General of Texas believes those members' content-moderation efforts have been imperfect. Third, NetChoice's members will suffer reputational harm if they are compelled to adopt HB18's blunt tools for content moderation. Some of these tools, such as hash-matching, are ineffective at identifying non-image or text-based content. Similarly, tools like hash-matching are only effective at removing previously identified content and are useless against new content. By forcing NetChoice's members to adopt these tools rather than allowing them to continue innovating ways to effectively engage in content moderation, NetChoice's members effectiveness at content moderation will diminish, their reputations will suffer, and they will lose users. Fourth, while NetChoice's members have been able to establish sophisticated content-moderation strategies already, many smaller websites with fewer resources will not be able to adopt HB18-compliant content-moderation strategies. For instance, "hash-sharing" technology is not something that most smaller websites can implement—and certainly not without enormous expense. *Id.* § 509.053(b)(1)(C). Finally, these harms (and HB18's regulation) are entirely unnecessary. As this Declaration details, NetChoice's members already have detailed policies in place to address harmful and objectionable content on their websites.

23.    I understand that multiple NetChoice member companies are subject to HB18, as they meet the statutory definition of "digital service provider" and do not qualify for any statutory exception. In particular, at least the following NetChoice members are subject to HB18:

(1) Google, which owns and operates YouTube; (2) Meta, which owns and operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; (5) Snap Inc. (Snapchat); and (6) X. Specifically, these member companies (1) "determine[]" both the "means" and the "purpose of collecting and processing the personal identifying information of users," Tex. Bus. & Com. Code § 509.001(1)-(2); (2) "connect[] users in a manner that allows users to socially interact with other users on the digital service," *id.* § 509.002(a)(1); (3) "allow[] a user to create a public or semi-public profile for purposes of signing into and using the digital service," *id.* § 509.002(a)(2); and (4) "allow[] a user to create or post content that can be viewed by other users of the digital service, including sharing content on: (A) a message board; (B) a chat room; or (C) a landing page, video channel, or main feed that presents to a user content created and posted by other users," *id.* § 509.002(a)(3).

24. HB18 regulates many similar websites that are not operated by NetChoice members, but whose regulation nevertheless implicates NetChoice's interest in a free Internet. These websites include those that adults and minors use for myriad purposes including art, education, gaming, general interest, information gathering, professional activities, research, political engagement, and participation in religious services and communities. It appears the Act could sweep in countless websites, message boards, and community forums that are a home for discussion on every topic under the sun—everything from politics and religion to classical music, backpacking, homeschooling, board games, woodworking, gardening, knitting, and hundreds of other subjects.

25. Based on my experience in the industry, the challenged HB18 provisions will have a significant, immediate, and irreparable harm on members—and an even greater effect on other regulated websites that are *not* NetChoice member companies. Accordingly, compliance with HB18, and the risks of non-compliance, may be ruinous for many websites across the Internet. That will severely affect the availability of unique speech communities for people worldwide.

* * *

26. If the Act takes effect on September 1, 2024, NetChoice's mission to protect free speech and free enterprise online would be directly and substantially hurt—as would its affected member companies and their minor and adult account holders and users (both current and prospective).

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on ___July 29, 2024___ in Washington DC.

Carl Szabo