# Exhibit 5 –
# Declaration of Gautham Pai (Nextdoor)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, and <br><br> NETCHOICE, LLC, <br><br> *Plaintiffs,* <br><br> v. <br><br> KEN PAXTON, in his official capacity as Attorney General of Texas, <br><br> *Defendant.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 1:24-cv-849 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**DECLARATION OF GAUTHAM PAI IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Gautham Pai, declare as follows:

1. I serve as the Head of Customer Experience at Nextdoor. For the past 7 years, I have worked at Nextdoor, overseeing the end-to-end customer experience across multiple channels, markets, and languages. My role ensures high-quality service for our extensive global community of over 90 million members and businesses. I shape and execute operational strategies to deliver exceptional support experiences while driving operational and financial success. My team collaborates cross-functionally to continuously build and enhance abuse detection mechanisms, analytics, internal moderation tools, and enforceable policies. These efforts maintain a safe and engaging platform for our users. I submit this declaration in support of Plaintiff's Motion for Preliminary Injunction. I am over the age of 18 and am competent to make the statements herein. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

**Background Information on Nextdoor & Nextdoor Users**

2.      Nextdoor operates website www.nextdoor.com and the Nextdoor web application (collectively known hereafter, "platform") where users around the world turn daily to receive trusted information, give and get help, get things done, and build real-world connections with those nearby — users, businesses, and public services. By fostering these connections, both online and in the real world, Nextdoor builds stronger, more vibrant, and more resilient neighborhoods. Today, nearly 90 million verified users (hereafter, "users") and 5 million businesses rely on Nextdoor in more than 335,000 neighborhoods across 11 countries. In the US, 1 in 3 households uses the platform. Nextdoor is in 37.8% of households in Texas.

3.      On Nextdoor, users are placed in a neighborhood based on their address, and they automatically receive updates from nearby users, businesses, and public services.

4.      Since Nextdoor launched in 2011, Nextdoor has required individuals to register with and use their real names and addresses on the platform to foster mutual accountability and ensure that connections and conversations are authentic.

**Steps Nextdoor takes to Foster a Positive On-Platform Experience**

5.      Nextdoor verifies with a reasonably high degree of confidence that everyone signing up on Nextdoor is a real person with a tie to the real neighborhood in which they are registering. More specifically, Nextdoor verifies individuals and businesses based on a number of signals, including device location and third-party data vendors. If Nextdoor cannot verify an individual or business through these methods, additional verification steps are taken. An individual may be verified using a postcard (mailed by Nextdoor to the individual's address, which includes a code for the user to input into the website or app). Nextdoor does not require users to report their age or submit identification as part of this verification process, which as explained in the paragraphs

below, Nextdoor has found users unwilling to provide and comes at an increased cost. Alternatively, individuals may remain unverified (hereafter, "unverified users"), with limited functionality.

6.  Nextdoor's Member Agreement[1] prohibits people from using our Services if they are a registered sex offender in any jurisdiction.

7.  Nextdoor users must use their real name on Nextdoor; meaning, the first name they use when introducing themselves to users, friends and colleagues, and legal last name. Using an alias, initials, or an abbreviated version of their last name is prohibited except under limited circumstances. However, via privacy settings, users can control how their name appears to others, as well as other ways they may appear on Nextdoor in posts, search, or messages.

8.  By default, users' news feeds include posts from their neighborhood and nearby neighborhoods. This disincentivizes posts that are intended to get clicks and go viral and instead incentivizes users to keep their posts focused on ways to get and give local help and share relevant information with their neighbors.

9.  Nextdoor also provides users with the option to view their feeds in reverse chronological order (sorted by recent activity or posts) rather than curated by feed-ranking technology.

10. Nextdoor is committed to developing leading-edge product technology that facilitates constructive neighborhood connections and conversations, and a safe experience for users online. Our active in-product features include:

   a.  Kind Neighbor Pledge: Upon joining Nextdoor, all users are asked to agree to our Kind Neighbor Pledge, which is a commitment to be helpful, treat everyone in the Nextdoor community with respect, and to do no harm. It's an opportunity to establish norms and expectations for our platform and encourage prosocial behavior.

---

[1] <https://help.nextdoor.com/s/article/Nextdoor-Member-Agreement?language=en_US>

    b. Kindness Reminder: The Kindness Reminder appears when a user drafts and attempts to publish a post that may violate Nextdoor's Community Guidelines. The tool automatically detects potentially offensive language that may violate Nextdoor's Community Guidelines and encourages the author to edit their content before they publish. It was the first of our core product features to introduce pre-post moments of friction aimed at slowing people down and combating incivility. While the Kindness Reminder, is just a reminder and not a preemptive prohibition on posting offensive content, in 2023, users who received the reminder edited or withheld their post 36% of the time.

    c. Kindness Tips: Nextdoor Kindness Tips serve as a supportive tool to remind users who have had content previously removed about best practices for fostering constructive conversations. These tips offer five specific, actionable pieces of advice with illustrative examples. Importantly, instead of just taking corrective action on repeat violators (such as removal from the app), Kindness Tips aims to keep users on the platform by proactively guiding users to reflect on how to engage in open and respectful discussions while aligning with our Community Guidelines.

11. Nextdoor sets clear Community Guidelines that are designed to keep interactions on the platform safe and productive. These guidelines help promote thoughtful conversations and explicitly forbid racism, discrimination, misinformation, and other types of harmful content.

12. There are three main categories of guideline-violating content:

    a. Harmful: Content that is illegal, fraudulent, or unsafe, e.g., violent, graphic, discriminatory.

    b. Hurtful: Content that users consider uncivil, e.g., insults, rudeness, name-calling.

    c. Other: Non-local content, spam, content posted in error.

13. Nextdoor's Community Guidelines already prohibit the types of harmful content identified in HB 18, including content that "promotes, glorifies, or facilitates" suicide, self-harm, eating disorders, stalking, bullying, harassment, grooming, trafficking, child pornography, or other sexual exploitation or abuse.

14. Efforts to address guideline-violating content include:

    a. Tools to automatically detect and report harmful content.

    b. Product features that enable users to report guideline-violating content.

    c. Volunteer community moderators who monitor community discussions and help keep dialogue on the platform civil.

    d. Our internal Neighborhood Operations Team of trained specialists who review content and accounts that have been flagged and take appropriate action to support the users involved.

15. HB 18 prescribes a one size fits all approach to content moderation that does not take into account differences in risk across platforms. Moreover, it does not provide sufficient detail for companies to know what they must do to comply, which makes the cost of compliance difficult to ascertain. For instance, it requires use of "filtering technology and other protocols to enforce the blocking of material or content." It is not clear to Nextdoor what is meant by "filtering technology," which is a broad term, or what is to be included in those "other protocols." Additionally, HB 18 requires use of "hash-sharing technologies and other protocols." Again, it is not clear what is meant to be included in "other protocols." Further, if the law seeks to have hash-sharing technologies run across all videos and images on the platform, Nextdoor would be required to integrate with additional systems at an increased cost.

16. We work regularly with leading experts including our Neighborhood Vitality Advisory Board[2] to refine our Community Guidelines, iterate on our features and tools, and develop strategic research teams that further our work to create and maintain a welcoming platform.

17. Our annual transparency report discusses metrics around reported content from the year prior. In our recent report, published in February 2024[3], we disclose that in 2023:

    a. The subset of content reported for being "harmful" (as defined above) was 0.29% of total user-generated content on Nextdoor.

    b. Nextdoor made only six cybertip reports of suspected child sexual abuse material to National Center for Missing and Exploited Children.

---

[2] <https://about.nextdoor.com/advisory-boards/#vitality>
[3] <https://nxdr.co/3HRRFd1>

      c. Nextdoor's nearly 200,000 volunteer community moderators reviewed 90% of all reported content (which constituted 1.97% of aggregate content) and removed 55% of reported content within a median time of 5.3 hours. The remaining reported content was reviewed by paid Nextdoor Operations staff or automatically removed.

**Teenagers on Nextdoor**

    18. Nextdoor's Member Agreement requires minors to be 13 years old or older in the United States to join Nextdoor.[4]

    19. Nextdoor estimates that approximately 99% of its U.S. users are legal adults. Further, less than 1% of its users are between the ages of 13 and 17, and less than 10% are under 25 years of age. In contrast, Nextdoor estimates that approximately 40% or more of Nextdoor users are 55 and over.

    20. The overarching utility offered by Nextdoor does not, by nature, appeal to most minors. Nextdoor lacks games, cartoonish elements, minor-oriented music or activities, minor celebrities or celebrities who appeal to minors, and is not advertised to minors. It is used overwhelmingly by legal adults who are looking to connect with other nearby residents.

    21. Nevertheless, Nextdoor has observed teenagers engage on Nextdoor to seek or offer after-school or summer jobs. For example, teenagers on Nextdoor have sought dog-walking or cat sitting, selling crafts, gardening, snow shoveling, tutoring, babysitting, and offering technical computer assistance to users, including a class on how to use the latest generative Artificial Intelligence technology. In fact, a recent review conducted in February 2024 indicated that 3 of the top 4 searches by verified U.S. users aged 13 to 17 involved babysitting.

    22. The resources that Nextdoor would be required to put into HB 18's age registration and parental verification process are disproportionate to the small number of minors on our

---

[4] <https://help.nextdoor.com/s/article/Nextdoor-Member-Agreement?language=en_US>

6

platform (less than 1% of users). And even if Nextdoor were to update its Member Agreement to disallow users under 18 on the platform in Texas, since parents can dispute the age of a minor on the service, HB 18 would still cause Nextdoor to incur compliance costs through examination of those claims.

**Barriers to Nextdoor Imposed by Texas House Bill 18**

*Challenges with Registering Age*

23.   HB 18 would place a duty on Nextdoor to "register age" of users, but HB 18 does not define what it means to "register age" nor does it provide any guidance to companies on how to do this. Further, users may only alter this age through a process that "involves a commercially reasonable review process," which is similarly not defined or described in the law. Lastly, HB 18 provides certain rights for a "verified parent" yet the law does not provide any guidance to companies on how to verify these individuals. This leaves Nextdoor to guess what compliance would entail.

24.   Nextdoor has tested asking users for their date of birth on a voluntary basis, and has observed that merely seeking the age of users in various ways is a barrier to platform access.

25.   In the United States, over the three month period from February through April 2024, Nextdoor asked users to voluntarily provide their date of birth and found that only approximately 40% of users who were asked were willing to share their date of birth.

26.   In fact, Nextdoor has received negative feedback from users regarding date of birth collection.

   a.   Regarding date of birth collection in general, one user said: *"You do not need my birthday and I will not give it to you. Suffice it to say that when it comes to my age, all you need to know is that I am a Vietnam veteran."*

7

    b. Users who have been asked to share documentation to support their age have also shared concerns about providing personal information to Nextdoor:

        1. *"After having a Nextdoor account for a decade, I accidentally hit the wrong year and was told I couldn't have access anymore because I was under 13. I have provided plenty of information to indicate otherwise and was told the ONLY way to regain access was to submit my ID, which is unreasonable since you don't require one to set up a new account. Customer service sent me on a loop with AI bots with repetitive policy explanations. Did not solve the problem. Since I can't access my account, I wish for it to be deleted."*

        2. *"Are you kidding me? You think I'm gonna send you my license or any personal ID"*

        3. *"App rep wants my personal info to turn my account back on after using the app for over 5 years. I think this is a scam now...."*

        4. *"What?? I am over 60. There must be another way I do not have to give my actual pii info to be hacked."* - *"I'm 60 years old and I am not sending a copy of my driver's license to anyone."*

        5. *"I'm 57 years old and they're asking me for my government issued ID. This is totally insane.. I put my age down to zero because I thought it was a scam. Next-door now thinks my age is zero, so they won't reinstate my Account. Because of fraud there's no reason that anyone in Nextdoor needs my Social Security number or my drivers license number. They didn't have school IDs when I went to school so unfortunately I don't have one. Graduated 1983."*

27.     If date of birth collection were required from prospective users, then Nextdoor would expect a significant number of prospective users to decline to join the platform. If date of birth collection were required from current users, we would expect a significant number of users to be unable or unwilling to provide it in order to continue on the platform. The loss of current and prospective users would decrease the volume and diversity of speech available on Nextdoor, would reduce the audience that current and new users can reach, and would reduce Nextdoor's overall revenue.

28.     Further, if verification of date of birth using government identification were required, we would expect even higher numbers of prospective and current users to decline to join

the platform or be unable or unwilling to provide government identification, for a number of reasons.

    a. First, privacy- and security-conscious individuals are likely to consider government ID to be a more sensitive piece of information than simply date of birth. Nextdoor has already seen users leave the platform when they are asked to provide their date of birth or to provide government ID.

    b. Second, it is far more cumbersome to provide a photo of a government ID than to enter in a date of birth. Most people know their own birth dates from memory, but not everyone has the means to easily scan and send a photo of a government ID. And not everyone has a government ID, or an easily accessible government ID. If an individual has to seek outside assistance to verify, an individual may find verification too much work to continue.

29. If verification by a third party were required, then the number of prospective and current users willing and able to verify date of birth to join Nextdoor could further be reduced. Prospective users who are unfamiliar with Nextdoor and have yet to experience its value proposition may be unwilling to submit identity verification documentation just to try out the platform. Further, prospective and current users who trust Nextdoor with their information may be unwilling to trust an unfamiliar third party. Submission to a third-party system is an added layer of friction, which could lead to additional user frustration. If there were an error or other problem, Nextdoor Support agents may not have the information to help the user resolve the issue. This could hurt Nextdoor's image and relationship with its users.

*Challenges with Identity Document-Based Verification Experiments and High Cost of Identity Document-Based Verification*

30. Nextdoor has thus far developed an effective verification system that balances trust with friction and cost of onboarding new users. As noted above, Nextdoor is not sure what is entailed in registering the age of users, verifying parents, or if users seek to alter their registered age in only allowing them to do so through a process that "involves a commercially reasonable review process." However, to the extent that identity-document-based age verification is required

9

by the government in any of these processes, it would cause users to face a significant barrier to accessing the platform, and Nextdoor would suffer irreparable harm due to those users forsaking the service.

31. While Nextdoor has not attempted to require identity-document-based age verification for all users, Nextdoor does use identity-document-based verification in one circumstance and has experimented with third-party document verification. Both circumstances place a significant burden on Nextdoor and its users, indicating the severe challenges that would result if all users were required to provide this information just to access Nextdoor.

32. First, Nextdoor, per its Community Guidelines, requires users to use their real name and address on the platform. On occasion, users have been reported for using either a different name than their real name, or as not residing in the Neighborhood to which they belong on platform.

33. When a user is reported for one of these reasons, the user is suspended and may be required to submit to Nextdoor identity documentation showing their real name/address. Nextdoor Support agents review the user's identity documentation and, if needed, help the user update their name/address before unsuspending the user.

34. Based on the average cost of $2.50 of verifying a user's identity documentation in each real name/address case, if Nextdoor Support agents were required to process identity documentation for every new Texas user it would greatly surpass our average revenue per user figures, which was $1.22 for Q1 2024.

35. Second, Nextdoor attempted third-party verification of documents in 2020 without success. In 2020, Nextdoor attempted an experiment in Europe by which it offered individual verification through a third party using a utility bill. For individuals unable to verify by phone,

Nextdoor gave the individual the option of submitting a utility bill to be matched by a third party vendor. Unfortunately, less than 1% of individuals verified using this method, and Nextdoor discontinued the experiment.

36. Based on Nextdoor's experiences with date of birth collection, identity-document-based verification, and third-party verification, Nextdoor expects the percentage of users able and willing to complete a Texas mandated age registration process to be low.

37. Further, if HB 18 were to go into effect, Nextdoor expects that it would have to bar users under 18 from use of our platform as the compliance costs of building the parental tools required by the law would dwarf our possible revenue per user in this market.

*   *   *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on July 29, 2024 in San Francisco, California.

_____
Gautham Pai (Jul 29, 2024 19:19 PDT)

Gautham Pai