**FILED**

August 19, 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _Christian Rodriguez_

DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, and NETCHOICE, LLC.,** | § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **Civil Action No. 1:24-cv-849-RP** |
| **KEN PAXTON, in his official capacity as Attorney General of Texas,** | § § § | |
| **Defendant.** | § § § | |

---

**DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

---

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief - General Litigation Division

TODD A. DICKERSON
Attorney-in-Charge
Assistant Attorney General
Texas Bar No. 24118368
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 | FAX: (512) 320-0667
Todd.Dickerson@oag.texas.gov

**COUNSEL FOR DEFENDANT**

### TABLE OF CONTENTS

Table of Contents ..........................................................................................................................ii

Table of Authorities......................................................................................................................iii

Introduction ...................................................................................................................................1

Background .....................................................................................................................................3

   I.    Social Media Can Hurt Children................................................................................3

   II.   An Overview of HB 18...................................................................................................6

Argument .......................................................................................................................................8

   I.    Sovereign Immunity Bars this Lawsuit. ......................................................................8

   II.   Plaintiffs' Lack Standing. ..............................................................................................9

   III.  Plaintiffs Erred when They Treated HB 18's Many Disparate Provisions as an
       Undifferentiated Whole; this Court Should Not Make the Same Mistake...................13

      A.   NetChoice I Bars Plaintiffs' Attempt to Classify All of HB 18 as a Content- or
            Speaker-Based Regulation.........................................................................................13

      B.   A Provision-By-Provision Analysis Confirms that HB 18 is Constitutional. ...................15

      C.   Section 509.002 is Not Unconstitutionally Vague. ....................................................18

   IV.  HB 18's "Harm to Minors" Sections do Not Violate the First Amendment. ...........................20

      A.   Analysis of § 509.053(a). ............................................................................................20

         1.    Even Under a Broad Interpretation, § 509.053(a) is Constitutional..................................20

         2.    Section 509.053(a) is Readily Susceptible to a Limiting Construction. ..............................22

         3.    Section 509.053(a) is Not Unconstitutionally Vague. ......................................................27

      B.   Analysis of § 509.053(b)..............................................................................................28

      C.   Analysis of § 509.056..................................................................................................30

      D.   The "Harm to Minors" Sections are Not Preempted by 47 U.S.C. § 230...........................31

   V.   Four More Issues Concerning Plaintiffs' Motion for a Preliminary Injunction. ........................34

Conclusion .....................................................................................................................................35

Certificate of Service......................................................................................................................36

# TABLE OF AUTHORITIES

Cases

*Alamo Forensic Services, L.L.C. v. Bexar Cnty., Tex.,*
861 F. App'x 564 (5th Cir. 2021) ............................................................................................. 12

*Arce v. Douglas,*
793 F.3d 968 (9th Cir. 2015) .................................................................................................... 28

*Attwood v. Clemons,*
526 F. Supp. 3d 1152 (N.D. Fla. 2021) .................................................................................... 12

*B & L Productions, Inc. v. Newsom,*
104 F.4th 108 (9th Cir. 2024) ................................................................................................... 16

*Baggett v. Bullitt,*
377 U.S. 360 (1964) .................................................................................................................. 28

*Bano v. Union Carbide Corp.,*
361 F.3d 696 (2d Cir. 2004) ..................................................................................................... 10

*Barnes v. Yahoo!, Inc.,*
570 F.3d 1096 (9th Cir. 2009) .................................................................................................. 32

*Barr v. Am. Ass'n of Political Consultants, Inc.,*
591 U.S. 610 (2020) .................................................................................................................. 34

*Bass v. United States,*
324 F.2d 168 (8th Cir. 1963) .................................................................................................... 28

*Boelter v. Advance Magazine Publishers Inc.,*
210 F. Supp. 3d 579 (S.D.N.Y. 2016) ...................................................................................... 15

*Bowling v. McDonough,*
38 F.4th 1051 (Fed. Cir. 2022) ................................................................................................. 18

*Campbell v. Reisch,*
367 F. Supp. 3d 987 (W.D. Mo. 2019) ..................................................................................... 12

*Career Colleges & Sch. of Tex. v. United States Dep't of Educ.,*
No. 1:23-CV-433-RP, 2023 WL 4291992 (W.D. Tex. June 30, 2023) ..................................... 35

*City of El Cenizo, Tex. v. Tex.,*
890 F.3d 164 (5th Cir. 2018) .......................................................................................... 2, 22, 25

*Coal. for Indep. Tech. Research v. Abbott,*
No. 1:23-CV-783-DII, 2023 WL 8582597 (W.D. Tex. Dec. 11, 2023) ................................... 34

*Craig v. Boren,*
429 U.S. 190 (1976) .................................................................................................................. 12

*Crawford v. Marion Cnty. Election Bd.,*
553 U.S. 181 (2008) ............................................................................................ 17, 23, 24, 26, 28

*Ctr. for Individual Freedom v. Carmouche*,
    449 F.3d 655 (5th Cir. 2006) ........................................................................................11

*Davison v. Randall*,
    912 F.3d 666 (4th Cir. 2019) .......................................................................................12

*DC Operating, L.L.C. v. Paxton*,
    100 F.4th 657 (5th Cir. 2024) ......................................................................................13

*Digerati Distribution & Marketing, LLC v. Sarl*,
    No. 1:22-CV-01302-DII, 2023 WL 5687040 (W.D. Tex. Aug. 2, 2023) .....................35

*Doe I v. Landry*,
    909 F.3d 99 (5th Cir. 2018) ....................................................................................18, 27

*Doe v. MySpace, Inc.*,
    528 F.3d 413 (5th Cir. 2008) ........................................................................................34

*Empire State Rest. & Tavern Ass'n v. New York*,
    289 F. Supp. 2d 252 (N.D.N.Y. 2003) ..........................................................................19

*EMW Women's Surgical Ctr., P.S.C. v. Friedlander*,
    No. 19-5516, 2022 WL 2866607 (6th Cir. July 21, 2022) ...........................................12

*Ex parte Young*,
    209 U.S. 123 (1908) .................................................................................................2, 8

*Expressions Hair Design v. Schneiderman*,
    581 U.S. 37 (2017)........................................................................................................18

*F.T.C. v. Accusearch Inc.*,
    570 F.3d 1187 (10th Cir. 2009) ....................................................................................32

*Felts v. Reed*,
    504 F. Supp. 3d 978 (E.D. Mo. 2020)...........................................................................12

*Florida Bar v. Went For It, Inc.*,
    515 U.S. 618 (1995) ......................................................................................................16

*Free Speech Coal., Inc. v. Attorney Gen. United States*,
    974 F.3d 408 (3d Cir. 2020)..........................................................................................10

*Free Speech Coal., Inc. v. Paxton*,
    95 F.4th 263 (5th Cir. 2024) .............................................................................26, 31, 33

*Gibson v. Tex. Dep't of Ins.--Div. of Workers' Comp.*,
    700 F.3d 227 (5th Cir. 2012) ........................................................................................34

*Ginsberg v. State of N. Y.*,
    390 U.S. 629 (1968) ................................................................................................16, 21

*Glossip v. Gross*,
    576 U.S. 863 (2015) ......................................................................................................27

*Haverkamp v. Linthicum,*
  6 F.4th 662 (5th Cir. 2021) .................................................................................................9

*Henderson v. Source for Pub. Data, L.P.,*
  53 F.4th 110 (4th Cir. 2022) ..............................................................................................32

*Hunt v. Washington State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) .............................................................................................................9

*In re United Services Auto. Ass'n,*
  307 S.W.3d 299 (Tex. 2010) ...............................................................................................21

*Jones v. Dirty World Entm't Recordings LLC,*
  755 F.3d 398 (6th Cir. 2014) .................................................................................31, 32, 33

*Justice v. Hosemann,*
  771 F.3d 285 (5th Cir. 2014) ..............................................................................................11

*Keepers, Inc. v. City of Milford,*
  807 F.3d 24 (2d Cir. 2015) .................................................................................................11

*La'Tiejira v. Facebook, Inc.,*
  272 F. Supp. 3d 981 (S.D. Tex. 2017)................................................................................34

*Lawline v. Am. Bar Ass'n,*
  956 F.2d 1378 (7th Cir. 1992) ............................................................................................11

*Lemmon v. Snap, Inc.,*
  995 F.3d 1085 (9th Cir. 2021) ......................................................................................32, 33

*Lowe v. S.E.C.,*
  472 U.S. 181 (1985) ...........................................................................................................16

*McCall v. Zotos,*
  No. 22-11725, 2023 WL 3946827 (11th Cir. June 12, 2023)............................................32

*McGowan v. State of Md.,*
  366 U.S. 420 (1961) ...........................................................................................................19

*Mi Familia Vota v. Ogg,*
  105 F.4th 313 (5th Cir. 2024) ..............................................................................................8

*Moody v. NetChoice, LLC,*
  144 S. Ct. 2383 (2024) .................................................1, 2, 9, 10, 14, 17, 21, 26, 31

*Morse v. Frederick,*
  551 U.S. 393 (2007) .....................................................................................................16, 21

*Murthy v. Missouri,*
  144 S. Ct. 1972 (2024) ...........................................................................9, 13, 14, 21, 31

*Nat'l Org. for Marriage, Inc. v. McKee,*
  669 F.3d 34 (1st Cir. 2012) ................................................................................................18

*Nat'l Press Photographers Ass'n v. McCraw,*
    90 F.4th 770 (5th Cir. 2024) ..................................................................................8

*NetChoice, L.L.C. v. Paxton,*
    49 F.4th 439 (5th Cir. 2022) ............................................................ 1, 13, 14, 15, 19

*NetChoice, LLC v. Fitch,*
    No. 1:24-CV-170-HSO-BWR, 2024 WL 3276409 (S.D. Miss. July 1, 2024) ............... 11, 18

*NetChoice, LLC v. Griffin,*
    No. 5:23-CV-05105, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ............... 11, 18, 21, 22

*NetChoice, LLC v. Paxton,*
    573 F. Supp. 3d 1092 (W.D. Tex. 2021) ..................................................................19

*NetChoice, LLC v. Yost,*
    No. 2:24-CV-00047, 2024 WL 555904 (S.D. Ohio Feb. 12, 2024) ...................................11

*Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen., Florida Dep't of Health,*
    50 F.4th 1126 (11th Cir. 2022) ..................................................................................17

*Nova Records, Inc. v. Sendak,*
    706 F.2d 782 (7th Cir. 1983) ..................................................................................19

*O'Connor v. City & Cnty. of Denver,*
    894 F.2d 1210 (10th Cir. 1990) ..................................................................................17

*Packingham v. North Carolina,*
    582 U.S. 98 (2017) ..............................................................................................21, 26

*R J Reynolds Tobacco Co. v. Food & Drug Admin.,*
    96 F.4th 863 (5th Cir. 2024) ..................................................................................14

*Saunders v. Hearst Television, Inc.,*
    No. 23-CV-10998-RGS, 2024 WL 126186 (D. Mass. Jan. 11, 2024) ...............................15

*Serv. Employees Intern. Union, Local 5 v. City of Houston,*
    595 F.3d 588 (5th Cir. 2010) ..................................................................................11

*Sharp v. House of Lloyd, Inc.,*
    815 S.W.2d 245 (Tex. 1991) ..................................................................................29

*Shields v. Norton,*
    289 F.3d 832 (5th Cir. 2002) ..................................................................................11

*Small Justice LLC v. Xcentric Ventures LLC,*
    873 F.3d 313 (1st Cir. 2017) ..................................................................................32

*Sorrell v. IMS Health, Inc.,*
    564 U.S. 552 (2011) ..............................................................................................16, 17

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ..................................................................................................9

*Tex. All. for Retired Americans v. Scott*,
   28 F.4th 669 (5th Cir. 2022) ................................................................8

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ........................................................................9

*Turner Broad. Sys., Inc. v. F.C.C.*,
   512 U.S. 622 (1994) ......................................................................14

*United States v. Cavalier*,
   17 F.3d 90 (5th Cir. 1994) ..............................................................28

*United States v. Comer*,
   5 F.4th 535 (4th Cir. 2021) .............................................................20

*United States v. Gibson*,
   998 F.3d 415 (9th Cir. 2021) ...........................................................19

*United States v. Hansen*,
   599 U.S. 762 (2023) ...........................11, 20, 23, 24, 25, 26, 27, 28

*United States v. Nassif*,
   97 F.4th 968 (D.C. Cir. 2024) .........................................................18

*United States v. Sanderson*,
   730 F. App'x 426 (9th Cir. 2018) ......................................................19

*United States v. Smith*,
   945 F.3d 729 (2d Cir. 2019) ............................................................13

*United States v. White*,
   769 F.2d 511 (8th Cir. 1985) ............................................................1

*United States v. Williams*,
   553 U.S. 285 (2008) .................................................................22, 24

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ........................................................................1

*Vill. of Schaumburg v. Citizens for a Better Env't*,
   444 U.S. 620 (1980) ......................................................................11

*Virginia v. Am. Booksellers Ass'n, Inc.*,
   484 U.S. 383 (1988) ......................................................................11

*Vote.Org v. Callanen*,
   39 F.4th 297 (5th Cir. 2022) ...........................................................12

*Welch v. United States*,
   578 U.S. 120 (2016) ......................................................................27

*Yamada v. Snipes*,
   786 F.3d 1182 (9th Cir. 2015) .........................................................28

*Young v. Am. Mini Theatres, Inc.,*
    427 U.S. 50 (1976) .......................................................................................................18

*Zauderer v. Office of Disc. Counsel,*
    471 U.S. 626 (1985) ................................................................................................14, 31

*Zbaraz v. Madigan,*
    572 F.3d 370 (7th Cir. 2009) ......................................................................................17

<u>Statutes</u>

18 U.S.C. § 2252A .............................................................................................................24

18 U.S.C.A. § 2710 ............................................................................................................15

47 U.S.C. § 230 ......................................................................................................31, 32, 33

Tex. Bus. & Com. Code § 120.001 ...............................................................................13, 14

Tex. Bus. & Com. Code § 120.051 ....................................................................................13

Tex. Bus. & Com. Code § 120.052 ....................................................................................13

Tex. Bus. & Com. Code § 17.47 .....................................................................................7, 8

Tex. Bus. & Com. Code § 509.002 ........................................................1, 6, 14, 18, 19

Tex. Bus. & Com. Code § 509.051 ...............................................................................6, 16

Tex. Bus. & Com. Code § 509.052 .................................................1, 7, 9, 15, 16

Tex. Bus. & Com. Code § 509.053 ....................2, 7, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32

Tex. Bus. & Com. Code § 509.054 ................................................................................7, 17

Tex. Bus. & Com. Code § 509.055 ...........................................................................1, 7, 15

Tex. Bus. & Com. Code § 509.056 ..............................................................................7, 30, 31

Tex. Bus. & Com. Code § 509.057 ............................................................................6, 26, 35

Tex. Bus. & Com. Code § 509.101 ...............................................................................7, 17

Tex. Civ. Prac. & Rem. Code § 143A.002 ........................................................................13

Tex. Gov't Code § 311.032 ...............................................................................................22

Tex. Pen. Code § 15.032 ...................................................................................................26

Tex. Pen. Code § 20A.02 ..................................................................................................26

Tex. Pen. Code § 22.08 ................................................................................................22, 26

Tex. Pen. Code § 42.07 ................................................................................................26, 27

Tex. Pen. Code § 42.072 ...................................................................................................26

Tex. Pen. Code § 43.261 ...................................................................................................26

Tex. Pen. Code § 43.262 ...................................................................................................26

Tex. Pen. Code §§ 481.001–490.151 ...................................................................................26

<u>Other Authorities</u>

*AI Advances to Better Detect Hate Speech*, META (May 12, 2020) .......................................... 29, 30

Aksha M. Memon, *The Role of Online Social Networking on Deliberate Self-Harm and Suicidality in Adolescents: A Systemized Review of Literature*, INDIAN J. PSYCHIATRY (Dec. 2018).................................5

Alisa Bowman, *Social Media's Effects on the Teen Brain*, MAYO CLINIC (Sept. 5, 2023) .............................4

Amro Khasawneh, et al., *Examining the Self-Harm and Suicide Contagion Effect of the Blue Whale Challenge on YouTube and Twitter: Qualitative Study*, JMIR PUBL'N (June 2020) ......................................4

Amy Orben, et al., *Windows of Developmental Sensitivity to Social Media*, NATURE COMMC'N (Mar. 28, 2022).................................................................................................................4

Bartbara Ortutay, *Facebook Parent Meta Posts Sharply Higher Profit in 3Q Thanks to Increase in Ad Revenue*, AP (Oct. 25, 2023) ....................................................................................3

BLACK'S LAW DICTIONARY (12th ed. 2024) .................................................................... 19, 23

*Bullying and Harassment*, META ....................................................................................5

CAMBRIDGE DICTIONARY ...............................................................................................18

Cecilia Kang, *Meta Reaches $1.4 Billion Settlement with Texas over Privacy Violations*, NEW YORK TIMES ....................................................................................................................17

DICTIONARY.COM ............................................................................................... 1, 19, 23

Elizabeth Napolitano, *Social Media Apps Made $11 Billion from Children and Teens in 2022*, CBS NEWS ....................................................................................................................16

*Google and YouTube will Pay Record $170 Million for Alleged Violations of Children's Privacy Law*, FTC .......................................................................................................................17

*How Enforcement Technology Works*, META (Jan. 19, 2022) .................................................. 28, 29

*How Review Teams Work*, META (Jan. 19, 2022) ....................................................................29

Jessica Bursztynsky & Lauren Feiner, *Facebook Documents Show how Toxic Instagram is for Teens, Wall Street Journal Reports*, CNBC (Sept. 14, 2021) .................................................................5

Kalev Leetaru, *Social Media Companies Collect so Much Data Even They Can't Remember All the Ways They Surveil Us*, FORBES (Oct. 25, 2018) ...................................................................18

Karen Hao, *The Facebook Whistleblower Says its Algorithms are Dangerous. Here's Why.*, MIT TECHNOLOGY REVIEW ....................................................................................................5

Kathy Katella, *How Social Media Affects Your Teen's Mental Health: A Parent's Guide*, YALE MED. (June 17, 2024)....................................................................................................... 3, 5

Kolbe Nelson, *Facebook Knew Instagram was Pushing Girls to Dangerous Content: Internal Document*, CBS NEWS (Dec. 11, 2022)...............................................................................................5

MERRIAM-WEBSTER ................................................................................... 18, 22, 23, 29

Michaeleen Doucleff, *The Truth About Teens, Social Media and the Mental Health Crisis*, NPR (Apr. 25, 2023)................................................................................................................3

*NetChoice Disappointed to see Texas Violate First Amendment and Erode Parental Rights*, NetChoice (June 13, 2023)..................................................................................................................35

*Online Child Protection*, META ..........................................................................................28

*Online Child Protection*, *supra* note 175; *NCMEC, Google and Image Hashing Technology*, GOOGLE............29

*Policy Statement on the Impact of Social Media on Youth Mental Health*, AM. ACAD. OF CHILD & ADOLESCENT PSYCHIATRY........................................................................................4

*Rights of Others—Relationship Standing*, 13A FED. PRAC. & PROC. JURIS. § 3531.9.3 (3d ed.) ...........................................12

Ryan Mac & Sheera Frenkel, *Facebook Downplays Internal Research Released on Eve of Hearing*, NEW YORK TIMES ....................................................................................................5

*Sean Parker: Facebook Takes Advantage of "Vulnerability in Human Psychology,"* CBS NEWS .................. 3, 4

*Social Media and Youth Mental Health*, U.S. DEP'T OF HEALTH AND HUMAN SERV. ..........................3, 5

*Social Media Platforms Generate Billions in Annual Ad Revenue from U.S. Youth*, HARVARD SCH. OF PUB. HEALTH (Dec. 27, 2023)..................................................................................3

*Technology Use and the Mental Health of Children and Young People*, ROYAL COLL. OF PSYCHIATRISTS, 31 (Jan. 2020) ................................................................................ 4, 23

Vania Martinez, et al., *Social Contagion, Violence, and Suicide Among Adolescents*, CURR OPIN PSYCHIATRY (May 2023)........................................................................................4

*What is "Brain Hacking"? Tech Insiders on Why You Should Care*, CBS NEWS ...................................3

*What the Online Safety Act Does*, GOV.UK ........................................................................21

*XLM-R: State-of-the-Art Cross-Lingual Understanding Through Self-Supervision*, META ................................30

## INTRODUCTION

Plaintiffs, two associations representing some of the largest social media companies in the world, challenge HB 18 mainly on First Amendment grounds. They appear to think the Constitution leaves Texas powerless to defend its children—or to empower parents to protect their children—against the obvious dangers linked to social media use. They are wrong.

First, most of Plaintiffs' claims turn on an argument foreclosed by binding precedent. They contend that HB 18's exemption for news, sports, and commerce sites that allow only incidental social interaction among users renders the *entire Act* unconstitutional. Plaintiffs tried the same tactic in the *NetChoice I* litigation over HB 20. The Fifth Circuit and Supreme Court rejected it.

Second, Plaintiffs did not perform the facial analysis required by *Moody v. NetChoice, LLC*. Per *Moody*, Plaintiffs had to look at the "full range of activities" that HB 18 covers to assess its constitutionality. They avoided this inquiry, likely because most of HB 18 clearly raises no First Amendment issues. For instance, § 509.055 regulates advertisements towards minors that promote illegal activity. Yet "the first amendment does not protect commercial speech which promotes an illegal activity or transaction."[1] Section 509.052(2)(C) bans providers from collecting a minor's precise geolocation data. This too is unprotected, as there is nothing inherently expressive about social media companies tracking a minor's location. And § 509.052(2)(B) stops providers from sharing, disclosing, or selling a minor's personally identifiable information. This mirrors the Video Protection Privacy Act's requirements, which courts have upheld against First Amendment challenges.

Third, Plaintiffs contend that they don't understand what the term "social" means in § 509.002, and call HB 18's use of that term unconstitutionally vague. Yet one of their members (Facebook) is the *dictionary-provided example* for what "social" means when used to discuss a digital technology.[2] Also,

---

[1] *United States v. White*, 769 F.2d 511, 516 (8th Cir. 1985) (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496 (1982)).
[2] *Social*, DICTIONARY.COM, https://tinyurl.com/59sxyhcp.

binding precedent holds that a plaintiff whose speech is clearly proscribed cannot raise a vagueness claim. Plaintiffs admit that seven of their members fall under HB 18's scope and cite no situations where their members' coverage would be ambiguous. This dooms their vagueness challenge.

Fourth, Plaintiffs' vagueness attack on § 509.053(a) likewise fails. This section requires providers to prevent known minors from being exposed to "material and other content that promotes, glorifies, or facilitates" certain specified harms. Plaintiffs contend that no ordinary person can understand what it means to "promote suicide" or "glorify self-harm," for example. Yet these terms come *directly from their own content-moderation policies*.[3] And courts have specifically found the terms "promote" and "facilitate" to be readily understandable in similar contexts.

Fifth, Plaintiffs challenge § 509.053(a) on tailoring grounds. But this section is targeted directly at the content most likely to cause harm to minors, such as material "facilitating" another user's suicide or self-harm. Also, any alleged line-drawing problems can be remedied by a limited construction of § 509.053(a), which the statute is readily susceptible to. Plaintiffs' omission of a "limited construction" analysis was a clear error as this is essential to their First Amendment claims.[4]

Finally, Plaintiffs have justiciability problems. For instance, recent Fifth Circuit precedent holds that the official sued must have "taken some step" to enforce the statute to trigger the *Ex parte Young* exception to sovereign immunity. Plaintiffs did not make this showing. And *Moody* requires a member-specific analysis for facial claims in this context. Plaintiffs' members will need to participate in this lawsuit to resolve these facial claims, which means Plaintiffs lack standing to sue in their associational capacity. This goes doubly true for the as-applied claims, which are also hopelessly unripe

---

[3] *See, e.g.*, ECF 6-3, ¶ 12(a) ("Meta prohibits speech that 'intentionally or unintentionally celebrates or *promotes* suicide, self-injury or eating disorders.'") (emphasis added) (brackets omitted); *id.* at ¶ 12(e) ("Snap prohibits 'the *glorification* of self-harm, including the *promotion* of self-injury, suicide, or eating disorders.'") (emphasis added); *id.* at ¶ 13(g) ("X prohibits 'selling, buying, or *facilitating* transactions in illegal goods or services,' including 'drugs and controlled substances.'") (emphasis added).

[4] *See City of El Cenizo, Tex. v. Tex.*, 890 F.3d 164, 182 (5th Cir. 2018) ("Federal courts *must* accept a reasonable narrowing construction of a state law to preserve its constitutionality.") (emphasis added).

as HB 18 has not been "applied" to Plaintiffs' members in any meaningful sense.

These are just some of the many problems with Plaintiffs' position. This Court should deny their motion for a preliminary injunction in its entirety.

**BACKGROUND**

## I. Social Media Can Hurt Children.

Facebook's founding president, Sean Parker, has spoken candidly about the designs and goals of social media platforms. "The thought process that went into building these applications . . . was all about: 'How do we consume as much of your time and conscious attention as possible?'"[5] Like a slot machine, these platforms give users dopamine hits every so often—a liked comment, a post they are interested in, etc.—to keep them hooked just a little longer.[6] More user time means more targeted advertisements, which means more money for Plaintiffs' members.[7]

Social media companies are good at keeping users engaged. Too good. 95% of teenagers (ages 13 to 17) report using social media, with more than a third of them using it "almost constantly."[8] Twenty-two percent of tenth grade girls spend *seven or more hours a day* on social media.[9] "[This] means many teenage girls are doing little else than sleeping, going to school and engaging with social media."[10]

---

[5] *Sean Parker: Facebook Takes Advantage of "Vulnerability in Human Psychology,"* CBS NEWS, https://tinyurl.com/4zb7s9d2.

[6] *Id.*; *What is "Brain Hacking"? Tech Insiders on Why You Should Care*, CBS NEWS, https://tinyurl.com/y4m278k3.

[7] *See Social Media Platforms Generate Billions in Annual Ad Revenue from U.S. Youth*, HARVARD SCH. OF PUB. HEALTH (Dec. 27, 2023), https://tinyurl.com/3cysj46e; Bartbara Ortutay, *Facebook Parent Meta Posts Sharply Higher Profit in 3Q Thanks to Increase in Ad Revenue*, AP (Oct. 25, 2023), https://tinyurl.com/emj4sbjc.

[8] Kathy Katella, *How Social Media Affects Your Teen's Mental Health: A Parent's Guide*, YALE MED. (June 17, 2024), https://tinyurl.com/53jsztv7.

[9] *Social Media and Youth Mental Health*, U.S. DEP'T OF HEALTH AND HUMAN SERV., https://tinyurl.com/m64xzwjx.

[10] Michaeleen Doucleff, *The Truth About Teens, Social Media and the Mental Health Crisis*, NPR (Apr. 25, 2023), https://tinyurl.com/3r4why5x.

3

This problem is not confined to teenagers. 40% of children (ages 8 to 12) are on social media.[11] Social media companies may claim they "prohibit members under 13."[12] But whatever they are doing, it isn't working.

"God only know what [social media] is doing to our children's brains."[13] This is a quote from Sean Parker in 2017. Since then, the research has developed. It is now clear that social media can cause significant harm to users. This is especially true for minors. An adult's brain "is equipped with a strong braking system (called executive functioning)," which helps curb destructive behaviors.[14] Yet a teenager's "prefrontal cortex (where executive functioning takes place) isn't fully developed," and thus they have a harder time "stop[ping] themselves from getting into trouble."[15] For this and other reasons, there are "distinct developmental windows of sensitivity to social media in adolescence," which generally last between the ages of 11 and 19.[16]

Social media posts depicting harmful behavior have a "contagious effect," where the undesired behavior spreads to other members.[17] Indeed, "[r]esearch suggests that direct exposure to suicidal behaviors and acts of self-harm through social media may increase suicidality through imitation and modeling, particularly in more vulnerable populations."[18] A Facebook internal report, which we only know about because it was leaked, found "that among teens who reported suicidal thoughts, 13% of

---

[11] *Policy Statement on the Impact of Social Media on Youth Mental Health*, AM. ACAD. OF CHILD & ADOLESCENT PSYCHIATRY, https://tinyurl.com/3ptxpyzy.

[12] ECF 1, ¶ 28.

[13] *Sean Parker: Facebook Takes Advantage of "Vulnerability in Human Psychology," supra* note 5.

[14] Alisa Bowman, *Social Media's Effects on the Teen Brain*, MAYO CLINIC (Sept. 5, 2023), https://tinyurl.com/bdcsnmfc.

[15] *Id.*

[16] Amy Orben, et al., *Windows of Developmental Sensitivity to Social Media*, NATURE COMMC'N (Mar. 28, 2022), https://tinyurl.com/536jkx52.

[17] Vania Martinez, et al., *Social Contagion, Violence, and Suicide Among Adolescents*, CURR OPIN PSYCHIATRY (May 2023), https://tinyurl.com/ye252na8; *Technology Use and the Mental Health of Children and Young People*, ROYAL COLL. OF PSYCHIATRISTS, 31 (Jan. 2020), *available at* https://tinyurl.com/yv9cvu6w.

[18] Amro Khasawneh, et al., *Examining the Self-Harm and Suicide Contagion Effect of the Blue Whale Challenge on YouTube and Twitter: Qualitative Study*, JMIR PUBL'N (June 2020), https://tinyurl.com/yc23y54d.

British users and 6% of American users traced the issue to Instagram."[19] More suicidal thoughts leads to more suicides. And "deaths have been linked to suicide- and self-harm-related content, such as 'cutting,' partial asphyxiation, and risk-taking challenges on social media platforms."[20]

This "contagious effect" also appears in cyberbullying,[21] which Meta recognizes as being "especially harmful for minors."[22] Between 10% and 40% of adolescents experience cyberbullying.[23] And "a positive association exists between cyberbullying, deliberate self-harm, and suicidal behavior among victims of such bullying."[24]

Social media use can also cause eating disorders. Facebook's leaked internal research states "we make body image issues worse for 1 in 3 teen girls."[25] In one internal investigation (also leaked), an Instagram employee opened a false account as a 13-year-old girl looking for diet tips, only to be "led to graphic content and recommendations to follow accounts tilted 'skinny binge' and 'apple core anorexic.'"[26] A former Facebook product manager blamed the company's "engagement-based ranking systems," which she said "caus[ed] teenagers to be exposed to more anorexia content."[27]

The U.S. Surgeon General also reports that "social media platforms can be sites for predatory behaviors and interactions with malicious actors who target children and adolescents."[28] These

---

[19] Jessica Bursztynsky & Lauren Feiner, *Facebook Documents Show how Toxic Instagram is for Teens, Wall Street Journal Reports*, CNBC (Sept. 14, 2021), https://tinyurl.com/bdnmnsrs.

[20] Katella, *supra* note 8.

[21] Martinez, *supra* note 17.

[22] *Bullying and Harassment*, META, https://tinyurl.com/4t6pn32s.

[23] Aksha M. Memon, *The Role of Online Social Networking on Deliberate Self-Harm and Suicidality in Adolescents: A Systemized Review of Literature*, INDIAN J. PSYCHIATRY (Dec. 2018), https://tinyurl.com/4ab3uj8v.

[24] *Id.*

[25] Ryan Mac & Sheera Frenkel, *Facebook Downplays Internal Research Released on Eve of Hearing*, NEW YORK TIMES, https://tinyurl.com/r66dyr93.

[26] Kolbe Nelson, *Facebook Knew Instagram was Pushing Girls to Dangerous Content: Internal Document*, CBS NEWS (Dec. 11, 2022).

[27] Karen Hao, *The Facebook Whistleblower Says its Algorithms are Dangerous. Here's Why.*, MIT TECHNOLOGY REVIEW, https://tinyurl.com/65vxa64s.

[28] *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory*, U.S. DEP'T OF HEALTH AND HUMAN SERV., 9 (2023), *available at* https://tinyurl.com/m64xzwjx.

behaviors include: (1) sexual exploitation; (2) financial extortion; and (3) attempts to sell illegal drugs.[29] Nearly 60% of "adolescent girls say they've been contacted by a stranger on certain social media platforms in ways that make them  feel uncomfortable."[30]

Plaintiffs may tout their self-regulatory efforts, yet as the above reflects, they are not working. Social media is hurting our children at an alarming and growing rate. States are allowed to implement reasonable regulations of this omnipresent industry—as Texas did with HB 18.

## II.    An Overview of HB 18.

HB 18 is a multifaceted bill designed to protect minors from harms associated with social media and to increase parents' ability to supervise their children's activities in this area. Below is an overview of HB 18's main provisions.

**The "Applicability" Section (§ 509.002):** This describes which "digital service providers" HB 18 covers. Plaintiffs focus on the provision extending coverage to providers that allow users to "socially interact" with each other. They also target the exemption for a provider that: "(A) primarily functions to provide a user with access to news, sports, commerce, or content primarily generated or selected by the digital service provider; and (B) allows chat, comment, or other interactive functionality that is incidental to the digital service."[31]

**The "Privacy" Sections (§§ 509.051–.052):** HB 18 requires providers to "register[]" a person's age before allowing him or her to create an account.[32] This differs from age verification, a more involved procedure that applies to a subset of providers.[33] If a user registers as under 18, the user becomes a "known minor."[34] This triggers certain privacy protections, like a limit on the

---

[29] *Id.*
[30] *Id.*
[31] Tex. Bus. & Com. Code § 509.002(b)(10).
[32] *Id.* at § 509.051(a).
[33] *See id.* at § 509.057(a).
[34] *Id.* at § 509.051(d)(1).

collection and use of the minor's personally identifiable information ("PII").[35]

**The "Parental Powers" Sections (§§ 509.054, 509.101–.103):** HB 18 expands parents' ability to supervise their kids' use of social media. To obtain this authority, a parent must first prove that he or she is, in fact, the parent of the minor in question.[36] The provider must adopt a "commercially reasonable method" for verifying a parent's identity and relationship to the minor.[37] Once verified, parents can limit the amount of time their children spend on the service and alter their kids' privacy and account settings.[38]

**The "Illegal Advertising" Section (§ 509.055):** This requires providers to make a "commercially reasonable effort" to prevent advertisers on that service "from targeting a known minor" with certain unlawful advertisements.[39]

**The "Harm to Minors" Sections (§§ 509.053, 509.056):** These require providers to prevent a minor's exposure to specified harmful content, like that promoting, glorifying, or facilitating suicide or child pornography.[40] Providers must make certain efforts, such as employing filtering technology, to prevent minors' exposure to harmful material.[41] Providers must make reasonable efforts to ensure that any algorithms they use do not interfere with their duties under these sections.[42]

**The Enforcement Clause (§ 509.151):** This states that "[a] violation of this chapter is a deceptive act or practice actionable under Subchapter E, Chapter 17, solely as an enforcement action by the consumer protection division of the attorney general's office." Subchapter E, Chapter 17 of the Deceptive Trade Practice Act makes enforcement discretionary, not mandatory.[43] Plaintiffs did

---

[35] *Id.* at § 509.052(1).
[36] *Id.* at § 509.101.
[37] *Id.* at § 509.101(a).
[38] *Id.* at § 509.054(b)(1), (4).
[39] *Id.* at § 509.055.
[40] *Id.* at § 509.053(a).
[41] *Id.* at § 509.053(b).
[42] *Id.* at § 509.056(1).
[43] Tex. Bus. & Com. Code § 17.47(a).

not allege that Attorney General Paxton has enforced, or threatened to enforce, HB 18 against any of their members.

**The Severability Clause (§ 5.01):** This provides "[i]f any provision of this Act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this Act that can be given effect without the invalid provision or application."[44]

ARGUMENT

## I.    Sovereign Immunity Bars this Lawsuit.

Plaintiffs do not satisfy the *Ex parte Young* exception to sovereign immunity. First, *Ex parte Young* only applies if the officials sued have the "particular duty to enforce the statute in question."[45] "Discretionary authority to act, on its own, is insufficient to give rise to a particular duty."[46] Plaintiffs rely on the fact that HB 18 gives the attorney general's office enforcement authority.[47] But HB 18 makes enforcement discretionary, not mandatory.[48] This is not a "particular duty" to enforce.

Second, *Ex parte Young* requires the named officials to have shown "a demonstrated willingness" to enforce the challenged statute.[49] This means "the state officials must have *taken some step* to enforce the statute."[50] Plaintiffs did not show that Attorney General Paxton took any "steps" to enforce HB 18 against them.

Finally, § 509.151 specifies that the "consumer protection division of the attorney general's office" has authority to enforce HB 18 violations. Yet *Ex parte Young* is not satisfied merely by suing

---

[44] ECF 6-1, 19.
[45] *Tex. All. for Retired Americans v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022).
[46] *Mi Familia Vota v. Ogg*, 105 F.4th 313, 327 (5th Cir. 2024).
[47] ECF 1, ¶ 15.
[48] Tex. Bus. & Com. Code § 509.151; *id.* at § 17.47(a).
[49] *Tex. All. for Retired Americans*, 28 F.4th at 672.
[50] *Mi Familia Vota*, 105 F.4th at 329 (emphasis added) (quotations omitted); *see also Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 787 (5th Cir. 2024).

8

an apex official of the agency where the alleged unlawful act would occur.[51]

## II.    Plaintiffs' Lack Standing.

**Pre-Enforcement Standing:** Plaintiffs did not establish an injury fairly traceable to many of the challenged HB 18 provisions. Take § 509.052 for instance, which bars providers from collecting a minor's precise geolocation data and selling a minor's PII. Are Plaintiffs doing these things, or do they have concrete plans to do so in the imminent future? They do not say.

This is a problem. To have standing in the pre-enforcement context, Plaintiffs must show an intent to engage in the conduct being regulated for *each* claim they press.[52] Plaintiffs did not make this showing, so they lack standing to sue.

**Associational Standing (Facial):** An association has standing to sue on its members' behalf when, among other things, neither the claim nor relief requested requires the participation of individual members in the lawsuit.[53] Plaintiffs lack associational standing as their facial claims require the participation of individual members. *Moody* clarified that this analysis is far more complicated in the context of social media regulations because "[t]he online world is variegated and complex, encompassing an ever-growing number of apps, services, functionalities, and methods for communication and connection."[54]

Reviewing *Moody's* two-step test shows that the facial analysis will require fact-specific inquiries into Plaintiffs' members. First, this Court must assess "[w]hat activities, by what actors, [does HB 18] prohibit or otherwise regulate?"[55] This requires analyzing which providers HB 18 regulates and what

---

[51] *See Haverkamp v. Linthicum*, 6 F.4th 662, 671 (5th Cir. 2021) (upholding the TDCJ director's sovereign immunity, noting the lack of "allegation[s] plausibly typing [her] to the specific decisions at issue").

[52] *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

[53] *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

[54] *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2398 (2024).

[55] *Id.*

9

aspect of their "variegated" services the Act implicates.[56]

Second, this Court must "decide which of [HB 18's] applications violate the First Amendment, and to measure them against the rest."[57] This Court must inspect "*every* covered platform or function" and HB 18's "*full* range of application" to assess the extent of the burden on Plaintiffs' members' First Amendment rights.[58] And the analysis may turn on the specific service at issue, especially as some members may not exercise sufficient "editorial judgment" over their social media feeds to trigger First Amendment protection.[59]

This gets to the heart of the problem. Plaintiffs are trying to skirt by a facial challenge with a few declarations explaining how HB 18 impacts a small portion of the entities regulated by this Act. This is *exactly* what got them in trouble with the Supreme Court in *Moody*. Plaintiffs carry a hefty burden to assert facial claims in this context. Yet as *Moody* says, this is "the price of [their] decision to challenge [HB 18] as a whole."[60]

**Associational Standing (As-Applied):** The points above apply with more force to Plaintiffs' as-applied claims which, by their nature, are more fact-specific than facial claims. The Third Circuit recently found that two associations representing various aspects of the adult entertainment industry could not pursue as-applied First Amendment claims against regulations of that industry due to the need for individualized inquiries.[61] The Third Circuit's reasoning applies here.

**Ripeness:** The general rule is that "a party cannot challenge a statute as-applied unless the

---

[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *See id.* ("Even on a preliminary record, it is not hard to see how the answers might differ as between regulation of Facebook's News Feed . . . and, say, its direct messaging service . . . ."); *id.* at 2409.
[60] *See id.* at 2409.
[61] *Free Speech Coal., Inc. v. Attorney Gen. United States*, 974 F.3d 408, 414–22 (3d Cir. 2020); *see also Bano v. Union Carbide Corp.*, 361 F.3d 696, 714–16 (2d Cir. 2004).

statute has been applied to him."[62] Plaintiffs offer no reasons for avoiding this rule here. And their as-applied claims require factual development to make them cognizable. What specific HB 18 provisions are at issue? Which association members are being targeted? What aspects their services are implicated? And so on. Plaintiffs' as-applied claims are speculative and premature and should be rejected.[63]

**Third-Party Standing:** Plaintiffs effectively assumed that they could assert claims based on injuries to their users and thus do not discuss third-party standing in detail. That improperly mixes third-party standing and overbreadth. Although some courts have accepted this conflation, this is a categorical error.[64]

An overbreadth claim arises when a statute *did not* violate the plaintiff's First Amendment rights, but it would violate the rights of others if applied to them.[65] In contrast, third-party standing "involves a plaintiff's claim that a single application of a law both injures him and impinges upon the constitutional rights of third persons."[66] Plaintiffs did not assert an overbreadth claim here.

This matters because the prudential standing test is easier to meet for overbreadth claims.[67] Plaintiffs mainly base their third-party standing claim off *Virginia v. Am. Booksellers Ass'n, Inc.* But that is best thought of as an overbreadth case, as the plaintiffs' claim for a violation of their own First Amendment rights had effectively been dropped by the time it reached the Supreme Court.[68]

---

[62] *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 659 (5th Cir. 2006); *see also Justice v. Hosemann*, 771 F.3d 285, 292–95 (5th Cir. 2014); *Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1386 (7th Cir. 1992).

[63] *See Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002).

[64] *See NetChoice, LLC v. Fitch*, No. 1:24-CV-170-HSO-BWR, 2024 WL 3276409, at *7 (S.D. Miss. July 1, 2024); *NetChoice, LLC v. Yost*, No. 2:24-CV-00047, 2024 WL 555904, at *6 (S.D. Ohio Feb. 12, 2024); *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *10–12 (W.D. Ark. Aug. 31, 2023).

[65] *See United States v. Hansen*, 599 U.S. 762, 769 (2023); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 633–34 (1980); *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 41–42 (2d Cir. 2015).

[66] *Keepers, Inc.*, 807 F.3d at 41–42 (quotations omitted).

[67] *See Serv. Employees Intern. Union, Local 5 v. City of Houston*, 595 F.3d 588, 597–98 (5th Cir. 2010); *Keepers, Inc.*, 807 F.3d at 41–42.

[68] *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 n.6 (1988) ("The complaint also alleged a violation of plaintiffs' own First Amendment right to display the restricted works, but that claim was not passed on below and is not pressed here.").

Without an overbreadth claim, Plaintiffs must establish the test for third-party standing to assert their users' rights. Namely, they must show (1) a "close relationship" with their users and (2) a "hindrance" to their users' ability to protect their own interests.[69] Plaintiffs made no showing on either point, which alone is grounds for dismissing their third-party standing claim.[70]

Even had they tried, Plaintiffs' third-party standing claims are suspect at best. Their members have "*billions* of users around the world,"[71] all of whom connect to the members' services remotely. It is hard to see how this is a *close* relationship. And it is a far cry from the "saloonkeeper" and customer connection that the Supreme Court found sufficient in *Craig v. Boren*.[72]

As to the "hindrance" prong, individual plaintiffs routinely sue on First Amendment grounds to challenge acts that allegedly restrict their use of or access to social media.[73] Nothing prevents Plaintiffs' users from doing the same.

Also, third-party standing may be denied when the plaintiffs' and third-party's interests conflict,[74] which is the case here. HB 18 is a *consumer protection* bill; it protects minors from having their PII collected, getting bombarded with harmful content, etc. Why should the business that doesn't want to enact consumer protection regulations have standing to sue on behalf of the consumers to be protected? It's like giving employers who want to pay pennies on the dollar standing to challenge minimum wage laws on their underpaid employees' behalf: It makes no sense.

Three more points. *First*, Plaintiffs do not have standing to sue in their own right (as noted

---

[69] *Vote.Org v. Callanen*, 39 F.4th 297, 303–04 (5th Cir. 2022).

[70] *See Alamo Forensic Services, L.L.C. v. Bexar Cnty., Tex.*, 861 F. App'x 564, 569–70 (5th Cir. 2021).

[71] ECF 6-2, ¶ 4.

[72] 429 U.S. 190, 195 (1976); *id.* at 215 (Burger, J., dissenting).

[73] *See, e.g., Davison v. Randall*, 912 F.3d 666, 672 (4th Cir. 2019); *Attwood v. Clemons*, 526 F. Supp. 3d 1152, 1160 (N.D. Fla. 2021); *Felts v. Reed*, 504 F. Supp. 3d 978, 982 (E.D. Mo. 2020); *Campbell v. Reisch*, 367 F. Supp. 3d 987, 989 (W.D. Mo. 2019).

[74] *Rights of Others—Relationship Standing*, 13A FED. PRAC. & PROC. JURIS. § 3531.9.3 (3d ed.); *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, No. 19-5516, 2022 WL 2866607, at *2 n.3 (6th Cir. July 21, 2022).

above), so they cannot pursue third-party claims.[75] *Second*, many of the disputed provisions, such as the "geolocation" and "PII" limits, do not impact *users'* speech rights in any way. Plaintiffs' users do not have standing to challenge these (and many other) HB 18 requirements, so Plaintiffs cannot pursue third-party standing claims on their users' behalf.[76] *Third*, due to traceability/redressability issues, Plaintiffs must show that HB 18 would cause them to block user speech that would not already be restricted under their own content-moderation policies.[77] This is questionable at best, as Plaintiffs state that their polices *already* restrict the harmful material covered by HB 18.[78]

## III. Plaintiffs Erred when They Treated HB 18's Many Disparate Provisions as an Undifferentiated Whole; this Court Should Not Make the Same Mistake.

### A. *NetChoice I* Bars Plaintiffs' Attempt to Classify All of HB 18 as a Content- or Speaker-Based Regulation.

Plaintiffs contend that: (1) HB 18 exempts news, sports, and commerce sites from its definition of digital service providers; (2) this creates a content- or speaker-based distinction that triggers strict scrutiny for all of HB 18; and (3) the entire Act fails this heightened review.[79] Plaintiffs ignore that the Fifth Circuit and Supreme Court rejected this *exact* argument in *NetChoice I.*

To recap, the statutes at issue in *NetChoice I* (HB 20) contain two main provisions. Chapter 120 imposes certain disclosure and operational requirements on social media platforms.[80] Chapter 143 bars social media platforms from censoring users based on their viewpoints.[81] Both chapters rely on the same definition of "social media platform."[82] This definition carries an exception for sites "that

---

[75] *DC Operating, L.L.C. v. Paxton*, 100 F.4th 657, 659 (5th Cir. 2024).

[76] *See United States v. Smith*, 945 F.3d 729, 736 (2d Cir. 2019).

[77] *Murthy v. Missouri*, 144 S. Ct. 1972, 1993 (2024).

[78] *See* ECF 6–3, ¶¶ 12–17.

[79] *See* ECF 6, 14–17.

[80] Tex. Bus. & Com. Code §§ 120.051–.052.

[81] Tex. Civ. Prac. & Rem. Code § 143A.002.

[82] *See* Tex. Bus. & Com. Code §§ 120.001, 120.051–.052; Tex. Civ. Prac. & Rem. Code §§ 143A.001(4), 143A.002.

consist primarily of news, sports, [or] entertainment."[83]

At the Fifth Circuit, Plaintiffs argued that HB 20's "news, sports, and entertainment" exception created a content- and speaker-based distinction that triggered strict scrutiny for the entire act.[84] The Fifth Circuit rejected this point, explaining that the exception "does not render HB 20 content-based because the excluded websites are fundamentally dissimilar mediums."[85] The Court continued: "'[T]he fact that a law singles out a certain medium is insufficient by itself to raise First Amendment concerns.'"[86]

Plaintiffs raised the point again before the Supreme Court.[87] The Supreme Court also rebuffed it. Remember, Plaintiffs' core point was that HB 20's content-moderation and disclosure provisions should *both* receive strict scrutiny as the act turned on a content- or speaker-based distinction. Yet the Supreme Court found that HB 20's disclosure requirement was subject to the "very differential"[88] *Zauderer*-level scrutiny.[89] And the Court found that HB 20's content-moderation provisions are subject to strict *or intermediate* scrutiny; the Court did not decide which.[90]

In short, *Moody* adopted a provision-by-provision analysis, as opposed to Plaintiffs' desired one-size-fits-all approach.[91] *Moody* also effectively confirmed, or at least did not disturb, the Fifth Circuit's analysis of HB 20's "news, sports, and entertainment" exception.

Perhaps recognizing the problem, Plaintiffs also contend that § 509.002(a)(1)'s use of the term

---

[83] Tex. Bus. & Com. Code § 120.001(1)(C).

[84] Brief of Appellees, 15–16, 41–42, *available at* 2022 WL 1046833.

[85] *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 480 (5th Cir. 2022) (hereinafter "*NetChoice I*"), *cert. granted in part sub nom. NetChoice, LLC v. Paxton*, 144 S. Ct. 477 (2023) *and vacated and remanded sub nom. Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024)

[86] *Id.* at 480–81 (ellipsis omitted) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 660 (1994)).

[87] Brief for Petitioners, 9–10, 14–15, 37–38, *available at* 2023 WL 8437869; Reply Brief for Petitioners, 15–16, *available at* 2024 WL 693692.

[88] *R J Reynolds Tobacco Co. v. Food & Drug Admin.*, 96 F.4th 863, 870 (5th Cir. 2024).

[89] *Moody*, 144 S. Ct. at 2398.

[90] *Id.* at 2407.

[91] *See id.* ("[N]othing said here puts regulation of NetChoice's members off-limits as to a whole array of subjects.").

"socially" creates a content-based distinction.[92] Yet they never explain how. To be clear, the focus in this context is on whether the law "discriminate[s] based on the topic discussed or the idea or message expressed."[93] The term "social," by itself, is indifferent to any specific topic or message. And the Fifth Circuit's *NetChoice I* decision confirms that there is nothing improper about regulating only certain distinct mediums, such as those platforms that allow users to socially interact with others.[94]

In sum, Plaintiffs' argument that strict scrutiny governs all of HB 18 must fail. Instead, a provision-by-provision analysis is warranted. Such an analysis, which Plaintiffs did not perform, will confirm that HB 18 does not violate the First Amendment.[95]

### B.   A Provision-By-Provision Analysis Confirms that HB 18 is Constitutional.

**The "PII" Provision:** Section 509.052(2)(B) bars digital service providers from sharing, disclosing, or selling a known minor's PII. This section shares much in common with the Video Privacy Protection Act ("VPPA"), which limits the knowing disclosure of information that "identifies a person as having requested or obtained specific video materials or services from a video tape service provider."[96] Courts have applied intermediate scrutiny to the VPPA's disclosure provision and upheld it, generally reasoning that (1) states have a substantial interest in protecting consumer privacy and (2) the VPPA directly targets the speech causing an invasion of privacy.[97] Section 509.052(2)(B) is no different.

Also, § 509.052(2)(B) is not plagued with content- and speaker-based exceptions, like the

---

[92] ECF 6, 14.

[93] *City of Austin, Tex. v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73 (2022) (quotations omitted).

[94] *See NetChoice I*, 49 F.4th 439, 480–81.

[95] Defendant addresses HB 18's "Harm to Minors" sections later in this response. *Infra*, 20–34. Defendant addressed the "Illegal Advertising" (§ 509.055) and "Geolocation" (§509.052(2)(C)) sections above, and thus do not reassert these points in the following section. *Supra*, 1.

[96] 18 U.S.C.A. § 2710(a)(3), (b)(2).

[97] *Saunders v. Hearst Television, Inc.*, No. 23-CV-10998-RGS, 2024 WL 126186, at *5–6 (D. Mass. Jan. 11, 2024); *Boelter v. Advance Magazine Publishers Inc.*, 210 F. Supp. 3d 579, 598–602 (S.D.N.Y. 2016).

disclosure law invalidated in *Sorrell v. IMS Health Inc.*[98] Rather, this section bars the disclosure of a known minor's PII to *anyone*, unless a parent consents otherwise. *Sorrell* stated that a regulation like this—one with narrower, justifiable exceptions—would be a "more coherent policy" that is more likely to be valid under the First Amendment.[99]

**The "Age Registration" Provision:** Section 509.051(a) requires providers to "register[] the person's age" before allowing him or her to create an account with the service. This section allows users to *self-select* their age when signing up. It is hard to see how this restricts any First Amendment rights. Plaintiffs do not meaningfully argue otherwise.

**The "Financial Transaction" Provision:** Section 509.052(2)(A) states that a provider may not "allow the known minor to make purchases or engage in other financial transactions through the digital service." This is constitutional as "consummating a business transaction is nonexpressive conduct unprotected by the First Amendment."[100]

**The "Targeted Advertisement" Provision:** Section 509.052(2)(D) bars providers from "us[ing] the digital service to display targeted advertising to the known minor." This is a content-neutral commercial speech restriction that triggers intermediate scrutiny.[101]

Section 509.052(2)(D) concerns the state's interests in protecting children from abuse and their privacy.[102] Social media companies are driven to collect gobs of sensitive personal information about minors so they can target them with ads.[103] And these companies have been caught evading

---

[98] 564 U.S. 552, 564–66 (2011).

[99] *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 573, 580 (2011).

[100] *See B & L Productions, Inc. v. Newsom*, 104 F.4th 108, 114 (9th Cir. 2024); *Lowe v. S.E.C.*, 472 U.S. 181, 232 (1985) (White, J., concurring); *see also Sorrell*, 564 U.S. at 567.

[101] *See Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623–24 (1995).

[102] *See Morse v. Frederick*, 551 U.S. 393, 407 (2007); *Ginsberg v. State of N. Y.*, 390 U.S. 629, 640 (1968).

[103] *See, e.g.*, Elizabeth Napolitano, *Social Media Apps Made $11 Billion from Children and Teens in 2022*, CBS NEWS, https://tinyurl.com/2ty9n8nw.

privacy and other child protection laws due to this perverse incentive.[104] Section 509.052(2)(D) is aimed directly at the heart of the problem. Thus, it survives intermediate scrutiny.

**The "Parental Powers" Provisions:** Plaintiffs do not explain how §§ 509.054, 509.101–.013—which give parents authority to supervise their kids' social media usage—create a First Amendment issue. These sections don't regulate Plaintiffs' members' content moderation, so they don't implicate their First Amendment speech rights ala *Moody*. And these sections leave minors free to post content on social media and view content posted by others. While a parent can limit a minor's social media usage with this new authority; it would not be the *State* doing the restricting. To the extent this is even a First Amendment restriction, it is easily justifiable under any level of scrutiny.[105]

Plaintiffs' real complaint is about cost of compliance;[106] they just dress it up to make it look like a First Amendment issue. But of course, Plaintiffs are not exempt from ordinary business regulations just because First Amendment activity occurs on their platforms.[107]

Also, it makes sense to have parents verify their identity and relationship to a minor before they "seek[] to perform an action on a digital service as a minor's parent."[108] Without this, *anyone* could conceivably restrict a minor's social media usage. And § 509.101 allows companies to use *commercially reasonable* methods, which greatly lessens the burden to individual providers.

One last thing. Plaintiffs state that HB 18 "require[s] the disclosure of personal information

---

[104] *See, e.g.*, *Google and YouTube will Pay Record $170 Million for Alleged Violations of Children's Privacy Law*, FTC, https://tinyurl.com/yckd5fxp; Cecilia Kang, *Meta Reaches $1.4 Billion Settlement with Texas over Privacy Violations*, NEW YORK TIMES, https://tinyurl.com/ydjcvhyj.

[105] *See Sorrell*, 564 U.S. at 573 ("[P]rivate decisionmaking can avoid governmental partiality and thus insulate privacy measures from First Amendment challenge."); *Zbaraz v. Madigan*, 572 F.3d 370, 388 n.11 (7th Cir. 2009); *cf. Cranford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008).

[106] *See* ECF 6, 12.

[107] *See Sorrell*, 564 U.S. at 567; *Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen., Florida Dep't of Health*, 50 F.4th 1126, 1135–37 (11th Cir. 2022); *O'Connor v. City & Cnty. of Denver*, 894 F.2d 1210, 1218 (10th Cir. 1990).

[108] Tex. Bus. & Com. Code § 509.101.

that increase[s] concern about minors' data privacy."[109] Let's put aside the fact that perhaps the world's largest collectors and sellers of personal information[110] are the ones making this point. If Plaintiffs are trying to say they cannot be trusted with personal information, that would justify many of HB 18's other provisions, most notably its "Privacy" sections. If that's not what they meant, then what, exactly, is their issue here?

### C.   Section 509.002 is Not Unconstitutionally Vague.

Plaintiffs challenge § 509.002's use of the terms "socially interact," "primarily," and "incidental to." They won on similar arguments in *Griffin*[111] and *Fitch*.[112] But *Griffin*'s and *Fitch*'s vagueness analyses were cursory. And as we will show, these courts got it wrong.

**The Overarching Problem:** Binding precedent holds that "[a] plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim."[113] Plaintiffs admit that HB 18 covers seven of their members.[114] And they do not identify any members where coverage would be ambiguous. Thus, their vagueness challenge fails,[115] and the analysis can realistically end here.

**The "Primarily" Analysis:** The term "primarily" means "mainly"[116] or "for the most part."[117] Read here, the underlying provision exempts services that *mainly* provide access to news, sports, and

---

[109] ECF 6, 12.

[110] *See, e.g.*, Kalev Leetaru, *Social Media Companies Collect so Much Data Even They Can't Remember All the Ways They Surveil Us*, FORBES (Oct. 25, 2018), https://tinyurl.com/ypc5an27.

[111] *Griffin*, 2023 WL 5660155, at *12–15.

[112] *Fitch*, 2024 WL 3276409, at *14–16.

[113] *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 48 (2017) (brackets omitted) (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010)); *see also Doe I v. Landry*, 909 F.3d 99, 117 (5th Cir. 2018); *United States v. Nassif*, 97 F.4th 968, 981 (D.C. Cir. 2024); *Nat'l Org. for Marriage, Inc. v. McKee*, 669 F.3d 34, 41 (1st Cir. 2012).

[114] ECF 6, 9.

[115] *See Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 58–59 (1976) ("We find it unnecessary to consider the validity of [the respondents' vagueness] arguments in the abstract. For even if there may be some uncertainty about the effect of the ordinances on other litigants, they are unquestionably applicable to these respondents."); *Bowling v. McDonough*, 38 F.4th 1051, 1061–62 (Fed. Cir. 2022).

[116] *Primarily*, CAMBRIDGE DICTIONARY, https://tinyurl.com/ypsr9c9h.

[117] *Primarily*, MERRIAM-WEBSTER, https://tinyurl.com/y6fx6uex.

commerce content. HB 18 contemplates that such services may allow some social "interactive functionality," but that is often *incidental* to the services' main purpose (think the New York Times, ESPN).[118]

The situation is flipped for social media companies. They exist *mainly* to allow users to socially interact with others, and the content on their platforms is an *incidental* outgrowth of connecting users to each other.[119] They are, in a way, the exact opposite of what's covered by the challenged exemption.

Also, the term "primarily" is commonly used in statutes. A Westlaw search of "Statutes & Court Rules" for the term "primarily" yields over 10,000 hits. It should be no surprise then that courts consistently find that this term is not unconstitutionally vague.[120]

**The "Incidental" Analysis:** The term "incidental" means "[s]ubordinate to something of greater importance; having a minor role."[121] It too appears in many statutes; a Westlaw or Lexis search will confirm this. In *McGowan v. State of Md.*, the Supreme Court found that a statute's use of the term "incidental" did not render it unconstitutionally vague.[122] This Court correctly reached the same conclusion in *NetChoice I*.[123]

**The "Socially Interact" Analysis:** When used in connection with digital technology, the term "social" "not[es] or relat[es] to online technologies, activities, etc., that promote companionship or communication with friends and other personal contacts: the use of social software to share expertise. social media."[124] Again, Facebook is the *dictionary-provided example* for what "social" means in

---

[118] Tex. Bus. & Com. Code § 509.002(b)(10)(B).

[119] *See* ECF 6-2, ¶ 4 ("These HB18 covered members enable billions of users around the world to create and share content using their services . . . .").

[120] *See, e.g.*, *United States v. Gibson*, 998 F.3d 415, 419 (9th Cir. 2021); *United States v. Sanderson*, 730 F. App'x 426, 428–29 (9th Cir. 2018); *Nova Records, Inc. v. Sendak*, 706 F.2d 782, 789–92 (7th Cir. 1983).

[121] *Incidental*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[122] 366 U.S. 420, 428–29 (1961); *see also Empire State Rest. & Tavern Ass'n v. New York*, 289 F. Supp. 2d 252, 256–57 (N.D.N.Y. 2003).

[123] *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1114 (W.D. Tex. 2021).

[124] *Social*, DICTIONARY.COM, https://tinyurl.com/59sxyhcp.

this context.[125] Also, the Fourth Circuit recently found HB 18's definition of "social"—or at least one quite like it—to be the "commonsense meaning" of the term in the context of digital technology.[126] Plaintiffs may claim that they no longer understand what "social" means, but this doesn't pass the smell test.

## IV.    HB 18's "Harm to Minors" Sections do Not Violate the First Amendment.

### A.    Analysis of § 509.053(a).

Section 509.053(a) requires providers to prevent known minors from being exposed to "material and other content that promotes, glorifies, or facilitates" certain specified harms, like stalking and child pornography. Our analysis of this section unfolds in three parts. *First*, even under a broad interpretation of § 509.053(a), this statute is constitutional. Social media poses a real danger to minors, and § 509.053(a) is aimed directly at the source of the harm. *Second*, § 509.053(a) is readily susceptible to a limiting construction that would avoid any First Amendment issues and expressly severable. *Third*, § 509.053(a) is not vague. Rather, its key terms mirror Plaintiffs' members' own content-moderation rules. Also, these terms are subject to well-settled interpretations, as seen in cases like *United States v. Hansen*.

#### 1.    Even Under a Broad Interpretation, § 509.053(a) is Constitutional.

Plaintiffs set up a broad interpretation of § 509.053(a)—saying it precludes support group discussions, The Police's *Every Breath You Take*, and so on—and attack this strawman on tailoring grounds.[127] This is not a fair reading of the statute. Section 509.053(a)'s focus is on preventing harm

---

[125] *Id.*

[126] *See United States v. Comer*, 5 F.4th 535, 542 (4th Cir. 2021) ("[W]e understand a 'social networking account' to be an account on a website or app that is *primarily* intended to facilitate *social introductions* between two or more persons through the use of personal profiles for the purposes of friendship, meeting others, or information exchanges. Thus, the *commonsense meaning* of the condition is that Comer may not have any social networking accounts, so defined, without her probation officer's permission.") (emphasis added).

[127] *See* ECF 6, 18–24.

to minors. This is apparent from the statute's title ("Digital Service Provider Duty to Prevent Harm")[128] and its substantive provisions, which turn on acts likely to cause harm to minors. Plaintiffs' cited examples would not reasonably harm minors. So, § 509.053(a) does not forbid them.

Properly read, § 509.053(a) is constitutional under any standard of review, particularly the intermediate scrutiny likely applicable to Plaintiffs' commercial speech.[129] The State clearly has a compelling interest in protecting minors from abuse.[130] And ample evidence shows the myriad harms associated with minors' use of social media, as discussed above.[131] Section 509.053(a) is narrowly tailored as it directly targets the content that is hurting minors.

The district court in *Griffin* effectively endorsed § 509.053(a)'s targeted approach. There, the court examined the U.K.'s Online Safety Bill and found it "more consistent with Supreme Court precedent than Arkansas's [Social Media Safety Act]."[132] *Griffin* acknowledged that the Supreme Court has recognized that states can feasibly enact laws targeted at specific conduct, like that which "often presages a sexual crime," without violating the First Amendment.[133]

The U.K. bill contains content-moderation provisions that mirror § 509.053(a)'s. For instance, the U.K. bill requires social media companies to remove content relating to, or otherwise encouraging or promoting: (1) "suicide"; (2) "child sexual abuse"; (3) "people smuggling"; (4) "sexual exploitation"; (5) "pornography"; (6) "self-harm"; and (7) "eating disorders."[134] It also severely limits content that is

---

[128] *See In re United Services Auto. Ass'n*, 307 S.W.3d 299, 307 (Tex. 2010) ("[W]hile . . . a heading cannot limit or expand the statute's meaning, the heading gives some indication of the Legislature's intent.") (quotations and citation omitted).

[129] *See Moody*, 144 S. Ct. at 2407 (applying intermediate scrutiny to alleged restrictions on Plaintiffs' members' speech, without deciding whether strict scrutiny is warranted in this context); *Griffin*, 2023 WL 5660155, at *16 (same).

[130] *See Morse*, 551 U.S. at 407; *Ginsberg*, 390 U.S. at 640 (1968).

[131] *Supra*, 3–6.

[132] *Griffin*, 2023 WL 5660155, at *20.

[133] *Id.* (quoting *Packingham v. North Carolina*, 582 U.S. 98, 106–07 (2017)).

[134] *What the Online Safety Act Does*, Gov.UK, https://tinyurl.com/ycy4atxp.

(8) "bullying" and (9) "abusive or hateful."[135] Given the similarities, if the U.K. bill is "more consistent with Supreme Court precedent,"[136] then so too is § 509.053(a).

### 2.   Section 509.053(a) is Readily Susceptible to a Limiting Construction.

When a state statute is readily susceptible to a narrower interpretation that would preserve its constitutionality, a court *must* adopt that interpretation.[137] A limiting construction is available for § 509.053(a) that avoids any meaningful First Amendment issues. And, regardless, severability applies to avoid any unconstitutional applications of the statute without negating the whole.

**The "Glorify" Issue:** The main question is how to interpret § 509.053(a)'s "promotes, glorifies, or facilitates" language. "Glorify" generally means to "honor, praise, or admir[e]."[138] This term can conceivably sweep in more speech than "promote" or "facilitate." "Glorify" also signals a viewpoint-based restriction. And it targets the content of the speech ("I think assisted suicide is beneficial and should be legal") as opposed to independently unlawful activity being carried out by speech ("Here are five ways you can kill yourself painlessly").[139] The parade of horribles Plaintiffs rely on stem from § 509.053(a)'s "glorify" language, although they try to claim otherwise.

**The "Severability" Issue:** Plaintiffs don't say it explicitly, but they need this Court to interpret "facilitate" and "promote" in line with "glorify." Why? Because if "glorify" is the only unconstitutional provision, then only that term should be severed from § 509.053(a), as per HB 18's severability clause.[140]

---

[135] *Id.*

[136] *Griffin*, 2023 WL 5660155, at *16.

[137] *See City of El Cenizo, Tex.*, 890 F.3d at 182.

[138] *Glorify*, MERRIAM-WEBSTER, https://tinyurl.com/2s45ajec.

[139] *See United States v. Williams*, 553 U.S. 285, 298–99 (2008) ("To be sure, there remains an important distinction between a proposal to engage in illegal activity and the abstract advocacy of illegality."); Tex. Pen. Code § 22.08(a) ("A person commits an offense if, with intent to promote or assist the commission of suicide by another, he aids or attempts to aid the other to commit or attempt to commit suicide.").

[140] *See* Tex. Gov't Code § 311.032(a) ("If any statute contains a provision for severability, that provision prevails in interpreting that statute."); ECF 6-1, 19 (containing HB 18's broad severability provision).

Plaintiffs' statutory interpretation argument, should they ever deign to make one, would rely on non-severability. They must argue that the cannon of *noscitur a sociis* "counsels that a word is given more precise content by the neighboring words with which it is associated."[141] Thus, "promote" and "facilitate" should be read in line with "glorify." Put differently, "glorify" infects its neighboring verbs, turning the whole series into broad, viewpoint-based, restrictions. This is not the best interpretation of § 509.053(a) for reasons touched on below. That said, "right or wrong" is largely irrelevant here. Plaintiffs need this to be the *only* reasonable reading of § 509.053(a). It is not.

**The Other Interpretation of "Promotes, Glorifies, or Facilitates":** The other viable interpretation of "promotes, glorifies, or facilitates" is that these verbs carry distinct meanings. "Facilitate" can mean "[t]o make the occurrence of (something) easier; to render less difficult."[142] "Promote" can mean "to help bring (something, such as an enterprise) into being."[143] These limited, and more natural, readings of "facilitate" and "promote" avoid Plaintiffs' laundry list of grievances. For instance, § 509.053(a) would not bar Romeo and Juliet[144] as this play does not "help" bring about the sexual exploitation of a minor. The TV series *13 Reasons Why*[145] likewise falls outside the statute's ambit. This series does not technically "make" committing suicide any easier, even though there is "strong evidence" that it "led to an approximately 13% increase in suicides for youths aged 10 to 19 years in the three months that followed its release."[146]

**The *Williams* and *Hansen* Decisions:** The Supreme Court has found the terms "promote" and "facilitate" to be readily understandable. *United States v. Williams* concerned an overbreadth

---

[141] *Williams*, 553 U.S. at 294.

[142] *Facilitate*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Facilitate*, MERRIAM-WEBSTER ("[T]o make (something) easier."), https://tinyurl.com/46c5pnkz.

[143] *Promote*, MERRIAM-WEBSTER, https://tinyurl.com/4k6kvzjs; *Promote*, DICTIONARY.COM ("[T]o help or encourage to exist or flourish; further."), https://tinyurl.com/4s2v3cxm.

[144] ECF 6, 21.

[145] *Id.*

[146] *Technology Use and the Mental Health of Children and Young People*, *supra* note 17.

challenge to a federal act aimed at preventing the sexual exploitation of children. Under that act, it is a crime to knowingly "advertise[], *promote[]*, present[], distribute[], or solicit[]" material that contains a "visual depiction" of a "minor engaging in sexually explicit conduct."[147]

The Court found the term "promote" to be "susceptible of multiple and wide-ranging meanings."[148] The Court adopted a narrower interpretation, reading it to cover "the act of recommending [the unlawful activity] to another person."[149] With this limited construction in place, the Court found that the act was constitutional, relying on the settled principle that the First Amendment does not protect speech "that is intended to induce or commence illegal activities."[150]

Next up is *United States v. Hansen*. There, the Supreme Court acknowledged that the term "facilitation," as used in the criminal context, "captur[ed] only a narrow band of speech" and would be presumptively constitutional.[151] The Court interpreted "facilitation" as "the provision of assistance to a wrongdoer with the intent to further an offense's commission."[152] The Court found that narrow terms such as this do not violate the First Amendment, as they "stretch[] no further than speech integral to unlawful conduct."[153]

Plaintiffs do not distinguish *Williams*. Rather, they cite it only for the proposition that the term "promote" is "susceptible of multiple and wide-ranging meanings."[154] Plaintiffs missed that this *hurts* their argument. If § 509.053(a)'s use of the term "promote" carries many "wide-ranging meanings," then at least *some* of those meanings will be narrow. Again, this Court *must* adopt a limited

---

[147] *Williams*, 553 U.S. at 290 (emphasis added) (citing 18 U.S.C. § 2252A(a)(3)(B)).
[148] *Id.* at 294–95.
[149] *Id.*
[150] *Id.* at 297–98.
[151] *See Hansen*, 599 U.S. at 770–73 (finding that the terms at issue in that case, "encourage" and "induce" were constitutional largely because they should be interpreted in line with well-settled terms like "solicitation" and "facilitation").
[152] *Id.* at 771.
[153] *Id.* at 783.
[154] ECF 6, 24–25.

interpretation if needed to avoid constitutional issues.[155] And nothing in § 509.053(a) forecloses a narrower construction.

Plaintiffs relegate their analysis of *Hansen* to a footnote; an odd choice given this case's clear impact here.[156] Their argument boils down to this: (1) *Hansen* analyzed a criminal statute; (2) "facilitate" has a "longstanding and pervasive" construction in the criminal context; (3) HB 18 is not a criminal statute; thus (4) *Hansen* is irrelevant here.

The first three points are generally right, but Plaintiffs made the fourth one up. They cite no cases analyzing *Hansen* so restrictively. Nor do they cite any cases finding that "facilitate" carries different meanings in the criminal and civil contexts. Plaintiffs' argument also begs the obvious question: If the term "facilitate" carries a limited, constitutionally sufficient, meaning in the criminal context, couldn't that *also* be a viable interpretation in the civil context? Plaintiffs act as if "facilitate" *must* carry different meanings in criminal and civil statutes. But they don't take their own argument seriously, and neither should this Court.

**How do the Points Above Impact a § 509.053(a) Analysis?** To recap, Plaintiffs effectively focus on the "glorifies" term. Yet this term is severable; Plaintiffs do not argue otherwise. This leaves "promotes" and "facilitates." And Supreme Court precedent shows that these terms can be narrowly construed to avoid First Amendment issues. So, what does the First Amendment analysis of § 509.053(a) look like from here?

The easy answer is that Plaintiffs did not do the bare minimum needed to sustain a viable First Amendment challenge to § 509.053(a). Their as-applied claims will largely turn on the speech at issue (is it independently illegal, is it "core" protected speech, etc.), how Texas is enforcing § 509.053(a), and various other factors. These facts are not before this Court.

---

[155] *See City of El Cenizo, Tex.*, 890 F.3d at 182.
[156] ECF 6, 23 n.3.

As to their facial claims, Plaintiffs did not perform the detailed analysis *Moody* requires of them. Most notably, they did not identify all the constitutional applications of § 509.053(a) and weigh them against the unconstitutional ones.

Plaintiffs likely shirked this responsibility because a proper review shows that § 509.053(a)'s constitutional applications substantially outweigh any unconstitutional ones. This section covers eleven topics.[157] Eight (suicide, stalking, harassment, grooming, trafficking, child pornography, sexual exploitation or abuse, and substance abuse) directly concern activity made illegal by either the Texas Penal Code or the Texas Health and Safety Code.[158] The list grows to nine when "bullying" is read in line with the other grouped topics, as per the cannon of *noscitur a sociis*.[159]

Speech on these nine topics is unprotected as it is "integral to unlawful conduct" or otherwise "intended to bring about a particular unlawful act."[160] At most, rational basis review would apply, which § 509.053(a) easily satisfies.[161] Put differently, many of § 509.053(a)'s "applications" are constitutional as they relate to unprotected speech. This ends Plaintiffs' facial challenge.

The First Amendment analysis is trickier for the remaining two topics (self-harm and eating disorders). Some speech in these areas will be independently unlawful and thus unprotected, especially when considered in connection with more limited definitions of "facilitate" and "promote." For instance, a user who repeatedly fat shames another and sends them multiple videos about how to

---

[157] Plaintiffs count twelve topics as they include § 509.057(a)'s use of the term "obscenity." This does not meaningfully change the analysis.

[158] *See, e.g.*, Tex. Pen. Code § 15.032 (child grooming); *id.* at § 20A.02 (trafficking); *id.* at § 22.08(a) (suicide); *id.* at § 42.07(a)(7)–(8) (electronic harassment); *id.* at § 42.072 (stalking); *id.* at §§ 43.261(b)(1), 43.262(b) (child pornography); *id.* at §§ 481.001–490.151 (containing Title 6 of the Tex. Health and Safety Code, Substile C, which is titled "*Substance Abuse* Regulation and Crimes") (emphasis added).

[159] *See Williams*, 553 U.S. at 294; Tex. Pen. Code § 42.07(a)(7)–(8).

[160] *Hansen*, 599 U.S. at 783; *see also Packingham*, 582 U.S. at 107 ("[T]he First Amendment permits a State to enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor.").

[161] *See Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 278 (5th Cir. 2024), *cert. granted sub nom. Free Speech Coal. v. Paxton*, No. 23-1122, 2024 WL 3259690 (U.S. July 2, 2024).

"binge and purge" has likely violated Texas's electronic harassment law.[162] That said, unlike the other nine topics, "self-harm" and "eating disorders" do not directly target independently unlawful speech.

This gets to a broader point, one applicable to all eleven topics. Even if strict scrutiny applies, adopting narrower definitions of "facilitate" and "promote" curbs § 509.053(a)'s scope. Once narrowed, this statute targets the speech especially likely to harm minors—e.g., one user making another develop an eating disorder, or one user teaching others how to slit their wrists. If that is not narrowly tailored, it is hard to imagine what would be in this context. The First Amendment is not a straitjacket, rendering States powerless to protect children from an obvious harm. The Constitution simply does not work that way.[163] This Court should find that § 509.053(a) does not violate the First Amendment.

### 3.   Section 509.053(a) is Not Unconstitutionally Vague.

Plaintiffs contend that § 509.053(a)'s terms "promotes," "glorifies," and "facilitates" are unconstitutionally vague.[164] They are wrong.

To begin, § 509.053(a) mirrors *Plaintiffs' own* content-moderation policies.[165] Of course, Plaintiffs wouldn't use these terms in this context if they were so vague that "ordinary people [could not] understand what conduct is prohibited."[166]

Also, to the extent its terms are unclear, § 509.053(a) is susceptible to a narrowing construction that would avoid any vagueness issues, as discussed above.[167] Indeed, *Hansen* found the term

---

[162] *See* Tex. Pen. Code § 42.07(a)(7)–(8).

[163] *See Glossip v. Gross*, 576 U.S. 863, 869 (2015) (noting that, if the constitution allows states to take a certain act—here, protecting children from abuse—it "necessarily follows that there must be a constitutional means of carrying it out").

[164] ECF 6, 24–25.

[165] *Supra*, 2.

[166] *See Doe I v. Landry*, 909 F.3d 99, 116 (5th Cir. 2018).

[167] *See Welch v. United States*, 578 U.S. 120, 134 (2016) ("It has long been our practice before striking a federal statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction.") (ellipsis and quotations omitted).

"facilitation" can be narrowly construed in a way that would be presumptively constitutional.[168]

As to "promote," Plaintiffs are correct that *Baggett v. Bullitt* found this term vague, but it did so in a wildly different situation than this one. *Baggett* concerned a loyalty oath that required teachers to swear that they will "promote respect for the flag and the institutions of the United States."[169] There, though, the term "promote" had to include viewpoint-based speech; a *loyalty* oath makes no sense otherwise. And it applied to an incalculable number of topics: Anything touching on the "institutions of the United States." Thus, while the *Baggett* Court tried to come up with a limiting construction, it could not find one that made sense given the oath's context and purpose.[170]

Yet *Williams* shows that "promote" can be narrowly construed in a manner that would be constitutional.[171] And courts have found that the term "promote" is not unconstitutionally vague outside of the loyalty oath context.[172] Thus, Plaintiffs' vagueness challenge to § 509.053(a) is flawed and should be rejected.

### B.    Analysis of § 509.053(b).

Plaintiffs' misreading of § 509.053(b) infects their arguments on this point. Once this fog is lifted, it will be clear that this section is constitutional.[173]

It helps to understand what § 509.053(b) does, and doesn't, require. It *does* require providers to use certain well-settled content-moderation procedures (filtering,[174] hash-sharing,[175] methods to

---

[168] *See Hansen*, 599 U.S. at 770–73.

[169] *Baggett v. Bullitt*, 377 U.S. 360, 371–72 (1964).

[170] *Id.*

[171] *See Williams*, 553 U.S. at 294–98.

[172] *See, e.g., United States v. Cavalier*, 17 F.3d 90, 93 n.5 (5th Cir. 1994); *Arce v. Douglas*, 793 F.3d 968, 985 (9th Cir. 2015); *Yamada v. Snipes*, 786 F.3d 1182, 1193 (9th Cir. 2015); *Bass v. United States*, 324 F.2d 168, 172–73 (8th Cir. 1963).

[173] As discussed above, most of the material limited by § 509.053(a) is unprotected speech that, at most, triggers rational basis review. Section 509.053(b) can easily be upheld under this lenient standard.

[174] *See, e.g., How Enforcement Technology Works*, META (Jan. 19, 2022) (discussing how Meta filters content via artificial intelligence technology), https://tinyurl.com/39uvfmmb.

[175] *See, e.g., Online Child Protection*, META (discussing how Meta filters child sexual abuse material via hash-sharing), https://tinyurl.com/2ayszkf7

stop filter evasion,[176] and human-level monitoring[177]) as part of their strategy to block harmful content. It *doesn't* require providers to use *each* procedure on *each* piece of content, which is how Plaintiffs interpret it.

Take "hash-sharing" for instance. This is a common method used to filter pictures and videos containing child sexual abuse material.[178] Yet Plaintiffs call § 509.053(b) "counterproductive" because "[h]ashing capabilities do not exist in meaningful forms for almost all of the categories identified by the Act."[179] They may be right about hash-sharing. But this should have caused Plaintiffs to question their reading of § 509.053(b), as they believe it leads to absurd results. Instead, they leaned into it, despite what statutory interpretation principles require.[180] Plaintiffs also contend that "hashing is not a viable approach to identifying *new* content,"[181] which is probably why the Legislature limited its hash-sharing provision to "*recurring* harmful material."[182]

Continuing their misreading, Plaintiffs protest § 509.053(b)(1)(B)—which requires the use of "filtering technology"—as it supposedly forces them to use an "outmoded, static checklist" for content moderation. It seems that Plaintiffs' members, at least the larger ones, have recently transitioned to filtering content via artificial intelligence.[183] But AI filtering fits comfortably within § 509.053(b)(1)(B)'s ambit.[184] And § 509.053(b)(1)(G) expressly contemplates that social media

---

[176] *AI Advances to Better Detect Hate Speech*, META (May 12, 2020) (discussing issues concerned with filter evasion, such as users intentionally misspelling certain terms), https://tinyurl.com/5xvubmyw.

[177] *How Review Teams Work*, META (Jan. 19, 2022) (discussing how Meta uses human-level monitoring), https://tinyurl.com/2wx2bc6j.

[178] *See, e.g.*, *Online Child Protection*, *supra* note 175; *NCMEC, Google and Image Hashing Technology*, GOOGLE, https://tinyurl.com/4sy4wmby.

[179] ECF 6, 24.

[180] *See Sharp v. House of Lloyd, Inc.*, 815 S.W.2d 245, 249 (Tex. 1991) ("Interpretations of statutes which would produce absurd results are to be avoided.").

[181] ECF 6, 24 (emphasis in original).

[182] Tex. Bus. & Com. Code § 509.053(b)(1)(C) (emphasis added).

[183] *See, e.g.*, *How Enforcement Technology Works*, *supra* note 174.

[184] *See Filter*, MERRIAM-WEBSTER (defining "filter" to include "software for sorting or blocking access to certain online material"), https://tinyurl.com/mubfzhyt;

companies will perform filtering via an "algorithm." HB 18 simply isn't dragging Plaintiffs back to the content-moderation stone age, despite what they want this Court to believe.

Moving on, Plaintiffs challenge § 509.053(b)(1)(G)'s algorithm disclosure requirement, claiming it will "enable malicious actors to evade moderation."[185] They cite their Veitch and Schruers declarations for this point.

Schruers did not address "moderation evasion." Instead, he chucks out the idea that unnamed "hostile foreign adversaries" and other scary sounding yet equally vague "advanced persistent threats" might use this information to somehow hurt "U.S. national security."[186] Such a bold claim cries out for elaboration, but Schruers gives none. Veitch's declaration likewise leaves readers thirsting for more. He contends that disclosure "could" create the "potential" that "malicious actors" would use the information to evade "moderation efforts."[187] Who are these "malicious actors"? What is the "potential" of misuse? How could one use an algorithm code to evade "moderation efforts"? Veitch never says.

There is a bigger problem with Plaintiffs' argument. They tout Meta as an exemplar of content moderation.[188] But Meta makes its algorithm code public.[189] Are they really claiming that the world's largest social media platform is currently endangering "U.S. national security"? If so, that would seem to be a reason for more government regulation of this trillion-dollar industry, not less. We could go on, but we won't. Plaintiffs' arguments against § 509.053(b) are meritless and should be treated as such.

### C.    Analysis of § 509.056.

---

[185] ECF 6, 24 (citing ECF 6-2, ¶ 19(f); ECF 6-4, ¶ 38).

[186] ECF 6-2, ¶ 19(f).

[187] ECF 6-4, ¶ 38.

[188] *See* ECF 6-2, ¶ 13(a).

[189] *XLM-R: State-of-the-Art Cross-Lingual Understanding Through Self-Supervision*, Meta (noting that Meta "open-sourc[es] our models and code, including its XLM-R model), https://tinyurl.com/4kw2c3xt; *AI Advances to Better Detect Hate Speech*, Meta (May 12, 2020) (explaining how Meta uses its XLM-R model for content-moderation purposes), https://tinyurl.com/5xvubmyw.

Section 509.056(1) requires providers that use "algorithms to automate the suggestion, promotion, or ranking of information to known minors" to reasonably ensure that the algorithm does not interfere with the provider's duties under § 509.053. This provision does not raise First Amendment issues independent of § 509.053(a). Thus, if this Court upholds § 509.053, it should also uphold § 509.056(1). Further, Plaintiffs do not directly challenge § 509.056(2), which requires certain disclosures about a provider's use of an algorithm.[190] This is likely because this provision is subject to the lenient *Zauderer*-level scrutiny.[191]

### D.      The "Harm to Minors" Sections are Not Preempted by 47 U.S.C. § 230.

Plaintiffs contend that § 230(c)(1) of the Communications Decency Act preempts the "Harm to Minors" sections. They assume CDA immunity applies because HB 18 liability touches on their content-moderation practices. That was a mistake, as we will show below.[192]

Section 230(c)(1) of the CDA states that "[n]o provider or user of an interactive computer service shall be treated as the *publisher* or speaker of any information provided *by another information content provider*."[193] This section immunizes digital providers when they act in their capacities as "publishers" of content provided by third parties.[194]

Section 230(f)(3) defines "information content provider" to mean "any person or entity that is responsible, in whole or in part, for the creation or *development* of information provided through the

---

[190] *Compare* ECF 1, pg. 26 (wherein Plaintiffs exclude § 509.056(2) from their "monitoring-and-censorship" claims), *with id.* at pg. 21 (wherein Plaintiffs include § 509.056 as part of their omnibus challenge to HB 18).

[191] *See Moody*, 144 S. Ct. at 2398.

[192] *See Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 409–10 (6th Cir. 2014) ("We have maintained that, despite the CDA, *some* state tort claims will lie against website operators acting in their publishing, editorial, or screening capacities.").

[193] 47 U.S.C. § 230(c)(1) (emphasis added).

[194] *Free Speech Coal., Inc.*, 95 F.4th at 284–86.

Internet or any other interactive computer service."[195] This creates an exception to § 230(c)(1).[196] A provider "develops" content when it "contributes materially to the alleged illegality of th[at] conduct."[197] Defendant contests whether Plaintiffs are "publishers" under § 230(c)(1) and "developers" under § 230(f)(3), although our argument mainly focuses on the latter.

It helps to identify (1) the unlawful act that gives rise to liability and (2) who is responsible for that act. Here, §§ 509.053 and 509.151 impose liability if providers do not adopt the required content-moderation "strategies." This is different than making a provider liable for damages a minor suffers from viewing harmful content posted by third parties.

In our situation, the provider is materially (if not solely) responsible for the unlawful act (not adopting certain strategies), which triggers § 230(f)(3)'s exception.[198] In the more common § 230(c)(1) scenario (think defamation),[199] the unlawfulness is stemming from the *content* of a *third party's* message. The provider usually is not responsible for the message's content, so § 230(f)(3) doesn't often apply in that context.[200] HB 18 does not make providers liable for damages minors suffer due to viewing harmful material. Thus, we are squarely outside of the more common scenario.

*Lemmon v. Snap, Inc.* is instructive. That case concerned whether § 230(c)(1) immunized a social media company (Snap) from a negligent design claim aimed at its smartphone application. The court found that "'§ 230(c)(1) cuts off liability only when a plaintiff's claim faults the defendant for

---

[195] 47 U.S.C. § 230(f)(3).

[196] *Jones*, 755 F.3d at 409.

[197] *Id.* at 410 (emphasis added); *see also id.* at 412 (noting other circuits that have applied this standard).

[198] *See, e.g.*, *McCall v. Zotos*, No. 22-11725, 2023 WL 3946827, at *2 (11th Cir. June 12, 2023) ("There may be several information content providers of a single piece of content, each responsible for its creation or development in part. If the claim is based on content that the interactive computer service developed, even if only in part, then the service could be held liable.") (citation omitted).

[199] *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir. 2009) ("The cause of action most frequently associated with the cases on section 230 is defamation.").

[200] *See, e.g.*, *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 127 (4th Cir. 2022); *Small Justice LLC v. Xcentric Ventures LLC*, 873 F.3d 313, 321 (1st Cir. 2017); *F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1199–1200 (10th Cir. 2009).
*See, e.g.*, *McCall v. Zotos*, No. 22-11725, 2023 WL 3946827, at *2 (11th Cir. June 12, 2023).

information provided *by third parties*."[201] The court noted that "internet companies remain on the hook when they create or develop their own internet content."[202] The court held that § 230(c)(1) did not bar the plaintiffs' suit, reasoning that their claims "rest[ed] on nothing more than Snap's own acts."[203]

In *Free Speech Coalition, Inc. v. Paxton*, the Fifth Circuit applied similar reasoning when it found that § 230 did not preempt Texas's age-verification requirement for pornographers (HB 1181). The Court looked at the source of the liability-producing harm and found that it was "not reliant on the harm done by third-party content."[204] Rather, "[HB 1181] impose[d] liability purely based on whether plaintiffs comply with the statute, independently of whether the third-party speech that plaintiffs host harms anybody."[205] The Fifth Circuit found that § 230 immunity did not extend to this situation,[206] even though the underlying regulation targeted "sexual material" content that was "harmful" to minors.[207] The Court found this situation "plainly different" from the scenario where a provider is made liable because "a minor circumvents age verification . . . and is subsequently harmed by third-party content."[208] The Fifth Circuit also mentioned a publisher's role being the "monitoring, screening, and deletion of content."[209] Yet it did so only when discussing other cases involving liability that directly stemmed from third-party content, as opposed to the defendant's own acts. Regardless, the Fifth Circuit's analysis fits snugly within a traditional § 230(f)(3) review, which doesn't turn on whether the provider is considered a "publisher."[210]

It is telling that Plaintiffs could not unearth a *single case* finding that § 230 preempts state

---

[201] *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1093 (9th Cir. 2021) (emphasis added).
[202] *Id.*
[203] *Id.* at 1094.
[204] *Free Speech Coal., Inc.*, 95 F.4th at 284.
[205] *Id.* at 285.
[206] *Id.* at 284–86.
[207] Tex. Civ. Prac. & Rem. Code § 129B.002(a).
[208] *Free Speech Coal., Inc.*, 95 F.4th at 285.
[209] *Id.* at 286.
[210] *See Lemmon*, 995 F.3d at 1093–94; *Jones*, 755 F.3d at 409.

regulations akin to this one. They cite *Doe v. MySpace* and *La'Tiejira v. Facebook*, but these are distinguishable as they involved plaintiffs attempting to make providers liable for damages caused by third parties.[211] And their last case (*Free Speech Coalition*) supports the State's position. This Court should find that § 230 does not preempt HB 18's "Harm to Minors" sections.

## V.   Four More Issues Concerning Plaintiffs' Motion for a Preliminary Injunction.

**Severability:** If the Court finds any HB 18 provision to be unconstitutional, it should sever only that provision. While hard to analyze in the abstract, there is one notable severability point about HB 18's "news, sports, and commerce" exemption. Even if Plaintiffs were right that this exemption triggers strict scrutiny for all of HB 18, their call for HB 18's entire invalidation is not the proper remedy. *Barr v. Am. Ass'n of Political Consultants, Inc.* highlights this point. There, the Supreme Court found that an exemption to the Telephone Consumer Protection Act created a content-based distinction and chose to sever that exemption rather than invalidate the entire act.[212] *Barr's* severance analysis would apply here.

**Prior Restraint:** Plaintiffs refer to HB 18 as a "prior restraint" nine times in their motion, trying to sneak into the "most exacting" level of scrutiny applied to such speech restrictions.[213] But their claims do not fall into the small class of cases that can properly be called "prior restraints"— mainly, administrative and judicial orders that forbid speech in advance of the time that speech would occur.[214] In short, nearly every regulation that limits speech does so before it occurs in a way. But not every regulation is considered a "prior restraint." The plaintiffs in *Coal. for Indep. Tech. Research v. Abbott* tried the same tactic; this Court rightly rejected it.[215]

---

[211] *Doe v. MySpace, Inc.*, 528 F.3d 413, 418–22 (5th Cir. 2008); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991 (S.D. Tex. 2017).

[212] *See Barr v. Am. Ass'n of Political Consultants, Inc.*, 591 U.S. 610, 616–36 (2020).

[213] ECF 6, 18–19, 23.

[214] *Gibson v. Tex. Dep't of Ins.--Div. of Workers' Comp.*, 700 F.3d 227, 234–35 (5th Cir. 2012).

[215] No. 1:23-CV-783-DII, 2023 WL 8582597 (W.D. Tex. Dec. 11, 2023).

**Age Verification:** Section 509.057 requires certain providers to verify that they are 18 or older before allowing them to access content on that service. Plaintiffs did not challenge this provision,[216] so we do not analyze it here. Instead, we reserve the right to present argument should Plaintiffs bring such a challenge.

**Other Preliminary Injunction Factors:** The remaining preliminary injunction factors will not meaningfully impact this case. The only notable point is Plaintiffs' lengthy delay in filing suit.[217] This Court has found shorter delays to weigh against issuing a preliminary injunction.[218]

### CONCLUSION

This Court should deny Plaintiffs' motion for a preliminary injunction.

---

[216] *See, e.g.*, ECF 1, pgs. 21, 26.

[217] *See NetChoice Disappointed to see Texas Violate First Amendment and Erode Parental Rights*, NetChoice (June 13, 2023), https://tinyurl.com/yw8u2c6z.

[218] *See Digerati Distribution & Marketing, LLC v. Sarl*, No. 1:22-CV-01302-DII, 2023 WL 5687040, at *3 (W.D. Tex. Aug. 2, 2023); *Career Colleges & Sch. of Tex. v. United States Dep't of Educ.*, No. 1:23-CV-433-RP, 2023 WL 4291992, at *5 (W.D. Tex. June 30, 2023).

Dated: August 16, 2024                    Respectfully submitted,

                                          **KEN PAXTON**
                                          Attorney General of Texas

                                          **BRENT WEBSTER**
                                          First Assistant Attorney General

                                          **RALPH MOLINA**
                                          Deputy First Assistant Attorney General

                                          **JAMES LLOYD**
                                          Deputy Attorney General for Civil Litigation

                                          **KIMBERLY GDULA**
                                          Chief, General Litigation Division

                                          */s/ Todd Dickerson*
                                          **TODD DICKERSON**
                                          Attorney-in-charge
                                          Assistant Attorney General
                                          Texas State Bar No. 24118368
                                          Todd.Dickerson@oag.texas.gov

                                          Office of the Attorney General
                                          General Litigation Division
                                          P.O. Box 12548, Capitol Station
                                          Austin, Texas 78711-2548
                                          (512) 936-1309 | Fax: (512) 320-0667

                                          *Counsel for Defendant*


### CERTIFICATE OF SERVICE

I certify that a copy of the document above was served on all counsel of record who have entered an appearance on August 16, 2024, using the Federal Court CM/ECF system.

*/s/ Todd Dickerson*